United States District Court
Southern District of Texas
FILED

SEP 15 2000

Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DIVISION OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHRISTOPHER E. P., B/N/F ROSE V. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. C-00-021 |
| | § | |
| CORPUS CHRISTI INDEPENDENT | § | |
| SCHOOL DISTRICT AND | § | |
| CITY OF COPRUS CHRISTI, TEXAS | § | |

## CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT'S
## MOTION FOR SUMMARY JUDGMENT

Defendant, Corpus Christi Independent School District ("District"), files its Motion for Summary Judgment requesting that the Court enter judgment in favor of the District pursuant to Rule 56 of the Federal Rules of Civil Procedure. Corpus Christi Independent School District will show that no genuine issues of material fact exist regarding Plaintiff's complaints, and that the District is entitled to summary judgment as a matter of law.

Plaintiff filed this suit alleging that the Corpus Christi Independent School District (and the City of Corpus Christi) violated the Americans with Disabilities Act, 42 U.S.C. §12132, the Rehabilitation Act of 1973, 29 U.S.C. § 7949, and the Individuals with Disabilities Education Act, 20 U.S.C. § 1415.

### SUMMARY JUDGMENT RECORD

In support of this motion, Defendant refers the Court to the pleadings and the depositions of Daniel Whitworth, Senja Robin West, and Rose V.

### BACKGROUND

Plaintiff, Rose V., brought this suit on behalf of her son Christopher. Christopher is "disabled" as the term is defined in the various Federal laws under which this suit was

1

brought. Christopher receives special education services from the Corpus Christi Independent School District during his attendance at public school. The Latch Key Program is an after-school child care program operated by the Parks and Recreation Department of the City of Corpus Christi. Rose V. has attempted to enroll Christopher in the City of Corpus Christi's Latch Key Program, an after school recreational day care program. Christopher was denied entry into the program. Christopher is now 12 years old and by age (and grade) will no longer be eligible to participate in the Latch Key Program.

The Latch Key Program is operated by the City of Corpus Christi to fill a need in the community for after-school supervision of children whose parent(s) are not home when school lets out. The Corpus Christi Independent School District is utilized for its facilities, and the Program is operated and administered by the City of Corpus Christi. Corpus Christi Independent School District has no role in the: (1) hiring or training of Latch Key staff; (2) the collection or division of fees; (3) compliance with the health or safety guidelines; or (4) the maintenance of state licensure requirements. Corpus Christi Independent School District is not required to provide any type of educational program for the Latch Key Program. [Whitworth Deposition; Ex. 1, pp 50-51]

The Latch Key Program is an after-school child care program operated by the Parks and Recreation Department of the City of Corpus Christi. In an interlocal agreement with the City of Corpus Christi, the Corpus Christi Independent School District agreed to provide buildings, utilities, and janitorial services for the Latch Key Program. [West deposition, Ex. 2, pp 8-9] Issues dealing with registration, staff hiring, and general management of the Latch Key Program are functions of the City of Corpus Christi. [West deposition; Ex. 2, pg 12]

## ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), the party moving for summary judgment has the initial burden of "informing the district court of the basis of its motions, and identifying those portions of [the summary judgment record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Cortrett*, *477 U.S. 317, 323 (1986)* The Court must review the competent summary judgment evidence, in a light, most favorable to the non-movant. However, no "genuine" issue exists if the evidence, so viewed as a whole, lacks sufficient probative value to support a reasonable jury's affirmative finding on the essential element in question. *Matsushita Electric Industrial Co. v. Zenith Radio Corp. 475 U.S. 574, 586-87 (1986)*

### B.    Education of Individuals with Disabilities
### (20 U.S.C. 1411-1420)

The Latch Key Program is not an "educational service" as defined by the Education with Disabilities Act ("IDEA").

Congress has listed the purposes of IDEA within the statute itself. A review of these purposes shows that IDEA concerns education, not child care. One purpose is "to ensure that all children with disabilities have available to them a free appropriate public education and related services designed to meet their unique needs and prepare them for employment and independent living." *20 U.S.C. § 1400 (d)((1)(A)* None of the stated purposes suggests that IDEA applies to an after-school child care program. Federal regulations interpreting IDEA reinforce the conclusion that IDEA does not apply to after-school child care. Like IDEA,

3

these regulations concern education, not child care.  IDEA and the federal regulations interpreting it focus upon providing a free appropriate education in public schools.

As the Latch Key Program does not fall within the definitions and intentions of the IDEA, the District cannot be held liable for any perceived violations of said act.  The cause of action against the Corpus Christi Independent School District under the IDEA should be dismissed.

**C.    The Americans with Disabilities Act.**

**(42 U.S.C. 12131)**

Plaintiff has complained that the Latch Key Program operates in violation of the Americans with Disabilities Act.  Plaintiff has stated that there is no problem with the physical accessibility to the school building.  There is no issue as to accessibility with the school building structure, including the ramps and doors.  [Rose V. deposition; Ex. 3, pp 15-16]

Given no genuine issue of material fact regarding the physical accessibility of the school building itself, as the owner of the building, Corpus Christi Independent School District has complied with the ADA provisions.  The federal regulation in 28 CFR § 35.102 makes reference to the applicability of the ADA to "all services, programs, and activities provided or made available by public entities."  The Latch Key Program is not (1) provided by, (2) a program of, or (3) an activity made available by the Corpus Christi Independent School District.  The cause of action against the District under the ADA should be dismissed.

**D.    Section 504 of the Rehabilitation Act of 1973.**

**(29 U.S.C. 794)**

There is some confusion given the code section noted on Plaintiff's pleadings.  This discussion assumes the correct review is addressed in the regulations of 34 CFR § 104.  The

4

City of Corpus Christi Latch Key Program is not a program or activity that receives Federal financial assistance. The Latch Key Program is not a Corpus Christi Independent School District program or activity.

34 CFR § 104.3 defines Federal finance assistance as "any grant, loan, contract, or any other arrangement by which the Department of Education provides or otherwise makes available assistance in the form of:

(1)     Funds
(2)     Services of Federal personnel or
(3)     Real and personal property or any interest in or use of such property including:
          (i)     Transfers or leases of such property for less than fair market value or for reduced consideration; and
          (ii)     Proceeds form a subsequent transfer of such property if the Federal share of its fair market value is not returned to the Federal Government.

The City of Corpus Christi Latch Key Program is funded through the fees collected by the participants [Whitworth deposition; Ex. 1, pp 4-5]  Again, Corpus Christi Independent School District does not operate this Latch Key Program or its activity. With regard to the accessibility of facilities, Plaintiff has asserted that there is not an issue or problem of this nature. [Rose V. deposition Ex. 3, pp 15-16]  The cause of action against the District under Section 504 of the Rehabilitation Act of 1973 should be dismissed.

## PRAYER

The Corpus Christi Independent School District respectfully requests that the Court grant this Motion for Summary Judgment and enter an Order dismissing this case, with prejudice.

Respectfully submitted,

CORPUS CHRISTI INDEPENDENT
   SCHOOL DISTRICT
P. O. Box 110
Corpus Christi, Texas 78403
TELEPHONE: (361) 886-9067
FACSIMILE:  (361) 844-0283


BY: _____
LINDA FLORES RESENDEZ
Federal Bar No. 12591
State Bar No. 07164490
ATTORNEY FOR RESPONDENT


## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of September, 2000, a true and correct copy of the above and foregoing pleading was served to the following:

Mr. Les Cassidy
Woolsey & Cassidy
1020 Bank of America Center North
500 North Water Street
Corpus Christi, Texas 78471
Telephone: 361/887-2965
Facsimile:  361887-6521

**U. S. Mail**
**Return Receipt Requested**
Receipt No. 391 242 152

Mr. Andrew Quittner
Assistant City Attorney
City of Corpus Christi
P. O. Box 9277
Corpus Christi, Texas 78469-9277
Telephone:  361/880-3360
Facsimile:   361/880-3239

**U. S. Mail**
**Return Receipt Requested**
Receipt No. Z 391 242 153


Linda Flores Resendez

6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DIVISION OF TEXAS
# CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER E. P., B/N/F ROSE V.** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. C-00-021** |
| | § | |
| **CORPUS CHRISTI INDEPENDENT** | § | |
| **SCHOOL DISTRICT AND** | § | |
| **CITY OF COPRUS CHRISTI, TEXAS** | § | |

**STATE OF TEXAS**

<b>AFFIDAVIT</b>

**COUNTY OF NUECES**

Before me, the undersigned authority, personally appeared Linda Flores Resendez, who, being by me duly sworn, deposed as follows:

"My name is Linda Flores Resendez, I am over 18 years of age, of sound mind, capable of making this affidavit and personally acquainted with the facts herein stated:

Attached hereto are true and correct copies of the original depositions of Daniel Whitworth dated August 4, 2000, labeled Exhibit 1 consisting of 60 pages; Senja Robin West dated August 4, 2000, labeled Exhibit 2 consisting of 25 pages; and Rose V. dated June 22, 2000, labeled Exhibit 3 consisting of 34 pages.  These are exact duplicates of the original depositions taken in the above-referenced cause of action."

_____
Affiant

SWORN TO AND SUBSCRIBED before me on this the 15th day of September, 2000.

PRISCILLA M. CASALL
Notary Public
STATE OF TEXAS
My Comm Exp April 21, 2001

_____
Notary Public, State of Texas
My commission expires: 4-21-2001

Case 2:00-cv-00021   Document 29   Filed in TXSD on 09/15/2000   Page 8 of 40

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CHRISTOPHER E.P., b/n/f    *
ROSE V.,               *
      Plaintiff,     *
                   *
VS.               *  NO. C-00-021
                   *
CORPUS CHRISTI INDEPENDENT *
SCHOOL DISTRICT and CITY  *
OF CORPUS CHRISTI, TEXAS,  *
      Defendants.    *

--------------------------------------------------

ORAL DEPOSITION OF

DANIEL WHITWORTH

August 4, 2000

**CONDENSED**

--------------------------------------------------

    ORAL DEPOSITION OF DANIEL WHITWORTH, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above styled and numbered cause on the 4th day of August, 2000, from 9:06 a.m. to 10:39 a.m., before Sandra M. Allen, CSR in and for the State of Texas, reported by machine shorthand, at 1201 Leopard Street, Fifth Floor, Corpus Christi, Texas, pursuant to the Federal Rules of Civil Procedure, and the provisions stated on the record or attached herein.



*Depositions Etc.*

EXHIBIT

VIDEO SERVICE • PROCESS SERVING • INTERPRETERS • ASCII DISK • CONDENSED • COURIER •

Office: (361) 883-9990 • Fax: (361) 883-9991 • E-mail: DeposEtc@aol.com
500 N. Water St. • Suite 612 South Tower • Corpus Christi, Texas 78471

## Page 2

1        A P P E A R A N C E S
2    ATTORNEY FOR PLAINTIFF:
3        LES CASSIDY
             Woolsey & Cassidy, P.C.
4            1020 North Tower
             500 North Water Street
5            Corpus Christi, Texas 78741
6    ATTORNEY FOR DEFENDANT CCISD·
7        LINDA FLORES-RESENDEZ
             801 Leopard Street
8            P.O. Box 110
             Corpus Christi, Texas 78401
9
     ATTORNEY FOR CITY OF CORPUS CHRISTI, TEXAS:
10
         ANDREW L. QUITTNER
11           1201 Leopard Street, Fifth Floor
             P.O. Box 9277
12           Corpus Christi, Texas 78469-9277
13   ALSO PRESENT: Robin West
                      Rosie Vasquez
14                    Marcia West
15   REPORTED BY: Sandra M. Allen, CSR No 7509
16
17            I N D E X
18   EXAMINATION OF DANIEL WHITWORTH:          PAGE
19       By Mr. Cassidy           3, 52
         By Mr. Quittner             49
20       By Ms. Flores-Resendez          50
21
                      INITIAL
22   EXHIBIT(S)               REFERENCE
23   (None.)
24
25

## Page 4

1        DANIEL WHITWORTH,
2    having been first duly sworn, testified as follows:
3                EXAMINATION
4    BY MR. CASSIDY:
5        Q    Please state your name for the record.
6        A    Daniel Whitworth.
7        Q    What is your address?
8        A    3267 Austin Street.
9        Q    In Corpus Christi?
10       A    In Corpus Christi.
11       Q    And the zip code?
12       A    78404.
13       Q    How long have you lived there?
14       A    About 17 years.
15       Q    How are you employed?
16       A    I'm assistant director of programs for the Park
17   and Recreation Department, City of Corpus Christi.
18       Q    And what does that job description involve?
19       A    I oversee senior community services, recreation
20   programs, cultural services, juvenile assessment center,
21   Weed and Seed Program.
22       Q    Where does the Latchkey Program fit in?
23       A    It fits in under the recreation division.
24       Q    Who do you report to?
25       A    Tony Cisneros, the director of Parks and

## Page 5

1    Recreation.
2        Q    What is your relationship with the Latchkey
3    Program?  What do you do for the Latchkey Program, or
4    with it?
5        A    I provide administrative oversight for the
6    program.
7        Q    And what does that mean?
8        A    It means I deal with them on policy issues, and
9    the overall program guidelines all get reviewed by
10   myself.  I have a superintendent of recreation and a
11   Latchkey Program supervisor that also work within the
12   program.  That's the hierarchy.
13       Q    Okay.  Let's talk about that.  You are the head
14   as the administrator; is that right?
15       A    Correct.
16       Q    And then beneath you, you have two supervisors?
17       A    Recreation superintendent, who has several
18   program areas that she's responsible for, athletics,
19   aquatics, the Latchkey Program, and recreation centers.
20       Q    What is her name?
21       A    Linda Hodge, H-o-d-g-e.
22       Q    And the other supervisor?
23       A    The Latchkey Program supervisor, we just hired a
24   new lady, I'm sorry, I can't recall her name off the top
25   of my head.

## Page 6

1        Q    Who was the previous Latchkey --
2        A    Steve Ramos.
3        Q    Now, did Steve Ramos report to Linda Hodge?
4        A    Yes.
5        Q    And what was Steve Ramos' job title?
6        A    Program manager.
7        Q    And was that specific to the Latchkey Program?
8        A    Yes.
9        Q    What does the program manager do?
10       A    Direct responsibility for the operation of the
11   program.
12       Q    Is Steve Ramos still employed with the city?
13       A    No, he is not.
14       Q    When did he leave employment with the city?
15       A    I can't give you that date off the top of my
16   head.
17       Q    What is your best recollection?
18       A    Sometime, say, within the last four months or
19   so, I would think.
20       Q    Why did he leave employment with the city?
21       A    He retired.
22       Q    Does he still live in Corpus Christi?
23       A    I assume so.  I do not know.
24       Q    Do you know how to contact him, if you need to
25   reach him?

## Page 7

1    A    We have his last known address.
2    Q    Do you know where he lives?
3    A    I don't know off the top of my head, no.
4    Q    What information do you have about where he
5    lives?
6    A    We've got his personnel file that would have his
7    address at the time that he was employed.
8    Q    Okay.  Did Steve Ramos have any city employees
9    working with him on the Latchkey Program?
10   A    Yes.
11   Q    How does the hierarchy continue then, moving
12   downward from Steve Ramos?
13   A    There is an assistant program supervisor.
14   Q    And who is that?
15   A    At the current time, it is acting in charge,
16   Isabell Huerta.
17   Q    Now, did you say at this time or at that time?
18   A    I said at this time.
19   Q    And how long has she been the assistant program
20   supervisor?
21   A    I don't know the dates.  Whenever she came in
22   there.  Adam Rodriguez was the prior incumbent in that
23   position.
24   Q    Is Adam Rodriguez still employed with the city?
25   A    No, he is not.

## Page 8

1    Q    And why did he leave his employment with the
2    city?
3    A    He resigned.
4    Q    Do you know why he resigned?
5    A    I believe he was going to pursue some
6    educational opportunities in San Antonio.
7    Q    Do you know how long ago it was that he
8    resigned?  Not the exact date but --
9    A    Not without going back and looking at some
10   records.
11   Q    What's your best recollection of the month or
12   time of year that he left -- and year?
13   A    Before Christmas.
14   Q    Of last year?
15   A    Yes.
16   Q    All right.  What was Adam Rodriguez's job as the
17   assistant program supervisor?
18   A    He assisted Mr. Ramos in the Latchkey Program
19   operations.
20   Q    Did he coordinate some sort of communication
21   between the city and some other department, or other
22   employees?
23   A    We have 31 latchkey sites that we run for an
24   after-school program that are staffed, and all the
25   details involved with the program are, you know, whether

## Page 9

1    it is purchasing of the materials for the sites, doing
2    the employee management for those directly assigning
3    people to those sites, those are the kinds of things that
4    they do.
5    Q    Okay.  These 31 latchkey sites, where are they
6    located?
7    A    Throughout the city.
8    Q    At the schools?
9    A    Through CCISD and through Flour Bluff ISD.
10   Q    Is every site located at a school?
11   A    Yes.
12   Q    And are these elementary schools and middle
13   schools?
14   A    Elementary.
15   Q    These are all elementary schools?
16   A    Correct.
17   Q    Who funds the Latchkey Program?
18   A    The people that participate in the program.
19   Q    Any other source of funding?
20   A    No.
21   Q    So that I understand your information exactly,
22   the Latchkey program is entirely funded by participants
23   in the program?
24   A    By the fees that we charge the participants,
25   correct.

## Page 10

1    Q    And no other funds?
2    A    That is correct.
3    Q    Does the Latchkey Program pay your salary?
4    A    No.
5    Q    Does it pay for Linda Hodge?
6    A    No.
7    Q    Does it pay for -- or did it pay for Steve
8    Ramos?
9    A    Yes.
10   Q    So at the level of Steve Ramos is where the
11   funding from the Latchkey Program was used exclusively?
12   A    Correct.
13   Q    Linda Hodge, what was the funding for her pay?
14   A    General fund.
15   Q    I believe I read in the paper within the last
16   three months that the Latchkey Program received a grant,
17   or the after-school program received a grant.  Do you
18   recall any information like that?
19   A    No, I do not.
20   Q    Are any grant funds used in the Latchkey
21   Program?
22   A    No, sir.
23   Q    Any federal assistance of any type?
24   A    No, sir.
25   Q    Why does the City of Corpus Christi participate

## Page 11

1  in a Latchkey Program?
2      A   To offer -- to try to fill a need that was
3  identified in the community.
4      Q   And what was the need?
5      A   For some recreational opportunities for kids who
6  have either dual working parents or single parent
7  families, and would be going home to a house
8  unsupervised.
9      Q   Who identified that need?
10     A   There was a survey that was done several years
11 ago that I think the Chamber of Commerce and the city and
12 the school district, I think -- I don't remember the
13 specifics of the group that put together the coalition
14 that put together the survey that determined the
15 community need.
16     Q   Has the city applied for any grants to fund the
17 Latchkey Program?
18     A   Not to my knowledge, no.
19     Q   How long has the city operated a Latchkey
20 Program?
21     A   I don't remember the exact date we started.  I
22 think it was probably -- I think it's probably been
23 operating for about 10 years, but I would have to go back
24 to my file to get the exact date for when they started
25 the first program.

## Page 12

1      Q   Why does the city operate the program in the
2  schools?
3      A   Because it is easier for us to do that.  We
4  don't have recreation facilities that would be sufficient
5  to handle the program with our existing recreation
6  centers.
7      Q   Does the city lease the buildings from the
8  school?
9      A   No.
10     Q   What is the financial relationship between the
11 city and the school for the operation of the Latchkey
12 Program?
13     A   The school district provides us with the
14 facility to operate the program.
15     Q   What else?
16     A   That's what the school district provides.
17     Q   Is the facilities to operate the program?
18     A   Yes.
19     Q   Who was responsible with the city for setting
20 policy for student eligibility to participate in the
21 Latchkey Program?
22     A   I was.
23     Q   Did you work with anyone else?
24     A   I worked with representatives from our Legal
25 Department and from our Human Resources Department.

## Page 13

1      Q   Why did you work with someone from the Human
2  Resources Department?
3      A   Because that's where the ADA coordinator for the
4  city for -- Americans with Disabilities Act coordinator
5  for the city was housed.
6      Q   And who was that?
7      A   David Ramos.
8      Q   What about the Legal Department?  Who did you
9  work with in the Legal Department?
10     A   Allison Galloway.  She is no longer employed.
11     Q   When was the policy set for eligibility for
12 participation in the Latchkey Program?
13     A   Again, I can't give you an exact date.  I think
14 we have been operating under our current scenario
15 probably for three to four years, maybe a bit longer.  I
16 don't recall specifically.
17     Q   Is the first requirement for eligibility to be
18 in the Latchkey Program that the student be enrolled in
19 CCISD?
20     A   No.
21     Q   So it is open to students who are not enrolled
22 -- or not students -- it is open to children who are not
23 enrolled within CCISD?
24     A   Our program begins when the child is checked
25 into the program.

## Page 14

1      Q   Who funds the scholarship program?
2      A   The participants in the program.  The fees are
3  structured so that the costs of the program are covered
4  by the participants.
5      Q   What's the total budget for the program, for
6  last year?
7      A   I can give you next year.  That's what I've been
8  working with.  I think it is around 1.7 million.  That's
9  inclusive of both after-school and summer Latchkey.
10     Q   And the 1.7 million is funded directly from the
11 participants?
12     A   From fees.
13     Q   What was the budget last year?  Was it more or
14 less than 1.7 million?
15     A   Less.  I don't remember the number though,
16 without going to the budget book.
17     Q   So the budget has increased?
18     A   Um-hum.
19     Q   Are you anticipating more participation?
20     A   We increased the fees by $5 across the board.
21     Q   Why did you increase the fees by $5?
22     A   To add additional staff to the sites, to deal
23 with the paperwork.
24     Q   You said add additional staff at the sites?
25     A   In order to deal with the paperwork.

## Page 15

1    Q   And what else?

2    A   That's why we added the staff.

3    Q   To deal with the paperwork only?

4    A   Well, the paperwork and the interactions with

5    the parents as they are coming in for checking in and

6    checking out, those types of things.

7    Q   How is the -- how many people do you intend to

8    add to the staff?

9    A   31. One at each site.

10   Q   Now, is it your testimony under oath that these

11   people that are going to be added to these sites are not

12   going to deal with supervision of the children?

13   A   No. We are adding staff to the sites in order

14   to free up an individual to deal with the parents and the

15   paperwork and the receiving of moneys, so that they will

16   not have to -- those individuals will not have to deal

17   with the kids directly, so that their time can be spent

18   directly on that activity.

19   Q   All right. So by increasing the funding for the

20   program, you are directly or indirectly providing for

21   more supervision for the children?

22   A   I would not see it that way, no.

23   Q   Well, the people that are going to be doing this

24   paperwork, you said are going to free up someone.

25   A   The people that we put out there, the new person

## Page 16

1    that's put out at the site, will free up that person who

2    was doing that, to do exclusively this other job. So I

3    don't view that as increasing the supervision for the

4    kids. It is an equal trade-out, because it is allowing

5    for the paperwork to be handled by this individual

6    exclusively.

7    Q   Okay. Well, I think I see it differently, but

8    I'm not going to argue with you about it. If you are

9    going to free up someone to spend more time supervising

10   the children, then aren't you increasing the amount, or

11   the -- the time spent with staff with the children?

12   A   I'm taking care of some paperwork problems -- I

13   understand what you are saying, but I don't see it that

14   way. I think I see it as having the same staffing able

15   to be fully dedicated to the kids.

16   Q   And no longer involved in the paperwork?

17   A   Correct.

18   Q   Okay. So in effect, by adding an additional

19   staff member at each site who is going to be exclusively

20   involved in paperwork, is that your testimony --

21   A   They will probably be doing some other things.

22   Q   What other things would they be doing?

23   A   They may be making arrangements for materials to

24   be ordered, and they will be dealing with some of our

25   paperwork as far as our accounting attendance and

## Page 17

1    scholarships and those kinds of things. They may be --

2    they may be, if we have a shortage of staff that day,

3    someone calls in sick, then they may have to actually

4    provide for direct supervision with the kids.

5    Q   Okay. All right. So to summarize what you are

6    saying, you are adding additional staff members at every

7    site, and it is expected that this will result in

8    additional supervision for the children at the site?

9    A   I guess under the scenario that you are

10   describing, yes. I don't view it exactly what way, but I

11   understand what you are saying.

12   Q   Okay. And I understand why you don't view it

13   that way.

14        Let me ask you some questions about the

15   determination of student eligibility.

16   A   Okay.

17   Q   You said you made that determination?

18   A   Um-hum.

19   Q   Did you also make the determination as to the

20   number of staff at the latchkey sites?

21   A   It is governed by our license with the

22   Department of Protective and Regulatory Services.

23   Q   And what does that license require?

24   A   I believe it is around a 1 to 20 ratio.

25   Q   Does that present any problems for supervision

## Page 18

1    of the children?

2    A   What do you mean by problems?

3    Q   Problems for students with special needs.

4    A   It prevents us from being able to provide a

5    program that would have a less than 1 to 20 ratio of

6    supervision, i.e., there are some -- in order to

7    participate in the Latchkey Program, we have some

8    guidelines which are required to participate. The

9    Latchkey Program was never established to be and

10   all-inclusive program.

11   Q   When you say all-inclusive, what do you mean?

12   Nondiscriminatory?

13   A   No. I mean the kids that participate in the

14   program are required to participate at a certain level

15   that's identified at registration.

16   Q   And the students that aren't eligible are not

17   permitted to participate in the program?

18   A   If they are unable to meet those guidelines. We

19   do have individuals with special needs that participate

20   in the Latchkey Program successfully.

21   Q   Do they meet the guidelines?

22   A   Yes.

23   Q   So the point is that the guidelines are a

24   threshold requirement for a child to participate in the

25   Latchkey Program?

## Page 19

1   A   Correct.

2   Q   One of the requirements that you have is that

3   the child must have the mental and physical abilities of

4   a five-year-old?

5   A   Correct.

6   Q   What are the mental and physical abilities of a

7   five-year-old?

8   A   We have not had a case where that's been called

9   into question.  I don't have a specific yardstick --

10  normally it would be that they would be functioning at

11  that level.

12  Q   Well, is that requirement then presumed that the

13  child would not have disabilities?

14  A   No.

15  Q   Well, what disabilities would be allowed?

16  A   Anyone that can participate within the

17  guidelines that we have set out for the program.  I mean,

18  I can give you examples of the types of disabilities or

19  conditions that some of the children who have

20  successfully participated in the program have been.

21          We've had individuals within wheelchairs.

22  We've had Downs' syndrome.  We've had Teret's syndrome.

23  We've had -- I don't want to give you misinformation.  I

24  don't know if we had some sight, visually impaired or

25  not, I'm not certain, but we've had a variety of

## Page 20

1   different types of disabilities that kids have had, but

2   they have been able to meet those guidelines and they

3   have been successful within the program.

4   Q   Who determines whether a child applicant has --

5   meets the requirements?

6   A   We have a form at registration that gives a

7   brief description of the program and what the guidelines

8   are.  And if there is a request for special

9   accommodations, then we request that the parent work with

10  the physician to go through that and identify for us

11  whether they think the child can participate within those

12  guidelines.

13  Q   With regard to the requirements that you have,

14  the requirement that the child has the mental and

15  physical abilities of a five-year-old, I understand that,

16  but what you are saying is there are no guidelines or no

17  restrictions on that?

18  A   If we had concerns about that, then I believe

19  that there are probably some methods that we could use

20  going back through the physician to make some

21  determinations on that.

22  Q   Have you turned down children from participation

23  in the Latchkey Program?

24  A   Yes.

25  Q   On what basis?

## Page 21

1   A   In some cases, they have been discipline

2   problems, haven't been able to comply with the guidelines

3   in terms of not preventing any kind of a risk for

4   themselves or for others.  And in some cases, we have had

5   them unable to be able to meet the guidelines for the

6   program, either not being able to deal with their own

7   toileting issues, not being able to deal with their own

8   medication issues, and not be able to reach some type of

9   a reasonable accommodation that would allow for that

10  participation.

11  Q   For example, what disabilities have been

12  excluded?

13  A   I can't give you off the top of my head.  I

14  would have to go back and look at some files to see.  I

15  don't have that information off the top of my head.

16  Q   Who made that determination?

17  A   In some cases, the staff at the site.  If there

18  is discipline issues, they go through a process of trying

19  to work with the parents to resolve those, and if it

20  doesn't get resolved, then the child is excluded from the

21  program.

22  Q   When we are talking about discipline issues, the

23  child has already been eligible --

24  A   Yes.

25  Q   -- but somehow his behavior after eligibility

## Page 22

1   disqualifies him?

2   A   Right.

3   Q   We are talking about children not being admitted

4   into the program, at least for purposes of this

5   deposition.

6   A   Okay.

7   Q   Who makes the decision within the city that a

8   child is not eligible to be in the program?

9   A   If we receive a request for special

10  accommodations, which is what I'm assuming that you are

11  talking about, then we have the committee involving the

12  Legal Department, Human Resources Department, and myself,

13  that will review the request for special accommodations

14  and respond back to that.

15  Q   Now, the form that you have for requests for

16  special accommodations requires that a physician sign a

17  statement that the child meets the eligibility

18  requirements?

19  A   That's correct.

20  Q   And if -- if it is submitted without that

21  concession by the physician, then the child is not

22  eligible?

23  A   I think it would depend on what the request for

24  the accommodation was, but if it requires -- we require

25  the physician's signature on the request for special

## Page 23

1   accommodations. It is not an optional kind of a thing.
2   So we normally -- we want the parent to work with their
3   physician to review the guidelines and make the
4   determination whether the child can participate under
5   those guidelines.
6          If they are going to need accommodations to
7   do that, then that's what that form is used for.
8   Q   Okay. But the special accommodation form
9   contains the same requirements as the application
10  form?
11  A   It outlines the program that we offer, yes.
12  Q   All right. As a City of Corpus Christi, to your
13  knowledge, ever been the subject to a lawsuit based upon
14  the administration of the Latchkey Program?
15  A   Yes.
16  Q   Other than this case?
17  A   Yes.
18  Q   When was that?
19  A   I don't know the date.
20  Q   What was the subject matter of that lawsuit?
21  A   It was an ADA compliance.
22  Q   Is the case still pending?
23  A   No.
24  Q   How was it resolved, if you know?
25  A   I'm not certain if I'm using the correct

## Page 24

1   terminology, but I think it was a summary judgment.
2   Q   Was it filed in state or federal court, if you
3   know?
4   A   I have no idea. I don't know.
5   Q   How long ago was that?
6   A   Maybe three or four years ago, something like
7   that.
8   Q   Any others?
9   A   No.
10  Q   Has the city identified any benefit to children
11  participating in the program with participation with
12  students with disabilities?
13  A   I'm not sure if I understood the question.
14  Q   Okay. Has the -- strike that. Let me start it
15  this way.
16          Were you involved in setting the goals and
17  the objectives of the Latchkey Program?
18  A   No.
19  Q   Who was?
20  A   When the program started, I'm hesitating because
21  of the dates. I'm not exactly sure who was here because
22  of the turnover we had in staff, I think it may have been
23  Mike Gordon, who was probably over the recreation
24  programs at that time as the assistant director, and he
25  was probably involved with some of that.

## Page 25

1   Q   Who is Mike Gordon?
2   A   He's a former employee that worked for us. I
3   mean, I know what the goals were. They were to provide a
4   recreational program for kids at the end of the school
5   day for -- that would otherwise be going home alone.
6   Q   Okay. And it is basically providing after-
7   school care for these children?
8   A   It was, from our view, to provide a recreational
9   program that would allow for these kids to have
10  supervised recreational programs in lieu of going home
11  alone.
12  Q   All right. You're familiar with the
13  requirements, aren't you, for kids in the Latchkey
14  Program?
15  A   Yes, sir.
16  Q   One of the requirements is that the child be
17  able to administer his or her own medication?
18  A   Correct.
19  Q   And what does that mean?
20  A   That they would have to deal with their
21  medicines themselves.
22  Q   Does the Latchkey Program provide any assistance
23  to these children in administering their medication?
24  A   No, sir.
25  Q   So these children carry their own medication?

## Page 26

1   A   In some cases, like with asthma, then they carry
2   their own medications. In other cases, the medications
3   are held at the desk and the children have to go and drop
4   them off or pick them up from there.
5   Q   Well, what supervision does the staff provide to
6   the children who are administering their own medication?
7   A   I'm not sure that I understand the question.
8   The kids are supposed to be responsible for their own
9   medications.
10  Q   But what does that exactly mean?
11  A   That if they have to take medications at
12  specific times, that they know that, and that they take
13  their medications at those times.
14  Q   And the staff and the Latchkey Program provide
15  no assistance to these children with regard to that?
16  A   No, sir.
17  Q   What exactly do the staff of the Latchkey
18  Program do?
19  A   We offer a recreational program.
20  Q   But what does that mean? What exactly do you
21  do?
22  A   We do arts and crafts. We do outside games. We
23  do videos or movies at times. We supervise the kids in
24  playing games.
25  Q   And if a child has a special need where he needs

Page 27

1    to take a medication at, say, 3 o'clock, or 3:30, during
2    the hours of the Latchkey Program, the staff don't assist
3    the child in taking the medication?
4        A    No, sir.
5        Q    Do -- does the staff of the Latchkey Program
6    hold the medication?
7        A    In some cases, they may hold the medication
8    after the child brings it in, and then the child will
9    check it back out.
10       Q    And why would they do that?
11       A    Simply for keeping it away from the other kids.
12       Q    And what about dosage?  Does the staff get
13   involved in --
14       A    No, sir.
15       Q    So if a child had been prescribed a potentially
16   dangerous medication, an elementary child, then he would
17   be permitted to administer that medication on his own?
18       A    I couldn't answer that.  To participate in our
19   program, we don't deal with administration of
20   medications.  So, I'm not -- I'm not -- I'm not sure I'm
21   understanding your question.  If a child --
22       Q    I'm trying to understand the program, really.
23       A    It is easy.  It is a recreational program for
24   kids who would be going home otherwise to a house by
25   themselves, where they have structured recreational

Page 28

1    activities.
2        Q    Okay.  The program describes a safe
3    professionally supervised environment.
4        A    Um-hum.
5        Q    What does that mean?
6        A    It means that we have staff there to monitor the
7    kids in the recreational program that we are offering
8    that would be there to supervise and structure the
9    program for the kids, have them participate.
10       Q    And what does the staff do to make it safe?
11       A    We try to keep the kids from doing things that
12   would harm them, and we try to keep them in activities
13   that are safe for them to play.
14       Q    It describes basic survival skills necessary in
15   today's society.  That's one of the things the program
16   tries to provide?
17       A    That's what we call being able to get along with
18   each other.  That's a basic skill.  A lot of folks don't
19   have it.
20       Q    A basic survival skill?
21       A    Um-hum.
22       Q    Okay.  It says professionally supervised.  Who
23   were the professionals, and what is their professional
24   training?
25       A    The Texas Department of Protective and

Page 29

1    Regulatory Services has some requirements for some hours
2    of training.  I can't recall the exact number of hours
3    that they have.  And so the staff are given an
4    orientation at the beginning of each program year, and we
5    go through with them the city policies and procedures
6    that they need to follow.
7            We are hiring primarily paraprofessionals
8    from the school district, or college students, or senior
9    citizens, or individuals.
10       Q    So you would hire paraprofessionals from the
11   school district?
12       A    If they apply.
13       Q    The other aspect of the program tries to provide
14   is quality recreational experiences and enhance the
15   child's leisure skills, including arts, drama, games, and
16   weekly special events?
17       A    Yes.
18       Q    Is there a program schedule that the staff
19   follows?
20       A    There is -- yes, I think they have one.
21       Q    Who determines what the program schedule is?
22       A    They work that through the program manager and
23   the assistant program manager, and the area supervisors
24   -- the area supervisors that have two or three schools
25   assigned to their supervision.

Page 30

1        Q    And how many people are employed by the city in
2    the Latchkey Program?
3        A    I think we have eight full-time staff members,
4    and then we have a lot of seasonals, what we call
5    seasonals, part-time.  I don't know the exact number of
6    FTEs for the Latchkey Program right now.
7        Q    When you say seasonal, you are describing the
8    people that are actually employed in the Latchkey Program
9    during -- at the time the program is in progress?
10       A    Correct.
11       Q    So when I asked how many employees, how many
12   would that be?
13       A    I would have to go back and get that number.  I
14   don't know how many seasonal staff we have hired for
15   Latchkey.
16       Q    What's your best understanding?  More than 100?
17       A    I don't know if it is going to be more than 100.
18   There will be a minimum of 60 or 65 at the very least,
19   and it is more than that, but I don't know the exact
20   number.
21       Q    Okay.  Is there a minimum number of staff people
22   per site?
23       A    By our policy, we have two staff members at
24   every site.
25       Q    A minimum of two staff members at every site

## Page 31

1  regardless of the enrollment?
2     A   Yes.
3     Q   Why do you have a policy for two staff members?
4     A   So that we can control our liability.
5     Q   What do you perceive to be the liability?
6     A   If we have a single staff person out there, and
7  there were allegations of any type of misconduct on the
8  part of the employee, then we would be at a disadvantage.
9  So we have two staff members at every site. We strive to
10  have a male and a female at each site, but we don't
11  always have enough applicants to do that, but we have two
12  at each site.
13     Q   Why do you strive to have a male and female at
14  each site?
15     A   For purposes of safety and the kids can be
16  comfortable.
17     Q   How does that have anything to do with safety?
18     A   Because some kids interact with a male or a
19  female better. For our purposes, it just seems to make
20  good sense to have two staff members out there so that
21  you have two people on site that are watching what's
22  going on.
23     Q   But that doesn't explain the gender preference
24  for a male and a female, as it might relate to safety?
25     A   Maybe it does not relate to safety then.

## Page 32

1     Q   Is the preference to have male and female staff,
2  like you said?
3     A   If we can, um-hum.
4     Q   And is that because the staff may be involved in
5  assisting the children with their hygiene?
6     A   No. We do not do that.
7     Q   What was the basis for the decision to set the
8  requirement that the childe be able to handle his or her
9  own personal hygiene?
10     A   It set the parameters of the program that we
11  were offering.
12     Q   Did you understand, when you set that as a
13  parameter, that some students would be excluded?
14     A   The program was never intended to be a universal
15  type of program. It was a recreational program, and you
16  had to comply with those guidelines in order to
17  participate in the program.
18     Q   Why was the decision made to have it be a
19  noninclusive program, as you've described it earlier?
20     A   Because that was what we were programming for.
21     Q   I understand that, but why were you programming
22  it --
23     A   Because that was the need that was out there,
24  that we perceived. It is apparently successful because
25  we've got some 2,000 -- 1,800 kids participating in the

## Page 33

1  program, so we feel like we are meeting a community need.
2     Q   But wouldn't a child with disabilities have that
3  same need?
4     A   Some do. Some participate in the program.
5     Q   And then my question is, why was it determined
6  that the program would not be all inclusive of all
7  children enrolled in CCISD?
8     A   I don't have an answer for that question. I
9  don't -- we set out the program parameters for the
10  program that we were offering.
11     Q   Okay. Well, then it is your understanding, or
12  you know this, that there are children who have the same
13  needs in terms of an after-school program that aren't
14  eligible for the Latchkey Program?
15     A   Yes, I know there are kids out there like that,
16  um-hum.
17     Q   Do you know how many children there are out
18  there?
19     A   I have no idea.
20     Q   Do you know why it was decided that not every
21  child enrolled in CCISD would be eligible to participate
22  in this Latchkey Program?
23     A   One of the decisions was that this is a fee-
24  based program. The participants pay for the program. We
25  go by our license guidelines as far as staff to

## Page 34

1  participate ratio, that is laid out in the license, and
2  we try to structure the fee schedule so that we can do
3  that. And so our guidelines are compatible with those
4  staffing requirements and our abilities with revenues.
5     Q   What would it cost to make the program all-
6  inclusive?
7     A   I don't know. That's not the program that we
8  are offering. I have never attempted to work out a
9  budget for that.
10     Q   What would be the additional cost -- or excuse
11  me -- is it your testimony that this program cannot be
12  made all-inclusive?
13     A   You would have to give me some more information
14  before I could answer that question. Under the
15  guidelines that we have set and the fee structure that we
16  have set, I would think it could not be.
17     Q   What financial information was considered about
18  the increased cost of making this program all-inclusive?
19     A   I don't know that we ever tried to make that
20  determination.
21     Q   What additional benefit would there be to the
22  children who are eligible for the program, as it stands
23  now, to be involved with children with disabilities that
24  are not eligible?
25     A   I don't know how to answer that.

## Page 35

1    Q   Was that a consideration?

2    A   No.

3        MR. CASSIDY:  We'll take a break and we

4    may go on.  I think we are more than halfway through, if

5    you want to know.

6        THE WITNESS:  All right.

7        (Off the record from 10:02 am to 10:08 am.)

8    Q   (By Mr. Cassidy)  Mr. Whitworth, what

9    information do you have about Rose Vasquez's son, Chris,

10   and his disability?

11   A   Only what is in the Request for Special

12   Accommodations form.

13   Q   Did you ever have any discussions with Rose

14   Vasquez about her son's disability?

15   A   Other than in terms of getting the Request for

16   Special Accommodations form sent in, no.

17   Q   What is your understanding of what his

18   disability is?

19   A   I do not know.

20   Q   How many conversations have you had with

21   Ms. Vasquez concerning the eligibility of her son

22   participating in the program?

23   A   If I'm recalling correctly, I may have had two

24   telephone conversations.

25   Q   Why did her son need a request for special

## Page 36

1    accommodations?

2    A   It is part of the registration package that was

3    given to everyone that registers for the program.  The

4    parents determine the need to request special

5    accommodations.

6    Q   Okay, but why was she discussing that with you,

7    if you know?

8    A   I think she was trying to -- I think I was

9    talking to her when she was questioning whether a

10   determination had been made on the Request for Special

11   Accommodations form, if I recall correctly.

12   Q   Why did her son need a special accommodation?

13   A   I would have to look at the form.  I don't

14   remember what her request was.  I believe it was for

15   having one-to-one supervision or something.  I would need

16   to look at the form to see.

17   Q   Would you allow a child to participate in the

18   program with an assigned paraprofessional?

19   A   With a caregiver assigned?

20   Q   Right.

21   A   Yes, we would do that at the parent's expense?

22   Q   Does it necessarily have to be the parent's

23   expense?

24   A   It would.  We don't have the ability to provide

25   that within our program.

## Page 37

1    Q   In other words, that would be a special

2    accommodation that would not be provided?

3    A   The accommodation would be to allow the

4    caregiver to come on-site in the licensed area during the

5    program time frame.

6    Q   Okay.  But the accommodation would not be for

7    the program to provide that supervision?

8    A   No, sir.

9    Q   And why is that?

10   A   Because we do not have the wherewithal to do

11   that.

12   Q   How much would that cost?

13   A   I don't know.

14   Q   And what's the basis of your statement that you

15   do not have the wherewithal to do that?

16   A   Because we have funding to staff approximately a

17   1 to 20 staff ratio.

18   Q   In the budget of $1.7 million, you don't have

19   the ability to provide more direct supervision for

20   individuals with disabilities that otherwise wouldn't

21   meet the requirements?

22   A   That's correct.

23   Q   And how do you know that?

24   A   Because the budget is promulgated along certain

25   staffing levels that reach that amount of money, and so

## Page 38

1    the staffing level that we are working with is the DPRS

2    guidelines.  So additional staff obviously costs money,

3    and that money is not budgeted in there.

4    Q   Okay.  But as I understood your testimony, no

5    calculation has been made as of today as to what that

6    would cost for this child?

7    A   I have not made that calculation.

8    Q   Does the Latchkey Program operate within budget?

9    A   We try to.

10   Q   What's the answer?  Did it operate within budget

11   last year?

12   A   Yes.

13   Q   Has it ever operated over budget?

14   A   Yes.

15   Q   When?

16   A   I would have to go back and look to see.

17   Q   Last year, it was operated within the budget?

18   A   Correct.

19   Q   Was there a surplus?

20   A   I would have to go back and look at my numbers

21   to see for sure.

22   Q   Who would have that information?

23   A   Budget office or myself.  I mean, I can get it

24   from the files, but I don't have it off the top of my

25   head.

## Page 39

1  Q   If someone were to ask for that information,
2  what specifically with they need to ask for?
3  A   I guess the ending balance for the last fiscal
4  year.
5  Q   To the Latchkey Program?
6  A   Um-hum.
7  Q   Who keeps those records?
8  A   We have a finance department and budget office
9  that maintains those records.
10  Q   Is the financing department the same as the
11  budget office?
12  A   No.
13  Q   What's the difference between the financing
14  department and the budget office?
15  A   The budget office is charged with the
16  establishment of the budget, and the finance department
17  monitors those expenses during the year.
18  Q   Is the same information provided to the
19  budgeting department that the financing department has?
20  A   No. If you are asking about how it operates,
21  your budget is set at the beginning of the year, and then
22  the actual expenditures that take place are tracked
23  through the finance department. So in one case, you are
24  setting up a plan, a budget, and the other is the actual
25  day-to-day operational costs of tracking that. So it is

## Page 40

1  not the same information in the sense that the numbers
2  rarely come exactly as they have been planned.
3  Q   But then a report is made at some point, and the
4  actual numbers are returned to the budgeting department?
5  A   Yes, from finance.
6  Q   And you use that information for the next year?
7  A   Correct.
8  Q   So if we were looking for the information, we
9  could go to the budgeting department?
10  A   We just ended our fiscal year in July, so they
11  are in the process of doing that right now.
12  Q   Are the surplus funds returned to the program,
13  or do they go to the general revenue?
14  A   They would go into the general fund.
15  Q   Skipping around, but going back to your
16  conversations with Ms. Vasquez, do you recall
17  specifically what she told you her son's disability was?
18  A   No, I do not.
19  Q   Do you recall any information about her son's
20  disability?
21  A   No, I do not.
22  Q   Did you make a determination as to whether her
23  son would benefit by participation in the program?
24  A   No.
25  Q   Would that be relevant to your consideration as

## Page 41

1  to his eligibility?
2  A   No. We were looking at whether or not they
3  could comply with the program guidelines, or if the
4  request for special accommodation could be met.
5  Q   Do you know why her son is not admitted into the
6  program?
7  A   No.
8  Q   Why was the -- what information was relied upon
9  by the city in determining that the minimum requirement
10  was the physical and mental ability of a five-year-old?
11  A   I believe we looked at some DPRS guidelines and
12  some of their licensing requirements, and we made a
13  determination that that was the age group that we wanted
14  to try to deal with.
15  Q   Where are those guidelines today?
16  A   Where are the DPRS guidelines?
17  Q   Right. I mean, was -- is there a file or some
18  compilation of this information that was reviewed and
19  relied upon by the city to make the determination of
20  eligibility requirements?
21  A   The Department of Protective and Regulatory
22  Services has some guidelines that are specific to
23  different age groups of children, and I believe what we
24  did was we determined 5 was going to be the minimum age
25  that we would be able to deal with in the program.

## Page 42

1  Q   So you looked at what those guidelines were, and
2  then a decision was made that we would -- the cut-off
3  would be 5?
4  A   Correct.
5  Q   Why was a decision made to cut it off at 5?
6  A   Because for some of the younger kids, there are
7  some requirements that we couldn't meet through our
8  program.
9  Q   And what would be those requirements?
10  A   They have them for infants all the way through.
11  This was the same licensing that occurs for people that
12  keep kids in their homes, or KinderCare, or any of these
13  other organizations, and it was at an age group that that
14  was not what our program was, and we didn't have the
15  ability to deal with that.
16  Q   Okay. So as I understand it, the program was
17  conceptualized first?
18  A   Um-hum.
19  Q   And based upon that program, you wanted to look
20  at eligibility requirements?
21  A   Um-hum.
22  Q   And it was determined that based upon how the
23  city wanted to administer the program and fund it, that
24  this cut-off at the 5 would be appropriate --
25  A   Correct.

## Page 47

1    Q   Okay.  Do you know what it would cost -- and I
2    may have asked this question, but I want to make sure I
3    got the answer.  Do you know what it would cost to make
4    this program all-inclusive to the children enrolled in
5    the elementary schools in CCISD?
6    A   No.
7    Q   Do you know whether it would cost 50 cents a day
8    more per child or --
9    A   I have no idea.  I would assume it would be much
10   more than 50 cents.
11   Q   Was a determination ever made as to what it
12   would cost?
13   A   No, because that was not the program that we
14   were offering.
15   Q   Then it would be fair to say that the Latchkey
16   Program, as it is administered in the Corpus Christi
17   Independent School -- as the program is held on school
18   grounds, does discriminate against the students of the
19   school based upon their disability?
20        MR. QUITTNER:  Objection.  Calls for a
21   legal conclusion.
22   Q   (By Mr. Cassidy)  You can answer the question.
23   A   Would you repeat it?
24   Q   The Latchkey Program, the way it is
25   administered by the city, discriminates among students

## Page 48

1    based upon their disabilities?
2    A   No, it does not.
3    Q   Well, you said it was not all-inclusive.
4    A   Certainly, but the program was never designed to
5    be.  In order for it to be discriminatory, we would have
6    had to try to structure something that excluded it from
7    the program parameters that were set.  Within the program
8    parameters, whoever can comply with those guidelines,
9    participates in the program.  And that includes, in cases
10   -- in some cases, kids that have special needs, as well
11   as kids who do not have speech needs.
12        It is not -- it was never intended to be a
13   program that was going to take any and all individuals
14   that came in whether they could meet the guidelines or
15   not.
16   Q   I understand what you are saying, but here is --
17   A   It is a critical point.
18   Q   But here is the critical point.  According to
19   the registration information which you've sent out --
20   A   Um-hum.
21   Q   -- the students eligible to participate in the
22   program, first of all, must be enrolled in the school?
23   A   Okay.
24   Q   But not every child who is enrolled in the
25   school can participate in the program?

## Page 49

1    A   Right.
2    Q   Because some children may have a disability that
3    is so severe that it excludes them from your program?
4    A   That they are unable to participate within the
5    guidelines of the program?
6    Q   Exactly.  Is that correct?
7    A   That's correct.  It is a city recreation program
8    that we are offering.
9    Q   Did you participate in any discussions with
10   anyone from the school district about the exclusionary
11   effect of these eligibility requirements?
12   A   No.
13   Q   Did anyone from the city participate in the
14   discussion with anyone from the school district, to your
15   knowledge --
16   A   No.
17   Q   -- about that?
18   A   (Witness shook head.)
19   Q   Was there a scholarship program available to
20   students whose disabilities would exclude them from
21   meeting the requirements?
22   A   No.
23        MR. CASSIDY:  Pass the witness.
24        MS. FLORES-RESENDEZ:  I just have a couple
25   of questions.

## Page 50

1        EXAMINATION         10:28 a.m.
2    BY MS. FLORES-RESENDEZ:
3    Q   My name is Linda Flores-Resendez.  I'm an
4    attorney for the district.
5    A   Yes, ma'am.
6    Q   This discussion about children who register for
7    Latchkey being enrolled with the district, you do not
8    have a Latchkey Program at every elementary school that
9    CCISD has; is that correct?
10   A   That's correct.
11   Q   Children who attend Latchkey do not have to be
12   registered in CCISD to register for Latchkey?
13   A   I don't believe so.
14   Q   Mutual and private schools, children in schools
15   that don't have a latchkey site, that will maybe move
16   over to where there is a program; is that correct?
17   A   We have had cases where we have had students
18   enroll, or children enrolled in the program that did not
19   attend that campus.
20   Q   Correct.  And with regard to the administration
21   of the Latchkey Program, CCISD had no responsibility for
22   any hiring or training of your staff; is that correct?
23   A   That's correct.
24   Q   They don't collect fees, they don't pay
25   expenses; is that correct?

**Page 51**

1   A   That's correct.
2   Q   They are not responsible for complying with any
3   of your health or safety guidelines?
4   A   That's correct.
5   Q   And they are not involved in maintaining any of
6   your state required licenses for the program; is that
7   correct?
8   A   That's correct.
9   Q   And CCISD is not required to provide any type of
10  educational program for the Latchkey?
11  A   That's correct.
12      MS. FLORES-RESENDEZ:  Thank you.  I have no
13  other questions.
14      MR. QUITTNER:  I have a few.
15      EXAMINATION      10:30 a.m.
16  BY MR. QUITTNER:
17  Q   Going back to the -- I guess I should identify
18  myself just for the record.  This is Andy Quittner, the
19  attorney for the City of Corpus Christi.
20      Going back to the guidelines, or actually
21  rules provided by the Texas Department of Protective and
22  Regulatory Services, do those rules mandate the child to
23  staff ratio?
24  A   They have minimum standards, yes, sir.
25  Q   And do those standards vary with the age of the

**Page 52**

1   child that participates?
2   A   Yes, sir.
3   Q   And was the selection of a five-year-old child,
4   then, made in part because of those ratios and the
5   costs --
6   A   Yes, sir.
7   Q   -- associated?  How many days does the Latchkey
8   operate?
9   A   The after-school Latchkey Program operates on
10  all days that the districts that we are involved with are
11  having classes, and then we have a summer Latchkey
12  Program, which is an all-day type of situation from 7 to
13  6:30 during the summertime.
14  Q   So that would be approximately 180 school days
15  plus the summer?
16  A   Correct.
17  Q   And how many hours a day during the school does
18  it operate?
19  A   It operates from 3 to 6 on most campuses, and
20  2 to 6, I think on some.
21  Q   So would the cost then of a one-to-one caretaker
22  be at least that hourly rate for whatever the period of
23  time the child was registered?
24  A   Correct.
25  Q   Does the Texas Department of Protective and

**Page 53**

1   Regulatory Services have any rules regarding the
2   qualifications or education level of a staff member that
3   would be giving medications or things like that to a
4   child?
5   A   I don't know.
6   Q   Just a couple more.  Have any other children who
7   needed a one-to-one paraprofessional applied for
8   participation in the Latchkey Program?
9   A   I'm uncertain, but I believe that we have had
10  some cases where that has been requested, and I think in
11  some cases that has been taken advantage of by the
12  parent.
13  Q   And have all of those cases been treated
14  equally?  That is, they would provide their own --
15  A   If there is a cost.
16      MR. QUITTNER:  Nothing further.
17      EXAMINATION      10:33 am
18  BY MR. CASSIDY:
19  Q   Do you actually know who paid the cost for the
20  paraprofessional?
21  A   I just know that it was not the program.
22  Q   Okay.  Who pays for the utilities in the
23  facilities where the Latchkey Program is held?
24  A   The school district.
25  Q   I do have some more questions.

**Page 54**

1       Do you know how many children are excluded
2   from participation in the program because of the
3   eligibility requirements adopted by the city?
4   A   No, sir.
5   Q   You are aware that some children are excluded
6   though; is that correct?
7   A   Some children cannot meet our guidelines.
8   Q   Do you know what the additional cost would be to
9   the city to -- let me put it this way.  I take it then
10  you have no opinion, and actually no idea of what the
11  cost would be to make the program inclusive of all
12  children with disabilities?
13  A   I do not know what that cost would be.
14  Q   The need for the Latchkey Program is a need that
15  both the city has -- you want these children supervised
16  after school; is that correct?
17  A   We were filling a need in the community by
18  having the Latchkey Program, yes.
19  Q   And the need is also a need that the parents or
20  the guardians would have for the children enrolled in the
21  program?
22  A   I would assume that's why they are
23  participating.
24  Q   Right.  And that need is equal to children with
25  disabilities as to children without disabilities.  If

## Page 55

1 they have a working parent, the parent needs someone to
2 be with the child, regardless of the child's
3 disabilities; is that right?
4   A  I would assume they have similar needs, yes.
5   Q  The basis, then, for the decision to exclude
6 children who don't meet the requirements was purely a
7 budgetary decision?
8   A  The decision was based upon the program that we
9 were offering, and the guidelines of what it took to
10 participate in that program.  Anyone who could comply
11 with those guidelines could participate in the program.
12   Q  Okay.  The program, though, was designed to
13 provide elementary children with an after-school
14 recreational program that would be supervised?
15   A  Correct.
16   Q  That's the program?
17   A  Within the guidelines that we have set, yes.
18   Q  And then a decision was made that some students
19 would be eligible and some would not based upon their
20 physical and mental abilities?
21   A  No.  The guidelines for the program were
22 established, and to participate in the program, then the
23 kids had to meet those guidelines, and everyone who could
24 comply with those guidelines was accepted into the
25 program.

## Page 56

1   Q  All right.  But that decision wasn't based upon
2 a determination of the cost to the program?
3   A  The cost to the program, or the program costs
4 from the program's inception have always been promulgated
5 on the fees covering those costs.  So any program
6 development that we did had to be able to be borne by the
7 revenues from the program.
8   Q  Whether it was all-inclusive or not?
9   A  Whatever the program was, the cost had to be
10 covered by the participant revenue.
11   Q  And if the program -- if the decision had been
12 made to make the program all-inclusive, the cost of the
13 program would still have to be born by the participants?
14   A  Um-hum.
15   Q  But no determination has been made by the city
16 as to what it would cost to make the program all-
17 inclusive?
18   A  That's correct.
19     MR. CASSIDY:  That's all I have.
20     MS. FLORES-RESENDEZ:  No further questions.
21     MR. QUITTNER:  Nothing further.
22     (The deposition concluded at 10:39 a.m.,
23     on August 4, 2000.)
24
25

## Page 57

1       CHANGES AND SIGNATURE
2 PAGE LINE CHANGE       REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11
12   I, DANIEL WHITWORTH, have read the foregoing
deposition and hereby affix my signature that this
13 deposition is true and correct, except as noted above.
14
                    _____
15                   DANIEL WHITWORTH
                    DEPOSITION DATE: August 4, 2000
16
STATE OF TEXAS      *
17 COUNTY OF _____ *
18   Before me _____, on this day personally
appeared DANIEL WHITWORTH, known to me or proved to me on
19 the oath of _____, or through
                    (description of identity card) to be
20 the person whose name is subscribed to the foregoing
instrument and acknowledged to me that he executed the
21 same for the purposes and consideration herein expressed.
22   Given under my hand and seal of office this _____
day of _____, 2000.
23
24                  _____
                   Notary Public, State of Texas
25                 My Commission Expires:_____

## Page 58

1     IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2         CORPUS CHRISTI DIVISION
3 CHRISTOPHER E.P., b/n/f  *
ROSE V.,                 *
4      Plaintiff,  *
                        *
5 VS            * NO C-00-021
                        *
6 CORPUS CHRISTI INDEPENDENT *
SCHOOL DISTRICT and CITY *
7 OF CORPUS CHRISTI, TEXAS, *
       Defendants.  *
8
        REPORTER'S CERTIFICATION
9    DEPOSITION OF DANIEL WHITWORTH
            August 4, 2000
10
   I, Sandra M. Allen, Certified Shorthand Reporter in
11 and for the State of Texas, hereby certify to the
following:
12   That the witness, DANIEL WHITWORTH, was duly sworn
by the officer and that the transcript of the oral
13 deposition is a true record of the testimony given by the
witness;
14   That the deposition transcript was submitted on
_____ to the attorney for DANIEL
15 WHITWORTH for examination, signature, and return to
Depositions, Etc. by _____
16   That the amount of time used by each party at the
deposition is as follows:
17
   LES CASSIDY -      (1:22)
18   LINDA FLORES-RESENDEZ - (0:02)
   ANDREW QUITTNER -    (0:03)
19
   That pursuant to information given to the deposition
20 officer at the time said testimony was taken, the
following includes all parties of record.
21
   LES CASSIDY, Attorney for Plaintiff
22   LINDA FLORES-RESENDEZ, Attorney for Defendant CCISD
   ANDREW QUITTNER, Attorney for Defendant City of
23     Corpus Christi, Texas
24
25

**DEPOSITIONS ETC.**
**361- 883-9990**

## Page 59

```
1       I further certify that I am neither counsel for,
     related to, nor employed by any of the parties in the
2    action in which this proceeding was taken, and further
     that I am not financially or otherwise interested in the
3    outcome of the action
         Further certification requirements pursuant to Rule
4    203 of TRCP will be certified to after they have
     occurred.
5
         Certified to by me this 8th day of August, 2000.
6
7                    _____
                     SANDRA M. ALLEN, CSR
8                    Certification No. 7509
                     Expiration Date:  12-31-00
9
                     DEPOSITIONS, ETC.
10                   Suite 612 South Tower
                     500 North Water Street
11                   Corpus Christi, TX  78471
                     (361) 883-9990
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 60

```
1           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                CORPUS CHRISTI DIVISION
3    CHRISTOPHER E.P., b/n/f   *
     ROSE V.,                  *
4           Plaintiff,         *
                               *
5    VS.                       *  NO. C-00-021
                               *
6    CORPUS CHRISTI INDEPENDENT *
     SCHOOL DISTRICT and CITY  *
7    OF CORPUS CHRISTI, TEXAS, *
            Defendants.        *
8
         FURTHER CERTIFICATION UNDER RULE 203 TRCP
9            DEPOSITION OF DANIEL WHITWORTH
                   August 4, 2000
10
         The original deposition _____ was _____ was not
11   returned to the deposition officer;
12       If returned, the attached Changes and Signature page
     contains any changes and the reasons therefor;
13
         If returned, the original deposition was delivered
14   to LES CASSIDY, custodial attorney,
15       That $_____ is the deposition officer's
     charges to Plaintiff for preparing the original
16   deposition transcript and any copies of exhibits.
17       That the deposition was delivered in accordance with
     Rule 203.3, and that a copy of this certificate was
18   served on all parties shown herein and filed with the
     Clerk.
19
         Certified to by me this _____ day of _____,
20   2000.
21                   _____
                     SANDRA M. ALLEN, CSR
22                   Certification No. 7509
23                   Expiration Date:  12-31-00
                     DEPOSITIONS, ETC
24                   Suite 612 South Tower
                     500 North Water Street
25                   Corpus Christi, TX  78471
                     (361) 883-9990
```

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CHRISTOPHER E.P., b/n/f      *
ROSE V.,                     *
          Plaintiff,         *
                             *
VS.                          *      NO. C-00-021
                             *
CORPUS CHRISTI INDEPENDENT   *
SCHOOL DISTRICT and CITY     *
OF CORPUS CHRISTI, TEXAS,    *
          Defendants.        *

------------------------------------------------------------

ORAL DEPOSITION OF

SENJA "ROBIN" WEST                    **CONDENSED**

August 4, 2000

------------------------------------------------------------

ORAL DEPOSITION OF SENJA "ROBIN" WEST, produced as
a witness at the instance of the Plaintiff and duly
sworn, was taken in the above styled and numbered cause
on the 4th day of August, 2000, from 10:?? .m. t. ??:?9
a.m., before Sandra M. Allen, CSR in and for the State of
Texas, reported by machine shorthand, at 120? Leopard
Street, Fifth Floor, Corpus Christi, Texas, pursuant to
the Federal Rules of Civil Procedure, and the provisions
stated on the record or attached herein.



*Depositions Etc.*

EXHIBIT
2

VIDEO SERVICE • PROCESS SERVING • INTERPRETERS • ASCII DISK • CONDENSED • COURIER • STA?

Office: (361) 883-9990 • Fax: (361) 883-9991 • E-mail: DeposEtc@aol.com
500 N. Water St. • Suite 612 South Tower • Corpus Christi, Texas 78471

## Page 2

1    A P P E A R A N C E S
2  ATTORNEY FOR PLAINTIFF.
3    LES CASSIDY
       Woolsey & Cassidy, P.C.
4      1020 North Tower
       500 North Water Street
5      Corpus Christi, Texas  78741
6  ATTORNEY FOR DEFENDANT CCISD:
7    LINDA FLORES-RESENDEZ
       801 Leopard Street
8      P.O. Box 110
       Corpus Christi, Texas  78401
9
   ATTORNEY FOR CITY OF CORPUS CHRISTI, TEXAS:
10
     ANDREW L. QUITTNER
11     1201 Leopard Street, Fifth Floor
       P.O. Box 9277
12     Corpus Christi, Texas  78469-9277
13 ALSO PRESENT: Rosie Vasquez
       Marcia West
14
   REPORTED BY:  Sandra M. Allen, CSR No. 7509
15
16
17    I N D E X

18 EXAMINATION OF SENJA "ROBIN" WEST·              PAGE
19   By Mr. Cassidy                      3
     By Mr. Quittner                     --
20   By Ms. Flores-Resendez              --
21
                    INITIAL
22 EXHIBIT(S)            REFERENCE
23   (None.)
24
25

## Page 5

1    A    817 Crestview, Corpus Christi.

2    Q    And the zip code?

3    A    78412.

4    Q    How long have you lived there?

5    A    27 years.

6    Q    How long have you worked for the city -- or the

7  school district?

8    A    Five years.

9    Q    And as the liason between the school district

10 and the city on the Latchkey Program, what exactly do you

11 do?

12   A    I facilitate between city and school district

13 staff in the review of the Interlocal Cooperation

14 Agreement every year.  And then, during the program year,

15 if barriers or problems arise, I will facilitate the

16 resolution of those problems dealing with facility and

17 site usage.

18   Q    Have you had any discussions with anyone from

19 the city concerning the exclusion of CCISD students from

20 participation in the Latchkey Program based upon

21 disability?

22   A    No.

23   Q    Are you aware that there are children enrolled

24 in the school district as students who are not eligible

25 to participate in the Latchkey Program because of their

## Page 4

1       SENJA "ROBIN" WEST,

2    having been first duly sworn, testified as follows:

3               EXAMINATION

4  BY MR. CASSIDY:

5    Q    Please state your full name for the record.

6    A    Senja Ann West.  Nickname, Robin.

7    Q    How did you get the nickname Robin?

8    A    Well, it was given to me by the nurses at the

9  hospital where I was born.  It was June.  It has nothing

10 to do with Senja Ann.  And I don't tell that story often.

11 It is on public record.

12   Q    How are you employed?

13   A    I'm an employee of the Corpus Christi

14 Independent School District.

15   Q    And your job title is?

16   A    Consultant for business and community

17 partnerships.

18   Q    As part of your jobs -- as part of your job

19 duties in that job description, do you negotiate with the

20 city on the Latchkey Program?

21   A    I coordinate or I am liason between the city and

22 the district for the Latchkey Program.

23   Q    I'm going to ask you some questions about that,

24 and before I do, I want to finish up the basic background

25 stuff.  What is your address?

## Page 6

1  disability?

2    A    No.

3    Q    Have you reviewed the eligibility requirements

4  of the city for students to participate in the Latchkey

5  Program?

6    A    Within the parameters of the agreement and the

7  brochures that they publish every year, that's my

8  knowledge.

9    Q    Is it your knowledge now that there are students

10 enrolled in CCISD who are not permitted to participate in

11 the Latchkey Program because of their disability?

12   A    I understand that there are application

13 processes that all potential participants go through, and

14 that the city establishes those parameters and manages

15 and coordinates them, and my knowledge ends basically

16 there.

17   Q    Have you reviewed the documents, including the

18 form for special accommodations?

19   A    I don't believe so, no.

20   Q    Does the school district have a policy which

21 would prohibit programs which use their facilities from

22 discriminating against people based on their disability?

23   A    I know of no such policy, no.

24   Q    Is Mr. Whitworth correct that the school

25 district provides the facilities to the program without

## Page 7

1  charge?

2      A   Yes.

3      Q   And the facilities that are provided, these are

4  buildings and premises which belong to the school

5  district?

6      A   Yes.

7      Q   And the funding for the operation of these

8  buildings and the maintenance of the premises is public

9  funding?

10     A   I believe so, through the school district, yeah,

11  um-hum.

12     Q   Why does the school district allow the city to

13  operate the Latchkey Program on its property?

14     A   The school district allows application from any

15  source, or resource in the community to access school

16  district properties for the betterment of community

17  welfare.  Latchkey is there among many, and has the

18  opportunity to access and use the facilities the school

19  district has.

20          Their particular instance was after school

21  -- a program for after-school recreation and care of

22  children.

23     Q   Children that are enrolled in the school?

24     A   By our agreement, there are no necessarily -- I

25  don't think it is necessary right now.  It has to be by

## Page 8

1  the school district, just children.

2      Q   Do you know the answer to that?

3      A   I would say no, I don't know the answer

4  specifically.

5      Q   Is there any benefit to the children enrolled in

6  the school district for participation in the Latchkey

7  Program?

8      A   As a response to a parent's need for after care

9  -- after-school care, for that child not to go home again

10  to an empty household for security and safety purposes,

11  yes, we believe there is a need.

12     Q   Has the school district provided a

13  paraprofessional to enable a student to participate in

14  the Latchkey Program?

15     A   I have no knowledge of that.

16     Q   Is there any policy that you're aware of which

17  would prohibit the school district from providing

18  paraprofessional assistance --

19     A   I have no knowledge of that.

20     Q   -- in the Latchkey Program?

21     A   I have no knowledge of that.

22     Q   Who would know the answer to that?

23     A   I would assume someone from the Office of

24  Academics who may be working with our special

25  populations, or possibly our Legal Department.

## Page 9

1      Q   What is the cost to the school district by

2  allowing Latchkey Program?

3      A   The school district facility costs involve

4  utilities, gas, electricity, maintenance, of course, of

5  just the site, for instance, floorkeeping, making sure

6  that the site is safe.  We pay for custodial costs, and

7  we also pay for some custodial supply costs.

8      Q   Who at the school district would make an

9  assessment as to the cost to the district by permitting

10  the Latchkey Program to operate?

11     A   Our business office, the superintendents of

12  business office would handle that.  Determinations are

13  often made by the director of energy services, so it

14  comes from the business office.

15     Q   Do you know if that determination has been made,

16  or would be made?

17     A   There is rest kept on all of our usage, I'm

18  sure.  We did a study about a year or so ago, and we do

19  have some figures that we have for that study.  They

20  would be accessible, again, through the office of the

21  business office.

22     Q   What is your recollection as to the cost?  I'm

23  not asking you what it is, but what do you recall the

24  cost?

25     A   I would recall around -- for a year's worth of a

## Page 10

1  school year program, a Latchkey Program, our utility

2  costs, custodial costs, incurred costs without specific

3  line items budgeted, would have been around 800,000, I

4  believe.

5      Q   So, in effect, by participating in the Latchkey

6  Program with the city, or allowing the Latchkey Program

7  to operate on its premises, the district subsidizes that

8  program indirectly, maybe up to $800,000?

9      A   I would suggest it is not subsidizes.  We just

10  incur costs, utility costs for the program as we would

11  any other program that has asked for that option with us.

12     Q   Are those costs passed on to the city?

13     A   No.

14     Q   Do you have an opinion as to whether the

15  Latchkey Program should be all-inclusive, which means

16  that every student eligible -- every student enrolled in

17  CCISD should be eligible to participate in the Latchkey

18  Program?

19     A   My opinion is that within the parameters of the

20  program, and the goals and objectives that were

21  established for it, it is a working and successful

22  program, and I think the school district is pleased with

23  its success.  That is strictly my opinion based upon

24  review every year.

25          Other than that, I couldn't give you a

## Page 11

1  further answer, because we are dealing then into
2  policies.
3      Q   Does the school district have any concern that
4  the eligibility requirement for student participation
5  excludes CCISD students because of their disability?
6      A   The eligibility parameters within the agreement,
7  again, are the responsibility of the city and are up for
8  review every year.  If notification comes of some other
9  considerations, then we would certainly sit down and
10  discuss that.  But within the parameters of the agreement
11  and the program as it exists now, those responsibilities
12  lie with the city, and we would honor them.
13      Q   Would it cost the school district anything more
14  than what it currently is absorbing to require that the
15  city make their program all-inclusive?
16      A   That would take study, because we are talking
17  about facility costs, and I would not know right now what
18  additional participation would include, the facility
19  costs.  I would have to find out.
20      Q   Do you contemplate, as we sit here in this
21  deposition, that there would be any additional cost to
22  the school?
23      A   Well, based upon the numbers of usage per site,
24  then I would assume there possibly could be some
25  additional costs.

## Page 12

1      Q   The additional costs that you are contemplating
2  is just the incremental costs?
3      A   Um-hum, usage to site -- right, usage to site,
4  custodial additional costs.  Those types of facility
5  costs, yes, would possibly increase.
6      Q   But not additional costs because of the
7  disability of the child?
8      A   I don't believe so, no.  We are dealing with
9  facility site costs.  That's numbers usually, and the
10  amount of space you are using for maintenance and so
11  forth.
12      Q   Do you know what the child, who is the subject
13  of this suit, what his disability is?
14      A   I have no knowledge of that.
15      Q   Is it your understanding that he is a student
16  enrolled in CCISD?
17      A   I, in fact, don't even know that.
18      Q   What is the purpose of having a liaison between
19  the school district and the city for the Latchkey
20  Program?
21      A   Well, the CCISD responsibilities regarding
22  facility usage, for one thing, we want to be sure that we
23  offer a safe site and safe environment at those sites.
24  Sometimes that means that a Latchkey staff person or
25  administration would tell us about a site safety issue,

## Page 13

1  and that needs to facilitate back to somebody within the
2  school district who can correct that problem.
3          So rather than have five different names in
4  the school district to call for energy problems or
5  backed-up sewage, or having to deal with that -- possibly
6  they need to move a group of children within the building
7  because of some other activities going on in the school
8  building, it is easier to have one person than to have to
9  have five different phones numbers and to try to reach
10  someone.
11          So in that respect, I'm able to communicate
12  and provide access to the proper person within the
13  district to resolve the facility and site questions.
14      Q   Okay.  Beyond facility and site questions, did
15  the school district review the program goals and
16  objectives and requirements of the city?
17      A   Reviewed them in the perspective, again, that we
18  want to provide a safe environment, yes.  And that we
19  want to be sure that we do address, again, this concept
20  of a benefit to the community, yes.  But for procedural
21  and protocols dealing with registration, with staff
22  hiring, management of the program, that again is a city
23  function, not a district function.
24          So again, reviewing the parameters of the
25  program, basically that site parameters is what we

## Page 14

1  review.
2      Q   Okay.  Did the city provide information to the
3  district about what its eligibility requirements would be
4  for students to participate in the program?
5      A   I have a copy of their brochure.  That is the
6  extent of our documentation.
7      Q   How did you obtain a copy of their brochure?
8      A   It is exchanged every year when we do the
9  agreement review.
10      Q   And what's the purpose of exchanging that?
11      A   Informational purposes, just FYI to keep on
12  file.  The school district does communicate information
13  regarding fees and so forth to parents through some of
14  our school publications as a courtesy to the city.
15      Q   I take it, then, the district will provide
16  enrollment information in the Latchkey Program?
17      A   Upon request.
18      Q   To parents?
19      A   Um-hum.
20      Q   Did the school district make any determination
21  as to whether the Latchkey Program was in compliance with
22  federal law concerning the Americans with Disabilities
23  Act, prior to this lawsuit being filed?
24      A   No, I don't believe so.  There is no
25  documentation of that.

## Page 15

1  Q   Have you read the agreement between the city
2  and the district concerning the operation of the Latchkey
3  Program?
4  A   Um-hum.
5  Q   It is called an Interlocal Cooperation
6  Agreement?
7  A   Um-hum. I'm sorry, yes.
8  Q   That's better. I should have asked you to
9  answer out loud.
10  A   Yes.
11  Q   The court reporter is going to kill me for that.
12      All right. Then the district does maintain
13  some authority concerning the operation -- not the
14  operation, but considering the use of its facilities?
15  A   Yes.
16  Q   And where it says -- I'll just read it to you,
17  Paragraph 9, District does not give up ultimate control
18  of the facilities and retains the right to enforce all
19  necessary laws, rules and regulations, as well as the
20  right to make announcements as District may deem
21  necessary in the interest of public safety.
22      What does it mean, enforce all necessary
23  laws, rules and regulations, if you know?
24  A   I'm trying to think of an instance. We've never
25  actually had anything, a situation arise that would bring

## Page 16

1  that into regard, so I'd hate to give you an instance
2  without some background on that.
3  Q   Does the -- you were going to say something.
4  You can answer.
5  A   Well, we have district policy regarding the use
6  of our facilities. More than anything else, it has what
7  you cannot do on a facility. So if it were determined
8  that any program using our facilities were to step over
9  those types of parameters, such as selling alcohol and
10  tobacco on the premises, using our premises for the
11  efficacy of violent activities, obviously at those times
12  those would be the types of policies and rules and
13  regulations we would take a stand on, but I've never seen
14  an incident of that happening.
15  Q   What is this you are referring to? Is it -- is
16  it a written policy?
17  A   Yes. We have certain policies regarding usage
18  of our facilities.
19  Q   And what's that called?
20  A   It is district policy, and I couldn't tell you.
21  Our legal office would have to give you the specifics on
22  that.
23  Q   It is a written document?
24  A   There are some policies, I understand written,
25  yes.

## Page 17

1  Q   I've not seen that, but let me ask you, you've
2  seen it, right?
3  A   Portions of it, yes.
4  Q   Did you review that policy as it regards to the
5  use of premises in a way that discriminates against
6  people based upon disabilities?
7  A   That is not in the policy, as I recall it.
8  Q   What about discrimination against people because
9  of their race, ethnicity, or national origin?
10  A   That is not in the policy, as I remember it.
11  Q   The administrator of the program, Mr. Whitworth
12  testified that the children administer their own
13  medication, or have to be able to administer their own
14  medication. Isn't that contrary to district policy?
15  A   I couldn't answer that. I don't know what
16  district policy is regarding that.
17  Q   Do you get involved in discussions with CCISD
18  people concerning public policy?
19  A   No.
20  Q   For instance, I think you said that the school
21  district is please with the operation of the Latchkey
22  Program?
23  A   I would think so, yes. That's not policy.
24  Q   Well, I take it from the school's standpoint,
25  they think that's a benefit to the community?

## Page 18

1  A   As a successful use of a site, I think we could
2  say that as far as, over the years we've been involved in
3  that participation, it's been a benefit to the community.
4  Q   It is a worthwhile program?
5  A   Yes.
6  Q   So from a public policy standpoint, the district
7  has decided to support the program by permitting it to
8  operate on its facilities?
9  A   I won't suggest that I could speak for district
10  policy, but within the parameters of the program and the
11  agreements that I see before me as my job as liaison,
12  then I understand it is a fairly successful program
13  within the parameters, yes, but I won't speak for policy.
14  Q   Let me ask you a personal opinion, based upon
15  your experience working with the school district. In
16  your opinion, is the cost of after-school supervision and
17  recreation of a severely handicapped child better to be
18  borne by public institutions or a handicapped child's
19  individual parents?
20  A   I think that is such a broad question that it is
21  very difficult to answer because that's based upon
22  individual -- an individual's needs. I don't think I can
23  give just an overall umbrella answer to that.
24  Q   Let me ask you another question then. The
25  school district is funded by tax revenues of people who

## Page 19

1  live and own property within the district.

2      A   Um-hum.

3      Q   My client is one of these people that lives

4  within the district.

5      A   Um-hum.

6      Q   Do you think it is fair to her to pay for a

7  program that excludes her child because of her child's

8  disability?

9      A   I think my personal opinion, being an employee

10  of the school district, is that the school district, as I

11  have worked with it over these years, tries to provide as

12  many services for the community as it possibly can, and

13  partners with other entities that provide services to

14  reach as many, many people as possible, because they are

15  our clients, and by doing so, the school district -- in

16  order to do so, the school district finds many ways of

17  doing that, and one of them is offering facilities and

18  sites -- safe facility and site for other programming to

19  come in to address community needs.  So I strongly feel

20  the school district has made a positive response to that.

21      Q   Let me think.  We can wrap this up.  Given that

22  the city budget is 1.7 million for this program, and the

23  school district contributes roughly 800,000, that's $2.5

24  million for the program, do you know whether the cost of

25  accommodating this child into the program would create an

## Page 20

1  unnecessary financial burden on the program?

2      A   I do not know.

3      Q   Do you know if that determination has ever been

4  made?

5      A   On this particular case?

6      Q   Yes.

7      A   No, I did not know, but I would assume not.

8      MR. CASSIDY:  All right.  Thank you.

9  That's all I have.

10      MR. QUITTNER:  No questions.

11      MR. FLORES-RESENDEZ:  No questions.

12      (The deposition concluded at 11:09 a.m.,

13      on August 4, 2000.)

14

15

16

17

18

19

20

21

22

23

24

25

## Page 21

1              CHANGES AND SIGNATURE

2  PAGE LINE CHANGE            REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12      I, SENJA "ROBIN" WEST, have read the foregoing

    deposition and hereby affix my signature that this

13  deposition is true and correct, except as noted above.

14

15              _____

    SENJA "ROBIN" WEST

    DEPOSITION DATE: August 4, 2000

16

    STATE OF TEXAS          *

17  COUNTY OF _____  *

18      Before me _____, on this day personally

    appeared SENJA "ROBIN" WEST, known to me or proved to me

19  on the oath of _____, or through

    _____ (description of identity card) to be

20  the person whose name is subscribed to the foregoing

    instrument and acknowledged to me that he executed the

21  same for the purposes and consideration herein expressed.

22      Given under my hand and seal of office this _____

    day of _____, 2000.

23

24              _____

    Notary Public, State of Texas

25  My Commission Expires:_____

## Page 22

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE SOUTHERN DISTRICT OF TEXAS

2              CORPUS CHRISTI DIVISION

3  CHRISTOPHER E.P., b/n/f  *

   ROSE V.,                 *

4      Plaintiff,            *

                            *

5  VS.                      *  NO. C-00-021

                            *

6  CORPUS CHRISTI INDEPENDENT *

   SCHOOL DISTRICT and CITY   *

7  OF CORPUS CHRISTI, TEXAS,  *

       Defendants.          *

8

9          REPORTER'S CERTIFICATION

       DEPOSITION OF SENJA "ROBIN" WEST

              August 4, 2000

10

11      I, Sandra M. Allen, Certified Shorthand Reporter in

   and for the State of Texas, hereby certify to the

12  following:

       That the witness, SENJA "ROBIN" WEST, was duly sworn

13  by the officer and that the transcript of the oral

   deposition is a true record of the testimony given by the

14  witness;

       That the deposition transcript was submitted on

15  _____ to the attorney for SENJA "ROBIN"

   WEST for examination, signature, and return to

16  Depositions, Etc. by _____;

       That the amount of time used by each party at the

17  deposition is as follows:

18  LES CASSIDY -       (0:29)

    LINDA FLORES-RESENDEZ - (0.00)

19  ANDREW QUITTNER -     (0.00)

       That pursuant to information given to the deposition

20  officer at the time said testimony was taken, the

   following includes all parties of record:

21

   LES CASSIDY, Attorney for Plaintiff

22  LINDA FLORES-RESENDEZ, Attorney for Defendant CCISD

    ANDREW QUITTNER, Attorney for Defendant City of

23      Corpus Christi, Texas

24

25

## Page  23

1       I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
2   action in which this proceeding was taken, and further
that I am not financially or otherwise interested in the
3   outcome of the action.
        Further certification requirements pursuant to Rule
4   203 of TRCP will be certified to after they have
occurred.
5

        Certified to by me this 8th day of August, 2000.
6
7       _____
        SANDRA M. ALLEN, CSR
8       Certification No. 7509
        Expiration Date:  12-31-00
9
        DEPOSITIONS, ETC.
10      Suite 612 South Tower
        500 North Water Street
11      Corpus Christi, TX  78471
        (361) 883-9990
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page  24

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2            CORPUS CHRISTI DIVISION
3   CHRISTOPHER E.P , b/n/f  *
    ROSE V.,                *
4        Plaintiff,         *
                            *
5   VS                      *  NO. C-00-021
                            *
6   CORPUS CHRISTI INDEPENDENT *
    SCHOOL DISTRICT and CITY   *
7   OF CORPUS CHRISTI, TEXAS,  *
         Defendants.        *
8
        FURTHER CERTIFICATION UNDER RULE 203 TRCP
9         DEPOSITION OF SENJA "ROBIN" WEST
              August 4, 2000
10
        The original deposition _____ was _____ was not
11  returned to the deposition officer;
12      If returned, the attached Changes and Signature page
    contains any changes and the reasons therefor;
13
        If returned, the original deposition was delivered
14  to LES CASSIDY, custodial attorney;
15      That $_____ is the deposition officer's
    charges to Plaintiff for preparing the original
16  deposition transcript and any copies of exhibits
17      That the deposition was delivered in accordance with
    Rule 203 3, and that a copy of this certificate was
18  served on all parties shown herein and filed with the
    Clerk.
19
        Certified to by me this _____ day of _____,
20  2000
21      _____
        SANDRA M. ALLEN, CSR
22      Certification No  7509
        Expiration Date.  12-31-00
23      DEPOSITIONS, ETC
        Suite 612 South Tower
24      500 North Water Street
        Corpus Christi, TX  78471
25      (361) 883-9990

DEPOSITIONS ETC.
361- 883-9990

1    **CHANGES AND SIGNATURE**

2    PAGE   LINE   CHANGE                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12        I, SENJA "ROBIN" WEST, have read the foregoing
     deposition and hereby affix my signature that this
13   deposition is true and correct, except as noted above.

14

15                    _Senja Robin West_
                      SENJA "ROBIN" WEST
                      DEPOSITION DATE: August 4, 2000

16   STATE OF TEXAS              *
17   COUNTY OF  _Texas_          *

18        Before me _Senja Robin West_ , on this day personally
     appeared SENJA "ROBIN" WEST, known to me or proved to me
19   on the oath of _Senja Robin West_ , or through
     _____ (description of identity card) to be
     the person whose name is subscribed to the foregoing
     instrument and acknowledged to me that he executed the
     same for the purposes and consideration herein expressed.

          Given under my hand and seal of office this _15th_
     day of _September_ , 2000.

          [Notary Seal:
          PRISCILLA M. CASALL
          Notary Public
          STATE OF TEXAS
          My Comm. Exp. April 21, 2001]

          _Priscilla M. Casall_
          Notary Public, State of Texas
          My Commission Expires: _4-21-2001_

                    DEPOSITIONS, ETC.  (361)883-9990
          500 North Water Street, Suite 612 South Tower, Corpus Christi, TX

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CHRISTOPHER E.P.,          *
B/N/F ROSE V.              *
                          *
VS.                       * CIVIL ACTION NO. C-00-021
                          *
CORPUS CHRISTI INDEPENDENT *
SCHOOL DISTRICT AND CITY   *
OF CORPUS CHRISTI, TEXAS   *

*******************************************************

THE ORAL DEPOSITION OF

ROSE V.

June 22, 2000

*******************************************************


ORAL DEPOSITION OF ROSE V., produced as a

witness at the instance of the Defendant(s), and duly

sworn, was taken in the above-styled and numbered

cause on the 22nd day of June, 2000, from 9:05 a.m. to

9:40 a.m., before MARICELA FLORES, CSR in and for the

State of Texas, reported by machine shorthand, at the

offices of Mr. Les Cassidy, Attorney at Law, 1020 Bank

of America Center North, 500 North Water Street,

Corpus Christi, Nueces County, Texas, pursuant to the

Texas Rules of Civil Procedure and the provisions

stated on the record or attached hereof.

EXHIBIT
3

CERTIFIED REPORTING & VIDEO
883-3400 (1-800-548-9521)

## Page 2

```
1          A P P E A R A N C E S
2
3   FOR THE PLAINTIFF(S):
4       MR. LES CASSIDY
        Attorney at Law
5       1020 Bank of America Center North
        500 North Water Street
6       Corpus Christi, Texas 78471
7   FOR THE DEFENDANT(S):
8       MR. ANDREW L. QUITTNER
        Assistant City Attorney
9       City of Corpus Christi
        P. O. Box 9277
10      Corpus Christi, Texas 78469-9277
11
12      MS. YLISE JANSSEN
        Assistant Staff Attorney
13      Corpus Christi Independent School District
        801 Leopard Street
14      P. O. Box 110
        Corpus Christi, Texas 78401
15
    REPORTED BY: MARICELA FLORES, C.S.R. NO. 2558
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1   DEPOSITION INDEX                                    PAGE
2   Appearances.........................................   2
3   Stipulations................(Attached following Index)
4
5   ROSE V.:                                            PAGE
    Examination by Mr. Quittner . . . . . . . . . .      4
6
    Examination by Ms. Janssen . . . . . . . . . .      14
7
    Re-examination by Mr. Quittner . . . . . . . .      27
8
    Re-examination by Ms. Janssen . . . . . . . . .     29
9
10  NO.            EXHIBIT(S)                           PAGE
11  1   City of Corpus Christi Parks & Recreation
        Department Latchkey Request for Special
12      Accommodations Form (Blank)                      7
13  2   City of Corpus Christi Parks & Recreation
        Department Latchkey Request for Special
14      Accommodations Form (Filled In)                 11
15
    INFORMATION TO BE PRODUCED                          PAGE
16
    (NONE)
17
18  INDEX TO OBJECTION(S)                            PAGE(S)
19  By Mr. Cassidy                                      16
20
21
22
23
24
25
```

## Page 4

```
1          ROSE V.,
2   having been first duly sworn, testified as follows:
3          E X A M I N A T I O N
4   BY MR. QUITTNER:
5     Q   Good morning.  We met earlier.  And before we
6   get started, I know you've had a chance to talk with
7   your attorney.  And hopefully, he told you a little
8   bit about how a deposition works.
9          Have you ever had your deposition taken
10  before?
11    A   Yes.
12    Q   All right.  So you're familiar with the
13  procedures?
14    A   Yes.
15    Q   All right.  And if you don't understand
16  something I say, or I get too overwinded or something,
17  please just, you know, let me know.  And I'll rephrase
18  the question.  Try and give me a chance to finish, and
19  I will try and do the same.  Okay?
20    A   Yeah.
21    Q   And also for the court reporter, I know she
22  would appreciate it if you always answer verbally.
23  It's all right to nod your head and that, but she
24  really needs words.  Because it's sometimes hard to
25  take down just hand gestures.
```

## Page 5

```
1     A   Uh-huh.
2     Q   Could you give me your name for the record?
3     A   Rosie V.
4     Q   And what do you do every day for a living?  Or
5   do you work?
6     A   I do work with Ear, Nose and Throat.  Medical
7   receptionist.
8     Q   With -- that's Doctor Mintz and company?
9     A   Yes.  Yes.
10    Q   How old is Christopher?
11    A   Twelve.
12    Q   And how old was he the first time that -- when
13  was the first time that you tried to get him enrolled
14  in latchkey?
15    A   First grade.  Six years old.
16    Q   And did they accept him at that time?
17    A   No.
18    Q   And when was the last time that you tried to
19  enroll him?
20    A   This last year.
21    Q   And why, after several years, did you decide
22  to file a lawsuit?
23    A   Well, I -- because of the numerous times of
24  being rejected and just learning, I guess, the things
25  that I can do for my son's rights.
```

**Multi-Page™**

---

Page 6

1  Q   Did anything change in his health and
2  abilities during those five years?
3  A   No.
4  Q   Could you explain or somewhat detail exactly
5  what Christopher can and can't do with respect to the
6  latchkey program and, you know, and the requirements
7  that are set forth there?  Not necessarily globally.
8  A   Right.  What he is able to do in the latchkey
9  program is participate with other children, intervene
10 as normally as possible at his capacity.  He can do
11 most anything that any other child can do with minimal
12 assistance.
13 Q   By "participate," could you detail that a
14 little bit more?  I mean, can he get down and walk
15 around with them and play games?
16 A   Yes.  He is ambulatory.  He is non-verbal, but
17 he does communicate with hand gestures and his Alpha
18 Talker.  And he can -- he does participate at school
19 in PE, with his para, in playing baseball, kickball,
20 throw ball, swimming.  Gee, whatever they do in PE.
21 Q   What is an Alpha Talker?
22 A   It's a communication device, electronic
23 communication device, that he uses to vocalize his
24 needs.  It's an electric communication device.
25 Q   Is that something that he types or --

---

Page 7

1  A   Yes.  That he presses with his one hand --
2  with one finger.
3  Q   Presses the button?
4  A   Uh-huh.
5  Q   And it produces a set number of words or --
6  A   Yes.
7  Q   Do you recognize this document?  It's three
8  pages.
9  A   Yes.
10 Q   And is that the application that was sent to
11 you for the latchkey program?
12 A   Yes, it is.
13 Q   All right.
14        MR. QUITTNER:  I'd like to get that
15 marked as, I guess, Exhibit 1.
16        (Exhibit No. 1 marked.)
17 Q   Now, on that application, does it set forth
18 certain basic abilities or limitations that all the
19 participants must meet for the latchkey?
20 A   Yes.
21 Q   And is Christopher able to meet all of what
22 they call the minimal qualifications for the program?
23 A   Well, it says he must be five years old and
24 have a mental ability of a five-year-old.  And
25 Christopher, in some areas, does.  In other areas, he

---

Page 8

1  does not.  And it does specify in there he must have a
2  mental capacity of a five-year-old.
3  Q   Did they tell you why they denied his entrance
4  into the program?
5  A   Yes.
6  Q   And what was the reason?
7  A   Because they didn't have the staffing for a
8  child of his disability, and because he didn't have
9  the mental capacity in all areas of a five-year-old.
10 For example, administering his own medication.
11 Q   Would he have to have medication during the
12 short time --
13 A   Yes.
14 Q   -- that he was there?
15 A   Yes.
16 Q   Is he able to take care of all his toileting
17 needs on his own?
18 A   All of them with assistance.
19 Q   So the answer to that then would be no, he
20 cannot on his own?
21 A   Correct.
22 Q   And is that not one of the basic requirements
23 for everybody in latchkey?
24 A   Well, his -- he can -- in toileting needs, he
25 can wash his hands, he can go to the toilet, but he

---

Page 9

1  cannot express his needs.
2  Q   The Alpha Board won't help him in that area?
3  A   If given to him, yes.  But it's a pretty heavy
4  device.  And he does need someone to hand it over to
5  him and take care of it.  It's a very expensive device
6  that, if thrown accidentally, it can be broken.
7  Q   So it's your feeling that he would have to
8  have somebody with him one on one during this entire
9  program in order to be able to participate?
10 A   No.  Not exactly.
11 Q   Could you --
12 A   He could have -- he's on a schedule as far as
13 toileting needs.  And at school, they do take them on
14 a schedule.  And at home, I also do that every hour.
15 So we don't have to have that one on one.
16        He can have a para there with him, as
17 long as they're within a certain distance from him.
18 They can also participate -- the para can participate
19 with other children as well.
20 Q   But didn't you tell the latchkey people, when
21 you applied, that he would need a personal assistant?
22 A   For toileting needs, yes.  And for
23 administering medications, yes.
24 Q   So as far as the program knew, he would need
25 personal assistance just for him for toileting needs?

---

ROSE V.
JUNE 22, 2000

Multi-Page™

Page 10

1   A   Correct.
2   Q   Which would not bring him within the minimum
3   capabilities that they require of everybody else?
4   A   I suppose.
5   Q   And why do you think that discriminates
6   against your son?
7   A   Well, because he is not accepted in the
8   program.  And I don't think most children at five
9   years old go to the bathroom without some assistance.
10  So Christopher does need the assistance.
11  Q   Exactly what services would the
12  paraprofessional or caretaker have to provide?
13  A   Assisting him with his needs, toileting
14  needs.  Assisting him with directing him with his
15  involvement in the latchkey program.
16  Q   And what type of training would a person like
17  this need?
18  A   Well, what the school district requires as far as
19  their paras suffice.
20  Q   But do you think that the latchkey program is
21  an educational program?
22  A   Yes, I do.
23  Q   And why do you believe that?
24  A   Because it allows my child to enhance his
25  ability to interact with other children as normal as

Page 11

1   possible.  To develop his physical abilities as well.
2       To be able to exercise his normally body
3   functions, rather than just sitting and watching TV
4   all day long or not interacting with other children.
5   It does help him to be able to learn and mimic from
6   other normal children.
7   Q   But isn't the latchkey program just a couple
8   of hours after school?
9   A   Even if it's fifteen minutes, it's a lot for a
10  child of his disability.
11  Q   And do you recognize this document?
12  A   Yes.  Yes, sir.
13  Q   And is that your writing on that document?  On
14  the bottom.
15  A   Yes, it is.
16  Q   And was that your application for last year
17  that you sent to the -- to the latchkey program?
18  A   Well, this is '99.
19  Q   For '99?
20  A   So yes.
21      MR. QUITTNER:  We'd like that marked as
22  the next exhibit.
23      (Exhibit No. 2 marked.)
24  Q   And on that application, you didn't have your
25  doctor sign that?

Page 12

1   A   This was sent to my doctor.  But because it
2   states on there the participant must have the mental
3   ability of a five-year-old, Christopher in all areas
4   does not.  So it doesn't specify on there for the
5   doctor to fill out that answer.
6       MR. CASSIDY:  Let me see that.
7   Q   So in that respect then, the application
8   wasn't complete?
9   A   Well, he didn't sign it.  It doesn't say it's
10  required on there.  It asks for it, but it didn't say
11  required.
12  Q   Do you think Christopher could participate in
13  this program if there were, say, just two teachers in
14  the room for twenty students, or however many there
15  is, as opposed to having somebody who would work with
16  him individually?
17  A   If they're on a schedule with him.
18  Q   And what would be on a schedule with him?  In
19  other words, how much time involvement would it
20  require?
21  A   Well, we can get that information from the
22  school as far as their schedule.
23  Q   Are you familiar with what his needs are?  I
24  mean --
25  A   At home.

Page 13

1   Q   At home, what would it require?
2   A   For him to be on a schedule.  For me or his
3   caretaker to be able to assist him with his toileting
4   needs or assist him with his needs to participate in
5   working with his computer or walking outside, making
6   sure he climbs up and down the stairs with minimal
7   assistance.
8   Q   Do you have a caretaker at home?
9   A   Yes.
10  Q   Why wouldn't you provide that caretaker for
11  him to be with him at the latchkey?
12  A   Does everybody else provide their own
13  providers at latchkey?
14      MR. CASSIDY:  Just answer the question.
15  A   No, I don't.  I didn't think that I had to.  I
16  thought the program had the personnel there.
17  Q   Didn't they tell you that you could provide
18  your own caretaker if you wanted to --
19  A   They said I could.
20  Q   -- if you wanted to participate?
21  A   Right.  But I don't --
22  Q   And they told you that they do not provide
23  caretakers?
24  A   I didn't want a caretaker.  I want him to
25  participate in the program.  I don't want a caretaker.

Page 14

1  Q  But you've testified that he can't participate
2  without assistance.
3  A  **I just want a paraprofessional with him.**
4  Q  And you think that the city or whoever should
5  provide that for him, as opposed to you providing it?
6  A  **Yes.**
7  Q  Even though you do have one?
8  A  **I have one, yes.**
9        MR. QUITTNER: I have nothing further.
10       E X A M I N A T I O N
11  BY MS. JANSSEN:
12  Q  Good morning, Ms. V.
13  A  **Good morning.**
14  Q  I don't have very many questions, but a few.
15  A  **Okay.**
16  Q  And the same thing. If you don't understand
17  my questions, then please just let me know, and I'll
18  be happy to rephrase it.
19  A  **Okay.**
20  Q  Okay. In going through your original petition
21  -- complaint, pardon me -- that was filed in federal
22  court, you cited three different causes or three
23  different statutes by which you think Christopher is
24  entitled to relief.
25       One of them being the Individuals with

Page 15

1  Disabilities in Education Act, commonly known as
2  IDEA. The other was the Americans with Disabilities
3  Act. And also the Rehabilitation Act of 1973, which
4  is commonly referred to as Section 504.
5        I'd like to ask you some questions
6  specifically about those. The Americans with
7  Disabilities Act tends to impose certain requirements
8  upon governmental entities, when providing programs,
9  to participants or those who would like to
10  participate.
11       My question to you is this: In reference
12  to the buildings in which the latchkey program is
13  provided, do you have any issue about the construction
14  and facilities in which this program is held?
15  A  **Do I have questions? I think they're all**
16  **fairly reasonable for any child with a disability.**
17  Q  Okay.
18  A  **And they're very accepted by the city as well.**
19  Q  Okay. But you have no -- no problem with the
20  structure itself? For instance, I'm talking about the
21  building.
22  A  **The school?**
23  Q  Okay. The school.
24  A  **No.**
25  Q  Is there anything about accessibilities?

Page 16

1  Ramps? Doors? Anything of that nature?
2  A  **No.**
3  Q  Okay. In reference to Section 504, again, the
4  same question: Do you feel that there is any problem
5  with the facilities in which the program is being
6  offered?
7        MR. CASSIDY: Excuse me. I'll let the
8  witness answer the question, but I do want to
9  interpose an objection that the question is calling
10 for a legal conclusion from this witness, who may not
11 be familiar with the nuances of Section 504.
12  Q  Okay. And to that extent, I would try, in
13 very simple terms, to say on the basis that Section
14 504 is an anti-discriminatory statute, under what --
15 on what basis do you think that he's being
16 discriminated against in being able to participate in
17 the latchkey program?
18       I mean, is it as simply, as Mr. Quittner
19 has previously asked you, in reference to being
20 admitted into the program? Or is there more than just
21 that?
22  A  **I don't understand it as well.**
23  Q  Okay.
24  A  **I'm sorry.**
25  Q  Okay. Well, let me begin by asking you this.

Page 17

1  A  **Okay.**
2  Q  Do you understand the differences between IDEA
3  or ADA or 504?
4  A  **No.**
5  Q  Okay. So you're not familiar with the various
6  provisions of each of the statutes?
7  A  **Right.**
8  Q  Okay. Then let's move on. Do you have any
9  complaint about the school district in terms of
10 accessibility for your child in participating in the
11 latchkey program?
12  A  **Well, the only thing is, I have asked for it**
13 **for numerous years. And they've always told me**
14 **Christopher wasn't qualified. And they didn't have**
15 **the staffing for children of this -- with this**
16 **disability.**
17  Q  Okay. When you have made that request, has
18 that been specifically to the City of Corpus Christi
19 only? Or has that been to any principal or
20 administrator within CCISD?
21  A  **Both.**
22  Q  Okay. And do you recall when you made those
23 requests to CCISD?
24  A  **In the first grade.**
25  Q  Okay.

ROSE. V.
JUNE 22, 2000

Multi-Page™

---

Page 18

1   A   Starting from the first grade. Every year in
2   the ARD meetings.
3   Q   In your ARD meetings?
4   A   Yes.
5   Q   Okay. And what were you told in those ARD
6   meetings by the ARD participants or the chair of the
7   ARD committee in reference to whether or not latchkey
8   was a CCISD program? What is your recollection as to
9   being told --
10  A   That -- exactly what I said. That they didn't
11  have the staffing for him, for children with his
12  disability. And that it wasn't something that I would
13  want my child in with the staff that they have.
14  Q   Okay. Were you ever told by CCISD staff that
15  it was not a CCISD program?
16  A   No.
17  Q   You were never told that?
18  A   No.
19  Q   Okay. In the literature that you received
20  each year -- and I'm gathering each year because you
21  previously testified to Mr. Quittner that you have
22  applied each year and been turned down each year.
23  A   Uh-huh.
24  Q   Was there ever anything in the literature that
25  indicated in any way that this was a CCISD program? I

Page 19

1   mean, were there any CCISD logos or --
2   A   I don't recall.
3   Q   Okay. If you would take a look at that
4   Exhibit 1. Was there any -- and take a few moments to
5   take a look at that and see if there's anything in
6   there that says it's a CCISD program.
7   A   Well, it says the program is held in
8   elementary school cafeterias.
9   Q   Okay. Does it say that CCISD runs that
10  program? Or hires the personnel?
11  A   No, it doesn't.
12  Q   Okay. Has Christopher ever participated in
13  any kind of after school activity other than
14  latchkey? Say, for instance, Boy Scouts? Campfire
15  Kids? Anything of that nature?
16  A   Yes.
17  Q   Okay. And where have -- have any of those
18  meetings ever been held on a school campus?
19  A   Yes.
20  Q   Okay. And was there ever any literature that
21  said, "This is a CCISD run program"?
22  A   A "run program"?
23  Q   In other words, CCISD sponsored it? CCISD
24  funded it?
25  A   Yes. Yes.

---

Page 20

1   Q   CCISD this, that and the other?
2   A   Yes.
3   Q   Okay. And have you -- okay.
4   A   Because it was during school.
5   Q   During school hours? Or after school?
6   A   During school hours.
7   Q   Okay. And specifically, what was that?
8   A   Cub Scouts.
9   Q   Okay. And when you say "during school hours,"
10  what hours?
11  A   8:00 to 3:00. Or I don't know exactly what
12  time they held the program, but they did have the Cub
13  Scouts for the children in special ed.
14  Q   Okay. Okay. Have you requested after school
15  care through any state or regional agency, such as
16  MH/MR or some similar type of agency?
17  A   Yes.
18  Q   Okay. And is Christopher currently receiving
19  that in the home?
20  A   Receiving --
21  Q   After school care through MH/MR or some other
22  state agency in the home.
23  A   Yes. Yes.
24  Q   Who's providing that?
25  A   In home -- I forgot the name of it.

Page 21

1   Q   Okay.
2   A   Of the program. But it's through MH/MR.
3   Q   It's through MH/MR. Okay. And what time is
4   that scheduled to begin?
5   A   Whatever time I want to use.
6   Q   Okay. Do you have any limit on the amount of
7   time you can use?
8   A   I have three hours -- I'm sorry. It's fifteen
9   hours a week.
10  Q   Okay.
11  A   Seven days. Up to seven days.
12  Q   Okay. And currently, how are you utilizing
13  those fifteen hours?
14  A   I'm using it during the weekends.
15  Q   The weekends?
16  A   Uh-huh.
17  Q   Okay.
18  A   One day a week. Maybe on a Wednesday. And it
19  just depends on Christopher's needs or activities that
20  are going throughout the city.
21  Q   Okay.
22  A   Whether it be swimming, baseball, bayfront
23  activities.
24  Q   Okay. In your capacity as Christopher's
25  parent, having been in a position to review his

---

**Page 22**

1 progress over the last six years in school, would you
2 say that latchkey is necessary for Christopher to make
3 educational progress?
4 A Yes.
5 Q Okay.
6 A Yes.
7 Q Has any medical professional provided a
8 written diagnosis or evaluation that specifically
9 cites that Christopher needs latchkey in order to make
10 educational progress? Any psychologist?
11 Psychiatrist? Medical doctor?
12 Have any -- has any medical professional
13 provided a written diagnosis, a written recommendation
14 or evaluation that specifically states he has to have
15 latchkey to make educational progress?
16 A Well, they don't specify "latchkey." I've
17 never presented the issue of "latchkey" to any of my
18 doctors. But I wouldn't have a problem obtaining
19 anything like that, I'm sure.
20 Q According to the report cards and the reports
21 that you have received from school officials, has
22 Christopher made educational progress during regular
23 school hours?
24 A Yes.
25 Q Okay. What summer education programs does

**Page 23**

1 Christopher participate in or has he participated in
2 over the course of the last five years? Summer
3 education programs.
4 A Well, he is in the year round school, CCISD
5 summer --
6 Q That would be EYS?
7 A Right. Summer program.
8 Q And what hours does he attend EYS during the
9 summer?
10 A 8:30 a.m. to 11:30.
11 Q Okay. And for what period of time during the
12 summer does he attend that? One month? Two months?
13 A June the 19th till, I think, July -- the end
14 of July.
15 Q Okay. Have you been satisfied with the EYS
16 program?
17 A Yes, ma'am.
18 Q Okay. In your petition -- in your complaint
19 -- I keep calling it a petition. I'm sorry. In your
20 complaint, you asked for extended year services for
21 Christopher's summer programs, yet you're testifying
22 that he currently receives extended year services.
23 Is there some problem with the extended
24 year service that he's receiving?
25 A Time.

**Page 24**

1 Q Time.
2 A I would like additional time during -- during
3 the week.
4 Q Okay. In your opinion as his parent -- and
5 again, having reviewed his progress over the past five
6 years, six years -- the amount of time that he has
7 received in extended year services during the summer,
8 do you consider that to be sufficient for him to not
9 regress as we get into each subsequent new school
10 year?
11 A Right. No. It's not enough time, what we
12 have had.
13 Q Okay. Can you cite specifically what you
14 think it is that he regresses in when he comes back to
15 school such that he needs more time in the summer?
16 What skill or what --
17 A His -- gee, there's many areas. Just his
18 basic skills.
19 Q Would those be his basic life skills? Or are
20 we talking about English? Math?
21 A Communication.
22 Q Communication?
23 A Communication.
24 Q Okay. Has any school official ever provided
25 you literature designating latchkey as a district

**Page 25**

1 program?
2 A No.
3 Q Okay. Have you ever asked of the school
4 district --
5 A Yes.
6 Q -- whether or not that was a school district
7 program?
8 A Yes.
9 Q Did anyone ever tell you that it was, in fact,
10 a school district program?
11 A Yes. They did tell me that it was.
12 Q Did they tell you it was offered at the
13 school? Or did they tell you that it was run by the
14 school?
15 A I don't recall exactly.
16 Q Okay. Do you recall who that was made to? Or
17 who made that representation to you?
18 A No. I don't recall. It was one of them, the
19 ARD members. And that could have been the principal
20 or his teacher.
21 Q Okay.
22 A Or even the counselor. I don't recall exactly
23 who made that.
24 Q And do you know when that representation was
25 made?

**Page 26**

1 A Well, every year.
2 Q Okay.
3 A The same question came up every year.
4 Q Okay. Do you have any complaints about his
5 regular school program?
6 A No.
7 Q Okay. Have you ever had any complaints as to
8 ARD issues concerning your son? In other words, have
9 you ever signed in disagreement on ARD minutes?
10 A Yes. Yes.
11 Q When was the most recent that you signed in
12 disagreement?
13 A Last year.
14 Q Okay. '98-'99?
15 A Eight. '98-'99.
16 Q Okay.
17 A I'm sorry.
18 Q And can you tell me why you signed the
19 disagreement? What was the issue?
20 A Transportation.
21 Q Okay. Was that issue finally resolved?
22 A Yes, ma'am.
23 Q Okay. When was it resolved?
24 A The same month --
25 Q Okay.

**Page 27**

1 A — the issue was presented.
2 Q Okay.
3 MS. JANSSEN: Okay. I have no further
4 questions. Thank you.
5 MR. QUITTNER: I've got a couple more, I
6 think, perhaps to clear up on this 504, IDEA, the
7 differences.
8 F U R T H E R   E X A M I N A T I O N
9 BY MR. QUITTNER:
10 Q Your child goes to Galvan Elementary?
11 A Yes, sir.
12 Q And the latchkey program would be at the same
13 school; is that correct?
14 A Yes. I think so. I think that's where the
15 city offers it.
16 Q Does your child have any problems getting
17 around, you know, physically in Galvan? Is access to
18 the rooms and the places he needs to be sufficient?
19 A No.
20 Q They are? Or they're not?
21 A There are no problems with him.
22 Q Okay. You also -- I believe you said that
23 latchkey is necessary for your child's development?
24 A Yes, sir.
25 Q What is it in that program -- what do they

**Page 28**

1 offer that's not offered at school or elsewhere that
2 is necessary for his educational development?
3 A I'm not clear on that question, sir. I'm
4 sorry.
5 Q Well, how is latchkey -- what does latchkey
6 provide that isn't provided in the school or somewhere
7 else that is necessary for his development?
8 A Extended time in his daily routine to enhance
9 his abilities and to continue his abilities throughout
10 the day in normal interaction, for one. And his --
11 Q Well, isn't it true that latchkey is only a
12 small subset of all the students who attend Galvan?
13 A I don't understand that question.
14 Q Do all the students who attend Galvan go to
15 latchkey?
16 A I don't know.
17 Q Well, what will you do with Christopher if
18 latch -- if and when latchkey is discontinued as a
19 program?
20 A Look for other programs to enhance his daily
21 living skills.
22 Q Have you found any others that can do the same
23 thing?
24 A Not -- well, I have been denied by all day
25 care services.

**Page 29**

1 Q And have you offered to provide your own
2 paraprofessional at some of the other day care
3 services?
4 A No.
5 MR. QUITTNER: Okay. Nothing further.
6 MS. JANSSEN: Just one followup to his
7 question.
8 F U R T H E R   E X A M I N A T I O N
9 BY MS. JANSSEN:
10 Q When was the most recent denial by a day care
11 service to provide service to Christopher?
12 A In '99.
13 Q Okay.
14 A And this has also been brought up to Advocacy,
15 Inc. in the valley. And they're also looking into it.
16 MS. JANSSEN: Okay. Nothing further.
17 MR. CASSIDY: Of course, we'll reserve
18 all questions for later. That's all we have.
19
20 June 22, 2000
21 MR. ANDREW L. QUITTNER          ROSE V., Witness
22
23
24
25

```
                                      Page 30                                              Page 31
 1  STATE OF TEXAS                              1          WITNESS CORRECTION SHEET
 2  COUNTY OF                                   2      The witness, ROSE V., states she wishes to
 3      SUBSCRIBED AND SWORN to before me by said  3  make the following changes or corrections in her
 4  Witness, ROSE V., on this the      day of      testimony as originally given:
 5           , 2000.                            4
 6                                              5  Page      . Line
 7                                                        Now reads:
    Notary Public in and for                    6        Should read:
 8  the State of Texas                                    Reason for Change:          Page
 9                                              7        . Line
10  Typed or Printed Name of                             Now reads:
11  Notary Public                               8        Should read:
    Commission Expires:                                  Reason for Change:          Page
12                                              9        . Line
13                                                       Now reads:
14                                             10        Should read:
15                                                       Reason for Change:          Page
16                                             11        . Line
17                                                       Now reads:
18                                             12        Should read:
19    .                                                  Reason for Change:
20                                             13  Page      . Line
21                                                       Now reads:
22                                             14        Should read: .
23                                                       Reason for Change:
24                                             15        (Attach additional pages, if necessary.)
25
                                               16  June 22, 2000
                                                   MR. ANDREW L. QUITTNER       ROSE V., Witness
                                               17
                                                   STATE OF TEXAS *
                                               18
                                                      SUBSCRIBED AND SWORN to before me by the
                                               19  said witness, ROSE V., on this the      day of
                                                             , 2000.
                                               20
                                               21        Notary Public in and for
                                                         the State of Texas
                                               22
                                               23
                                               24        Typed or Printed Name of
                                                         Notary Public
                                               25        Commission Expires:
```

```
                                      Page 32                                              Page 33
 1      REPORTER'S CERTIFICATE                  1       IN THE UNITED STATES DISTRICT COURT
                                                      FOR THE SOUTHERN DISTRICT OF TEXAS
 2  STATE OF TEXAS                                            CORPUS CHRISTI DIVISION
 3  COUNTY OF NUECES                            2
                                                3  CHRISTOPHER E.P.,
 4      I, MARICELA FLORES, a Certified Shorthand    B/N/F ROSE V.
    Reporter in and for the State of Texas, do hereby  4
 5  certify that these facts stated and set forth in the  VS.  * CIVIL ACTION NO. C-00-021
    caption hereto are true; that after the witness, ROSE  5
 6  V., had been by me first duly cautioned and sworn to  CORPUS CHRISTI INDEPENDENT *
    tell the truth, the whole truth, and nothing but the  6  SCHOOL DISTRICT AND CITY *
 7  truth, the foregoing questions were propounded to her  OF CORPUS CHRISTI, TEXAS *
    by the attorneys named in the caption hereto, and the  7
 8  foregoing answers were made by said witness at said     REPORTER'S CERTIFICATE OF FILING
    time in response to said questions so propounded to  8
 9  her; that the questions so propounded to the witness     ORAL DEPOSITION OF ROSE V.
    and the said answers in response thereto were by me at  9       June 22, 2000
10  said time and place taken down in shorthand on the  10
    22nd day of June, 2000, and the same were thereafter    I, MARICELA FLORES, Certified Shorthand Reporter
11  reduced to typewriting by computer-aided            11  in and for the State of Texas, hereby certify,
    transcription.                                         pursuant to the Rules and/or agreement of the parties
12      Further certification requirements, if any,    12  present, to the following:
    pursuant to the Rules will be certified to in the
13  Reporter's Certificate of Filing after they have     13     Certify that $     is the charge for the
    occurred.                                               preparation of the completed original deposition and
14      WITNESS MY HAND on this, the      day         14  any charges of exhibits, which is hereby taxed against
    of           , 2000.                                   and payable by the Defendant(s).
15                                             15
16                                                     I further certify that the original deposition
17      MARICELA FLORES, C.S.R.                16  was submitted to MR. ANDREW L. QUITTNER on
    Certification No.:  2558                               , 2000, that same was to be
18  Expiration Date:  12-31-00                 17  examined and signed by the witness within 30 days of
                                                   said date and      was      was not returned to
19  CERTIFIED REPORTING & VIDEO                18  CERTIFIED REPORTING AND VIDEO SERVICE, Certified
20  500 Frost Bank Plaza                           Shorthand Reporters, by           , and the
    802 North Carancahua                        19  attached Witness Correction Sheet contains changes, if
21  Corpus Christi, Texas 78475                    any, made by the witness, and that the
    Phone:  (512) 883-3400                      20  original/certified copy of the original deposition,
22                                                 together with copies of all exhibits, if any, was
23                                             21  delivered to          on
24                                                       , 2000.
25                                             22
                                                       I further certify that the following includes all
                                               23  parties or counsel of record at the time of taking
                                                   said deposition:
                                               24
                                                   MR. LES CASSIDY, Counsel for Plaintiff(s)
                                               25  MR. ANDREW L. QUITTNER AND MS. YLISE JANSSEN, Counsel
```

ROSE V.
JUNE 22, 2000

**Multi-Page™**

Page 34

```
 1      I further certify that a copy of this certificate
        was served on all parties or their counsel named
 2    herein.

 3      WITNESS MY HAND, this the        day of
                    , A.D., 2000.
 4

 5
              MARICELA FLORES, C.S.R.
 6            Certification No.:  2558
              Expiration Date:  12-31-00
 7
              CERTIFIED REPORTING & VIDEO
 8            500 Frost Bank Plaza
              802 North Carancahua
 9            Corpus Christi, Texas 78470
              Phone:  (512) 883-3400
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFIED REPORTING & VIDEO
883-3400 (1-800-548-9521)

Page 34 - Page 34