**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

United States District Court
Southern District of Texas
FILED

SEP 15 2000

Michael N. Milby, Clerk

| | | |
|---|---|---|
| **CHRISTOPHER E.P., b/n/f** | § | |
| **ROSE V.** | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO: C-00-021** |
| | § | |
| **CORPUS CHRISTI INDEPENDENT** | § | |
| **SCHOOL DISTRICT AN CITY OF** | § | |
| **CORPUS CHRISTI, TEXAS** | § | |

## CITY OF CORPUS CHRISTI'S MOTION FOR SUMMARY JUDGMENT

Defendant, City of Corpus Christi, files its Motion for Summary Judgment requesting that the Court enter judgment in favor of the City pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff, Rose V. has filed suit on behalf of her son, Christopher E.P. alleging that the City wrongfully denied his participation in the Latchkey Program. The City of Corpus Christi will show that no genuine issues of material fact exist regarding Plaintiff's complaints, and that the City is entitled to summary judgment as a matter of law.

### NATURE OF THE PROCEEDING

1.     Plaintiff filed this suit alleging that the City (and the Corpus Christi Independent School District) violated the Americans with Disabilities Act, 42 U.S.C. § 12132, the Rehabilitation Act of 1973, 29 U.S.C. § 7949, and the Individuals with Disabilities Education Act, 20 U.S.C. § 1415. According to Plaintiff, Christopher was denied special education services offered by the Latchkey Program, and that he was damaged by the refusal to allow him to participate in said program.

H:\LEG-DIR\NOEMI\ANDY\4452ROSE\4452qu19.pld

30.

CHbPDF - www.fastio.com

## SUMMARY JUDGMENT RECORD

Exhibit "1"     Excerpts from the Deposition of Rose V.

Exhibit "2"     Excerpts from the Deposition of Dan Whitworth.

Exhibit "3"     Affidavit of Dan Whitworth, including Attachment "A" thereto, which is

Chapter Five from the Day-care Center Minimum Standards and Guidelines

published by the Texas Department of Protective and Regulatory Services.

Exhibit "4"     1999-2000 Application for Latchkey Program.


## FACTUAL BACKGROUND

2.      Plaintiff, Rose V., brought this suit on behalf of her son Christopher.  Christopher

suffers from multiple disabilities, both physical and mental.  It is not disputed that Christopher is

"disabled" as the term is defined in the various Federal laws under which this suit was brought.

Similarly, there is no dispute that Christopher receives special education services from the Corpus

Christi Independent School District during his attendance in public school.  Christopher is now 12

years old, and by age (and grade will no longer be eligible to participate in the Latchkey Program).

3.      Rose V. has attempted to enroll Christopher in the Latchkey Program (sometimes

referred to herein as the "Program"), an after school recreational program.  Christopher was denied

entry into the Program because he did not meet the qualifications set by the program for all of its

participants,[1] and because Rose V. refused to accept the accommodation offered to her by the

Program.  In particular, Christopher cannot take care of his toileting needs without assistance, and

---

[1]Deposition of Rose V., at pp. 8 & 9, and Exhibit "4," Program Application

he would need a para-professional to be available to assist him with other needs.  The City offered

him admittance, if he provided his own caretaker.  Rose V. refused to accept this accommodation.[2]

4.     The Latchkey Program is run by the City of Corpus Christi to fill a need in the

community for after-school supervision of children whose parent(s) are not home when school lets

out.  The Program begins shortly after each school day and ends at 6:00-6:30 p.m.  In addition, the

City runs an all day program in the summer.  The Program is limited to children who are of the age

group that attend elementary school.  Due to financial and licensing considerations, the Program is

also limited to children who function at a mental and physical level of a five year old and are able

to handle any of their personal medications that they might need during the time they are in the

Program.

5.     The Latchkey Program is licensed by the Texas Department of Protective and

Regulatory Services under the guidelines established for day care programs.  In order to have such

a license, the Program must maintain certain minimum conditions.  One of the conditions, and in fact

the condition of primary concern herein, is the participant to care-taker ratio.  The TDPRS has a

schedule of minimum standards for participant to care-taker ratios that is based on the minimum age

of the child that is allowed into the Program.[3]  As can be seen in the TDPRS regulations, the ratio

of participants to care-takers decreases with the decreasing age of the youngest participant.  Under

the TDPRS licensing regulations, as the age of participants decreases, the staff (and room

---

[2]Deposition of Rose V., at pp. 13-14.

[3]Whitworth Affidavit, Attachment "A".

requirements) increase.  The City chose the present requirements to fit with elementary school age

and program affordability.[4]

6.      One of the other areas of concern, that is directly addressed by the Latchkey

requirements, is toileting.  Because of staffing and safety concerns, the Latchkey Program absolutely

requires that each participant be able to handle their own toileting needs.   This requirement is

applied equally to all of the Program Participants.   From Rose's deposition, it is clear that

Christopher does not meet this requirement.


## ARGUMENT

A.      **Summary Judgment Standard**

7.      Under Federal Rule of Civil Procedure 56(c), the party moving for summary judgment

has the initial burden of "informing the district court of the basis of its motion, and identifying those

portions of [the summary judgment record] which it believes demonstrate the absence of a genuine

issue of material fact."[5]  Once this burden is met, the burden of production shifts to the non-movant

to demonstrate, contrary to the motion, that a genuine issue of fact does exist on the essential

elements of his or her claim that the motion has placed in question.[6]  Whether the record supports

a genuine issue of fact presents a question of law for the Court.  To resolve this question, the Court

must review the competent summary judgment evidence, in a light, most favorable to the non-

movant.  However, no "genuine" issue exists if the evidence, so viewed as a whole, lacks sufficient

---

[4]Whitworth Affidavit

[5]*Celotex Corp. v. Catrett*, 477 U. S. 317, 323 (1986).

[6]*Celotex,* 477 U.S.  at 323-324.

probative value to support a reasonable jury's affirmative finding on the essential element in question.[7]

## B. The Individuals with Disabilities Education Act does not apply to the Latchkey Program.

8.      The Latchkey Program is a supervised recreational program whose purpose is to provide after-school supervision to elementary school aged children who would otherwise be going home alone, that is, they would be spending time (two to three hours) in an unsupervised house. The funding for the Program is provided solely by the fees charged to the Program's participants. The City of Corpus Christi expends no federal funds for the Program.[8]  The Latchkey Program is not an "educational service" as such is defined by the Education of Individuals with Disabilities Act ("IDEA").

9.      The purpose behind IDEA is to meet the special educational needs of children with disabilities by promoting the provision of "adequate services within the public school system."[9] Under "purposes" the IDEA states: "The purposes of this chapter are – (1)(A) to ensure that all children with disabilities have available to them a free appropriate **public education** that emphasizes special education and related services...."[10]  The Latchkey Program, as operated by the City of Corpus Christi, does not fall within the ambit of IDEA.  Most particularly, the act applies to

---

[7]*Matsushita Electric Industrial Co. v. Zenith Radio Corp.* 475 U.S. 574, 586-87 (1986).

[8]Whitworth Deposition, page 8, lines 17-25; page 9, lines 20-24, page 13, lines 2-4.

[9]20 U.S.C. § 1400(c)(2)(E).

[10]20 U.S.C. § 1400(d), *emphasis added.*

education and educational service agencies.  The City does not fit the Act's definition of an

educational service agency:[11]

> 10.    The term "educational service agency" –
>
> (A) means a regional public multi service agency–
>
> (i) authorized by State law to develop, manage, and provide services or programs to local educational agencies; and,
>
> (ii) recognized as an administrative agency for purposes of the provision of special education and related services provided within public elementary and secondary schools of the state; and
>
> (B) includes any other public institution or agency having administrative control and direction over a public elementary or secondary school.

The above definition applies to "public schools" and related agencies that are providing "free

appropriate public education."  It does not apply to municipalities.

> 11.    As used in the IDEA, the term "free appropriate public education" means special education and related services that[12] –
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

---

[11]20 U.S.C. § 1401(4)

[12]20 U.S.C. § 1401(8)

The provisions of IDEA are couched in terms of the State's duties and duties attributed to "local educational agencies."[13]  The City's program does not fit within the definitions and intentions of this act.  The Latchkey Program is not provided to the public "free" of charge.  Nor is the Program licensed or sanctioned by the State as an educational program.  The Latchkey Program is licensed by the State under the guidelines provided by the Texas Department of Protective and Regulatory Services as a "day-care center."[14]  The Program was put together for recreational and care purposes, not for education.[15]

12.     Although the Latchkey Program is not legally required to do so, the program directors will work to accommodate persons who do not exactly fit the qualifications for the Program.[16]  In this case it is important to note that Christopher was not completely denied participation in the Latchkey Program.  His mother, Rose V., was told that Christopher could be accommodated if he provided the para-professional that his mother stated that he needed.[17]  Given that the program is self-funded, it cannot afford to provide extra assistance such as para-professionals.[18]  It also can't take persons who are under an effective age of "five" years, without significantly increasing staffing

---

[13]Local educational agency includes an educational service agency, and other boards or agencies such as independent school districts.  20 U.S.C. § 1401(15).

[14]Deposition of Whitworth, page 16, lines 21-22; pages 50-51

[15]Deposition of Whitworth, page 10, lines 2-8; page 26, lines 23-25.

[16]Deposition of Whitworth, page 43, lines 10-13; page 52, lines 6-12; Exhibit 3

[17]Deposition of Rose V., page 13.

[18]Deposition of Whitworth, page 35, lines 22-25, Exhibit "3"

in accordance with the licensing regulations.[19]  Rose V. refused to accept the accommodation that was offered.[20]

13.    Since the City, and the Latchkey Program, do not fall within the definitions and intentions of the IDEA, the City cannot be held liable for any perceived violations of said act. The cause of action against the City under the IDEA should be dismissed.

**B.    The Rehabilitation Act of 1973 does not apply to the City's Latchkey Program.**

14.    Plaintiff has claimed that the City violated the Rehabilitation Act of 1973. Other than mentioning that jurisdiction under that act arises from 29 U.S.C. § 7949, Plaintiff has wholly failed to specify how, and which sections of the Act the City has allegedly violated. The code section cited does not exist, hence it is difficult for the City to determine the exact nature of Plaintiff's complaint.[21]  For the most part the Vocational Rehabilitation Act of 1973 deals with employment of individuals with disabilities.[22]  The Latchkey Program is limited to children who are of the age to attend elementary school; and as a matter of Texas law such children are not eligible for employment.[23]

---

[19] Whitworth Affidavit

[20] Deposition of Rose V., pages 13-14.

[21] Looking through the various permutations of 7949: 29 U.S.C. § 794 defines some of the standards applied, and defines "program or activity" for the purposes of the Act.

[22] 29 U.S.C. § 722(a)(1) defines eligibility as a disabled individual who needs services to prepare for, secure, retain or regain employment.

[23] Texas Labor Code § 51.011 (criminal offense to employ a child who is under 14 years of age.

15.     The regulations governing educational aspects of the Rehabilitation Act of 1973 can be found in 34 C.F.R. Part 104.  As in the IDEA, the Latchkey Program does not fit the definition of a program that is covered by this Act.[24]  The Latchkey Program is not a recipient of Federal Funding.[25]  It is also important to note that Subpart C (of Part 104) is not applicable to Plaintiff's claims.  In her deposition, Rose V. stated that the physical facilities were accessible, and that Christopher could physically access all of the rooms and areas of the school.[26]

16.     Likewise Subpart D does not apply because the Latchkey Program is neither federally funded nor is it an educational program.

> The provisions of Subpart D apply to state and local educational agencies. Although the subpart applies, in general, to both public and private education programs and activities that are federally assisted, §§ 104.32 and 104.33 apply only to public programs and § 104.39 applies only to private programs; §§ 104.35 and 104.36 apply both to public programs and to those private programs that include special services for handicapped students."[27]

Again, the applicable provisions refer to "education programs," a type of program that does not encompass the Latchkey Program.

17.     As stated above in paragraph twelve, Rose V. refused to accept the accommodation made by the Latchkey Program for including her son within their structure.  Such an accommodation, under the circumstances of the Latchkey Program, is a reasonable accommodation (*See below*, part

---

[24]34 C.F.R. § 104.1, 104.3(f).

[25]Deposition of Whitworth, page 9, lines 20-24.

[26]Deposition of Rose V., at page 15, line 19 through page 16, line 2 and page 27, lines 21.

[27]34 C.F.R. Part 104, Appendix A.

D), that would, if so required, suffice to comply with the Rehabilitation Act. Plaintiff's claims under the Rehabilitation Act should be dismissed.

## C.    The City's Latchkey Program does not violate The Americans with Disabilities Act.

18.    Plaintiff has also claimed that the City operates the Latchkey Program in violation of the Americans with Disabilities Act. As stated above in paragraph fifteen, Plaintiff's claim is not related to Christopher's ability to physically access the buildings (Rose V. admitted that this was not an issue). There is no claim, or genuine issue of material fact, regarding a lack of physical accessibility to the Latchkey Program. The claim is an apparent attempt to make the ADA public accommodation provisions applicable to the Latchkey Program.

19.    In addition to physical access, the regulations implementing the ADA state that "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity..."[28] In order to comply with this directive, public entities are required to maintain accessible features and make "reasonable" adjustments to programs so that disabled persons may participate. This requirement is, however, subject to certain specified limits. One of those limits is applicable in this situation. The ADA does not require a "public entity to provide to individuals with disabilities personal devices, such as wheelchairs...or services of a personal nature including **assistance in eating, toileting, or dressing**."[29] The Latchkey Program is not set up to allow toileting assistance to its

---

[28]28 C.F.R. § 35.130

[29]28 C.F.R. § 35.135, *emphasis added.*

participants.[30] Rose V. testified that her son must have assistance with toileting, and her son was excluded from the Program (unless he provided his own para-professional) for that reason.[31]

20.     The City has no legal responsibility to provide Christopher with toileting assistance. Plaintiff's claims under the ADA are without merit, and should be dismissed.

**D.     Plaintiff's request for a personal assistant is not a "reasonable" request for accommodation under the Americans with Disabilities Act.**

21.     As an alternative to the arguments raised in the above sections, the City contends that Plaintiff refused to accept the "reasonable" accommodation offered by the City. The City further contends that Rose V. has insisted on an accommodation that the Program provide Christopher with a para-professional on a one on one basis. This accommodation is not financially feasible for the Latchkey Program, and is therefore not reasonable.

22.     In her deposition, Rose V. testified that her son could not handle his medication (and such would be necessary during his participation in the Program) and could not take care of his toileting needs (without assistance).[32] In addition to this assistance, Rose testified that her son would also need assistance with participation in the Program activities(including watching his alpha-board so that it would not be broken).[33]

---

[30]Whitworth Affidavit; and Rose V. testified that other "day-care" programs have also refused to admit her son, unless she provided her own para-professional; Deposition of Rose V., at pages 28-29.

[31]Deposition of Rose V., at page 13, lines 10-25.

[32]Deposition of Rose V., at page 8. Lines 7- 21.

[33]Deposition of Rose V., at page 9, lines 3-6; page 10. Lines 13-15

ChmPDF - www.fenlio.com

23.     In order to provide the services that Christopher requires, the Program would need to hire additional staff, not only for working the Christopher, and similar children, but also nursing staff to handle issues involving medications.  The cost of hiring a nurse, or other medical professional, is much higher than the cost for the present staff.  The Program has been set up to be a "day-care" type program, with minimal semi-professional staffing.[34]

24.     It is difficult to gauge the exact staffing needs, but considering that assistance with toileting is one of the accommodation issues the Program would need to have persons trained in performing such duties, and staff would need to be sex-matched for each student needing assistance. It would be expected that the Program would need to pay a greater hourly wage to attract part-time personnel with these qualifications.[35]

25.     The important issue to consider is payment and financial accessibility to the Program. This Program is completely funded by its participants.  Such funding considerations also include the scholarships offered to all families who meet current guidelines (which are eligibility for the school lunch program).   The entire cost of additional personnel would be borne by those not receiving scholarship assistance (approximately 40% of the participants are on scholarship).[36]

26.     There is an additional consideration.  The reason for having an ability limitation (that of a five year old) is to meet the minimum staffing requirements for licensing.  By allowing children who need assistance with toileting (that is children with an effective age below five years) the City

---

[34]Whitworth Affidavit

[35]Whitworth Affidavit

[36]Whitworth Affidavit

would need to increase its staff at many of the program schools (in order to maintain the child/staff ratios).[37]  Again, this would increase the cost to the participants.

27.    In order to cover the cost of professional assistance and other required staff,  the estimated increase in monthly fees would seriously jeopardize the viability of the entire Program. As it is, it is difficult to balance staffing needs with affordability.  The addition of staff contemplated to accommodate this Plaintiff (and other similarly situated individuals) would seriously jeopardize the Program because the fee increase would make the Program less affordable to those participants at lower income levels (that are not eligible for scholarship).

<div align="center">

**PRAYER**

</div>

The City of Corpus Christi respectfully requests that the Court grant this Motion for Summary Judgment and enter an Order dismissing this case, with prejudice.

Respectfully submitted,
**JAMES R. BRAY, JR.**
**CITY ATTORNEY**

Andrew L. Quittner
Assistant City Attorney
Texas Bar No.: 16439975
S.D. Texas No.: 17001
City of Corpus Christi
P.O. Box 9277
Corpus Christi, Texas 78469-9277
Telephone: (361) 880-3360
Facsimile:  (361) 880-3239

**ATTORNEY FOR DEFENDANT**
**CITY OF CORPUS CHRISTI**

---

[37]Whitworth Affidavit, Attachment A,  page 5-2

# EXHIBIT "1"

CVisPDF – www.fenixo.com

# CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2000, a true and correct copy of the above and foregoing document was served on the following by the method indicated:

**BY U.S. MAIL, CERTIFIED**
**RETURN RECEIPT REQUESTED**

Mr. Les Cassidy
Woolsey & Cassidy
1020 Bank of America Center, North
500 North Water Street
Corpus Christi, Texas 78471

**BY U.S. MAIL:**

Ms. Linda Flores-Resendez
Corpus Christi Independent School District
801 Leopard Street
P.O. Box 110
Corpus Christi, Texas 78401

Andrew L. Quittner

# EXHIBIT "1"

CitiPDF – www.fastio.com

1

1    IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
2            CORPUS CHRISTI DIVISION

3    CHRISTOPHER E.P.,              *
     B/N/F ROSE V.                  *
4                                   *
     VS.                            * CIVIL ACTION NO. C-00-021
5                                   *
     CORPUS CHRISTI INDEPENDENT *
6    SCHOOL DISTRICT AND CITY       *
     OF CORPUS CHRISTI, TEXAS       *
7

8    ********************************************************

9              THE ORAL DEPOSITION OF

10                    ROSE V.

11             June 22, 2000  CERTIFIED COPY

12   ********************************************************

13

14           ORAL DEPOSITION OF ROSE V., produced as a

15   witness at the instance of the Defendant(s), and duly

16   sworn, was taken in the above-styled and numbered

17   cause on the 22nd day of June, 2000, from 9:05 a.m. to

18   9:40 a.m., before MARICELA FLORES, CSR in and for the

19   State of Texas, reported by machine shorthand, at the

20   offices of Mr. Les Cassidy, Attorney at Law, 1020 Bank

21   of America Center North, 500 North Water Street,

22   Corpus Christi, Nueces County, Texas, pursuant to the

23   Texas Rules of Civil Procedure and the provisions

24   stated on the record or attached hereof.

25

2

1                        A P P E A R A N C E S

2

FOR THE PLAINTIFF(S):
3
                MR. LES CASSIDY
4               Attorney at Law
                1020 Bank of America Center North
5               500 North Water Street
                Corpus Christi, Texas 78471
6

7   FOR THE DEFENDANT(S):

8               MR. ANDREW L. QUITTNER
                Assistant City Attorney
9               City of Corpus Christi
                P. O. Box 9277
10              Corpus Christi, Texas 78469-9277

11
                MS. YLISE JANSSEN
12              Assistant Staff Attorney
                Corpus Christi Independent School District
13              801 Leopard Street
                P. O. Box 110
14              Corpus Christi, Texas 78401

15
    REPORTED BY:  MARICELA FLORES, C.S.R. NO. 2558
16

17

18

19

20

21

22

23

24

25

7

1    A    Yes.  That he presses with his one hand --

2  with one finger.

3    Q    Presses the button?

4    A    Uh-huh.

5    Q    And it produces a set number of words or --

6    A    Yes.

7    Q    Do you recognize this document?  It's three

8  pages.

9    A    Yes.

10   Q    And is that the application that was sent to

11  you for the latchkey program?

12   A    Yes, it is.

13   Q    All right.

14          MR. QUITTNER:  I'd like to get that

15  marked as, I guess, Exhibit 1.

16          (Exhibit No. 1 marked.)

17   Q    Now, on that application, does it set forth

18  certain basic abilities or limitations that all the

19  participants must meet for the latchkey?

20   A    Yes.

21   Q    And is Christopher able to meet all of what

22  they call the minimal qualifications for the program?

23   A    Well, it says he must be five years old and

24  have a mental ability of a five-year-old.  And

25  Christopher, in some areas, does.  In other areas, he

1   does not.  And it does specify in there he must have a

2   mental capacity of a five-year-old.

3       Q    Did they tell you why they denied his entrance

4   into the program?

5       A    Yes.

6       Q    And what was the reason?

7       A    Because they didn't have the staffing for a

8   child of his disability, and because he didn't have

9   the mental capacity in all areas of a five-year-old.

10  For example, administering his own medication.

11      Q    Would he have to have medication during the

12  short time --

13      A    Yes.

14      Q    -- that he was there?

15      A    Yes.

16      Q    Is he able to take care of all his toileting

17  needs on his own?

18      A    All of them with assistance.

19      Q    So the answer to that then would be no, he

20  cannot on his own?

21      A    Correct.

22      Q    And is that not one of the basic requirements

23  for everybody in latchkey?

24      A    Well, his -- he can -- in toileting needs, he

25  can wash his hands, he can go to the toilet, but he

1    cannot express his needs.

2       Q    The Alpha Board won't help him in that area?

3       A    If given to him, yes.  But it's a pretty heavy

4    device.  And he does need someone to hand it over to

5    him and take care of it.  It's a very expensive device

6    that, if thrown accidentally, it can be broken.

7       Q    So it's your feeling that he would have to

8    have somebody with him one on one during this entire

9    program in order to be able to participate?

10      A    No.  Not exactly.

11      Q    Could you --

12      A    He could have -- he's on a schedule as far as

13   toileting needs.  And at school, they do take them on

14   a schedule.  And at home, I also do that every hour.

15   So we don't have to have that one on one.

16             He can have a para there with him, as

17   long as they're within a certain distance from him.

18   They can also participate -- the para can participate

19   with other children as well.

20      Q    But didn't you tell the latchkey people, when

21   you applied, that he would need a personal assistant?

22      A    For toileting needs, yes.  And for

23   administering medications, yes.

24      Q    So as far as the program knew, he would need

25   personal assistance just for him for toileting needs?

CERTIFIED COURT REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

1    A    Correct.

2    Q    Which would not bring him within the minimum

3  capabilities that they require of everybody else?

4    A    I suppose.

5    Q    And why do you think that discriminates

6  against your son?

7    A    Well, because he is not accepted in the

8  program.  And I don't think most children at five

9  years old go to the bathroom without some assistance.

10  So Christopher does need the assistance.

11    Q    Exactly what services would the

12  paraprofessional or caretaker have to provide?

13    A    Assisting him with his needs, toileting

14  needs.  Assisting him with directing him with his

15  involvement in the latchkey program.

16    Q    And what type of training would a person like

17  this need?

18    A    What the school district requires as far as

19  their paras suffice.

20    Q    But do you think that the latchkey program is

21  an educational program?

22    A    Yes, I do.

23    Q    And why do you believe that?

24    A    Because it allows my child to enhance his

25  ability to interact with other children as normal as

13

1    Q    At home, what would it require?

2    A    For him to be on a schedule.  For me or his

3  caretaker to be able to assist him with his toileting

4  needs or assist him with his needs to participate in

5  working with his computer or walking outside, making

6  sure he climbs up and down the stairs with minimal

7  assistance.

8    Q    Do you have a caretaker at home?

9    A    Yes.

10   Q    Why wouldn't you provide that caretaker for

11 him to be with him at the latchkey?

12   A    Does everybody else provide their own

13 providers at latchkey?

14            MR. CASSIDY:  Just answer the question.

15   A    No, I don't.  I didn't think that I had to.  I

16 thought the program had the personnel there.

17   Q    Didn't they tell you that you could provide

18 your own caretaker if you wanted to --

19   A    They said I could.

20   Q    -- if you wanted to participate?

21   A    Right.  But I don't --

22   Q    And they told you that they do not provide

23 caretakers?

24   A    I didn't want a caretaker.  I want him to

25 participate in the program.  I don't want a caretaker.

1    Q    But you've testified that he can't participate

2    without assistance.

3    A    I just want a paraprofessional with him.

4    Q    And you think that the city or whoever should

5    provide that for him, as opposed to you providing it?

6    A    Yes.

7    Q    Even though you do have one?

8    A    I have one, yes.

9         MR. QUITTNER:   I have nothing further.

10             E X A M I N A T I O N

11   BY MS. JANSSEN:

12   Q    Good morning, Ms. V.

13   A    Good morning.

14   Q    I don't have very many questions, but a few.

15   A    Okay.

16   Q    And the same thing.  If you don't understand

17   my questions, then please just let me know, and I'll

18   be happy to rephrase it.

19   A    Okay.

20   Q    Okay.  In going through your original petition

21   -- complaint, pardon me -- that was filed in federal

22   court, you cited three different causes or three

23   different statutes by which you think Christopher is

24   entitled to relief.

25             One of them being the Individuals with

1  Disabilities in Education Act, commonly known as

2  IDEA.  The other was the Americans with Disabilities

3  Act.  And also the Rehabilitation Act of 1973, which

4  is commonly referred to as Section 504.

5           I'd like to ask you some questions

6  specifically about those.  The Americans with

7  Disabilities Act tends to impose certain requirements

8  upon governmental entities, when providing programs,

9  to participants or those who would like to

10 participate.

11          My question to you is this:  In reference

12 to the buildings in which the latchkey program is

13 provided, do you have any issue about the construction

14 and facilities in which this program is held?

15     A    Do I have questions?  I think they're all

16 fairly reasonable for any child with a disability.

17     Q    Okay.

18     A    And they're very accepted by the city as well.

19     Q    Okay.  But you have no -- no problem with the

20 structure itself?  For instance, I'm talking about the

21 building.

22     A    The school?

23     Q    Okay.  The school.

24     A    No.

25     Q    Is there anything about accessibilities?

1  Ramps?  Doors?  Anything of that nature?

2     A     No.

3     Q     Okay.  In reference to Section 504, again, the

4  same question:  Do you feel that there is any problem

5  with the facilities in which the program is being

6  offered?

7              MR. CASSIDY:  Excuse me.  I'll let the

8  witness answer the question, but I do want to

9  interpose an objection that the question is calling

10  for a legal conclusion from this witness, who may not

11  be familiar with the nuances of Section 504.

12     Q     Okay.  And to that extent, I would try, in

13  very simple terms, to say on the basis that Section

14  504 is an anti-discriminatory statute, under what --

15  on what basis do you think that he's being

16  discriminated against in being able to participate in

17  the latchkey program?

18              I mean, is it as simply, as Mr. Quittner

19  has previously asked you, in reference to being

20  admitted into the program?  Or is there more than just

21  that?

22     A     I don't understand it as well.

23     Q     Okay.

24     A     I'm sorry.

25     Q     Okay.  Well, let me begin by asking you this.

1    A    -- the issue was presented.

2    Q    Okay.

3           MS. JANSSEN:  Okay.  I have no further

4    questions.  Thank you.

5           MR. QUITTNER:  I've got a couple more, I

6    think, perhaps to clear up on this 504, IDEA, the

7    differences.

8           F U R T H E R   E X A M I N A T I O N

9    BY MR. QUITTNER:

10    Q    Your child goes to Galvan Elementary?

11    A    Yes, sir.

12    Q    And the latchkey program would be at the same

13    school; is that correct?

14    A    Yes.  I think so.  I think that's where the

15    city offers it.

16    Q    Does your child have any problems getting

17    around, you know, physically in Galvan?  Is access to

18    the rooms and the places he needs to be sufficient?

19    A    No.

20    Q    They are?  Or they're not?

21    A    There are no problems with him.

22    Q    Okay.  You also -- I believe you said that

23    latchkey is necessary for your child's development?

24    A    Yes, sir.

25    Q    What is it in that program -- what do they

1    offer that's not offered at school or elsewhere that

2    is necessary for his educational development?

3        A    I'm not clear on that question, sir.  I'm

4    sorry.

5        Q    Well, how is latchkey -- what does latchkey

6    provide that isn't provided in the school or somewhere

7    else that is necessary for his development?

8        A    Extended time in his daily routine to enhance

9    his abilities and to continue his abilities throughout

10   the day in normal interaction, for one.  And his --

11       Q    Well, isn't it true that latchkey is only a

12   small subset of all the students who attend Galvan?

13       A    I don't understand that question.

14       Q    Do all the students who attend Galvan go to

15   latchkey?

16       A    I don't know.

17       Q    Well, what will you do with Christopher if

18   latch -- if and when latchkey is discontinued as a

19   program?

20       A    Look for other programs to enhance his daily

21   living skills.

22       Q    Have you found any others that can do the same

23   thing?

24       A    Not -- well, I have been denied by all day

25   care services.

1    Q    And have you offered to provide your own

2  paraprofessional at some of the other day care

3  services?

4    A    No.

5              MR. QUITTNER:  Okay.  Nothing further.

6              MS. JANSSEN:  Just one followup to his

7  question.

8         F U R T H E R   E X A M I N A T I O N

9  BY MS. JANSSEN:

10    Q    When was the most recent denial by a day care

11  service to provide service to Christopher?

12    A    In '99.

13    Q    Okay.

14    A    And this has also been brought up to Advocacy,

15  Inc. in the valley.  And they're also looking into it.

16              MS. JANSSEN:  Okay.  Nothing further.

17              MR. CASSIDY:  Of course, we'll reserve

18  all questions for later.  That's all we have.

19

20

21  June 22, 2000
    MR. ANDREW L. QUITTNER          ROSE V., Witness
22

23

24

25

32

1          REPORTER'S CERTIFICATE

2     STATE OF TEXAS

3     COUNTY OF NUECES

4              I, MARICELA FLORES, a Certified Shorthand
      Reporter in and for the State of Texas, do hereby
5     certify that these facts stated and set forth in the
      caption hereto are true; that after the witness, ROSE
6     V., had been by me first duly cautioned and sworn to
      tell the truth, the whole truth, and nothing but the
7     truth, the foregoing questions were propounded to her
      by the attorneys named in the caption hereto, and the
8     foregoing answers were made by said witness at said
      time in response to said questions so propounded to
9     her; that the questions so propounded to the witness
      and the said answers in response thereto were by me at
10    said time and place taken down in shorthand on the
      22nd day of June, 2000, and the same were thereafter
11    reduced to typewriting by computer-aided
      transcription.
12             Further certification requirements, if any,
      pursuant to the Rules will be certified to in the
13    Reporter's Certificate of Filing after they have
      occurred.
14             WITNESS MY HAND on this, the ___5th___ day
      of ___July_____, 2000.
15

16

17    _____
      MARICELA FLORES, C.S.R.
18    Certification No.: 2558
      Expiration Date: 12-31-00

19    CERTIFIED REPORTING & VIDEO
20    500 Frost Bank Plaza
      802 North Carancahua
21    Corpus Christi, Texas 78475
      Phone: (512) 883-3400

22

23

24

25

CERTIFIED COURT REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470

33

<center>IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION</center>

```
CHRISTOPHER E.P.,                *
B/N/F ROSE V.                    *
                                 *
VS.                              *  CIVIL ACTION NO. C-00-021
                                 *
CORPUS CHRISTI INDEPENDENT       *
SCHOOL DISTRICT AND CITY         *
OF CORPUS CHRISTI, TEXAS         *
```

<center>REPORTER'S CERTIFICATE OF FILING

ORAL DEPOSITION OF ROSE V.

June 22, 2000</center>

I, MARICELA FLORES, Certified Shorthand Reporter in and for the State of Texas, hereby certify, pursuant to the Rules and/or agreement of the parties present, to the following:

Certify that $_____ is the charge for the preparation of the completed original deposition and any charges of exhibits, which is hereby taxed against and payable by the Defendant(s).

I further certify that the original deposition was submitted to MR. ANDREW L. QUITTNER on _____, 2000, that same was to be examined and signed by the witness within 30 days of said date and ___ was ___ was not returned to CERTIFIED REPORTING AND VIDEO SERVICE, Certified Shorthand Reporters, by _____, and the attached Witness Correction Sheet contains changes, if any, made by the witness, and that the original/certified copy of the original deposition, together with copies of all exhibits, if any, was delivered to _____ on _____, 2000.

I further certify that the following includes all parties or counsel of record at the time of taking said deposition:

MR. LES CASSIDY, Counsel for Plaintiff(s)
MR. ANDREW L. QUITTNER AND MS. YLISE JANSSEN, Counsel for Defendant(s)

<center>CERTIFIED COURT REPORTING & VIDEO SERVICE
500 Frost Bank Plaza, Corpus Christi, Texas 78470</center>

34

1        I further certify that a copy of this certificate
was served on all parties or their counsel named
2  herein.

3        WITNESS MY HAND, this the _____ day of
_____, A.D., 2000.

4

5                        *Mariela Flores*
          MARICELA FLORES, C.S.R.
6          Certification No.:  2558
          Expiration Date:  12-31-00
7
          CERTIFIED REPORTING & VIDEO
8          500 Frost Bank Plaza
          802 North Carancahua
9          Corpus Christi, Texas 78470
          Phone:  (512) 883-3400

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



*FAXED*
*10/11/99  2:45pm*
*DAN WHITWO...*



City of Corpus Christi

# Park & Recreation
# D E P A R T M E N T

### *from the:*

## Office of the Director

1201 Leopard Street, Corpus Christi, Texas 78401
or
P.O. Box 9277, Corpus Christi, Texas 78469-9277
**Ph: (361) 880-3461**
**Fax: (361) 880-3864**

**DATE:** _10/11/99_

**TO:** _Rosie   Vasquez_

**ATTN:**

**FAX:** _854 - 4245_

**FROM:** _Dan   Whitworth_

**PH:** _880 - 3471_

**MESSAGE:** _Here is the Request for Special accomodation form._

**NO. OF PAGES:** _____

**PLEASE CALL TO CONFIRM RECEIPT OF FAX**

**EXHIBIT**
_1_

CM/PDF - www.festo.com

---

### Did You Know...

The City of Corpus Christi **Park & Recreation Department** offers a wide range of recreational activities for all age groups. Activities include swimming, tennis, golf, martial arts, sports, arts & crafts, and seminars on various topics.

For a sampling of the cultural experience, there are special events, dances, art exhibits, festivals, cooking demonstrations in Heritage Park, summer concerts in Cole Park, and much more.

The Latchkey program provides an organized, supervised after school environment for children. It is a welcome alternative to working parents. Camps are also offered during the summer break.

Senior Community Services provides programs designed for older adults which include nutrition, recreation, volunteer and social services.

The Corpus Christi Marina offers a full range of services to local residents, tourists, and boaters. It hosts a variety of activities and special events including fishing, power boat races, boat parades, and fireworks. Sailing classes are provided during the summer months.

It's easy to plan an outing or picnic with your family and friends with over 200 parks available throughout the city.

For more information about these and other services provided by the City of Corpus Christi Park & Recreation Department, call 880-3461.

# City of Corpus Christi Park & Recreation Department
# LATCHKEY - REQUEST FOR SPECIAL ACCOMMODATIONS

Child's Name:_____ Age:_____ Grade:_____ Site:_____

Parent's Name:_____ Home Phone:_____ Work Phone:_____

Specific Accommodations Requested:_____

Reason for the accommodation:_____

The Latchkey Program is an organized, supervised after school program for children who would otherwise go home to an unsupervised environment. The Latchkey Program is not a preschool, nursery school, or infant care program. The Program is held in elementary school cafeterias, with a ratio of one supervisor to approximately twenty children. Children participate in both active and passive recreation activities and special events.

To qualify to participate in the Latchkey After School Program, the participant must:
* be five years old and have mental and physical abilities of a five year old.
* be able to take responsibility for and handle his/her own personal hygiene.
* be able to administer his/her own medication.
* be able to communicate with site supervisor.
* not place the safety of him/herself or others at risk.
* be willing and able to comply with the Latchkey After School Program rules and regulations.
* be able to take responsibility for and handle interactions with the other participants and staff.

'ark and Recreation will allow participants to have a personal assistant or caregiver enter the Latchkey site contingent on the personal caregiver or assistant obtained by the participant's parent or guardian: 1) is qualified to provide such care, 2) is designated by the parent to provide such care, and 3) abides by the rules and regulations.

Reasonable accommodations will be made based on a review of request for accommodation. Requests for reasonable accommodations must be made at the time of registration or within ten (10) days after the need arises. Each time a child enrolls in the Latchkey Program, a new request for reasonable accommodation must be made. Failure to make a timely request for reasonable accommodation may result in delay of the review and implementation of an accommodation or delay the child's entry into the Latchkey Program. An accommodation is not reasonable if it results in a fundamental change in the Latchkey Program.

_____           _____
Parent's Signature                          Physician's Signature

APPROVED:            Date:                   DISAPPROVED:            Date:
(Reasonable Accommodation can be made.)      (Reasonable Accommodation cannot be made.)
   Reasonable Accommodation to be made:         Comments:

**FOR OFFICE USE ONLY**

h:\pr-dir\shared
\latchkey\newrfsa
11-97

# EXAMPLES OF CONDITIONS THAT REQUIRE ACCOMMODATIONS
## and
## EXAMPLES OF ACCEPTABLE ACCOMMODATIONS

| CONDITION | ACCOMMODATION |
|---|---|
| Insect Allergy | Request that emergency injections be administered as first aid (and provide injection) |
| Asthma | Request that child be allowed to keep inhaler on his/her person. |
| Prescription Medication | |
|     1) when to take | Post a list of who takes medication at what time - staff can **not** remind children to take medication.   That would be assisting in medicating and is not part of the program. |
|     2) how to identify own medication | Mark medicine bottle with bright color. stickers, child's name in big letters - all prescription medication must be kept in one place that is not accessible to other children - staff can **not** assist child in getting or taking  medication. |
|     3) how to open | Ask pharmacist to put medications in a bottle the child can open.  Medicine will be locked up except when a child with medication is accessing his/her own medicine. |
| Toileting Assistance | |
|     1) if assistance is needed | Parent makes arrangements with school to take child to bathroom prior to child being checked-in at Latchkey. Latchkey staff will **not** assist with toileting. |
|     2) clothing | Parents need to make sure child is wearing clothes he/she can put back on after toileting.  This can be a problem with very young children.  Staff will notify parents if child is having problems with certain types of clothes. |
|     3) child with catheter | Child must be able to empty bag on his/her own. |
| Deaf Child | Latchkey staff member who knows sign language can communicate with child or staff can communicate in writing with child. |
| Child Running Away from Program Site | Pursue and physically restain child if necessary.  Staff will notify parents of incident and suspension, which may be permanent. |

EAR, NOSE & THROAT ASSOCIATES

CARE and SURGERY of the EAR, NOSE & THROAT AND
FACIAL PLASTIC and RECONSTRUCTIVE SURGERY

of Corpus Christi

Michael L. Wintz, M. D., F. A. C. S.
_. Zane, M. D., F. A. C. S.
_e M. Fisher, M. D., F. A. C. S.
_rt D. Oehman, M. D., F. A. C. S.
_s M. Motes, M. D., F. A. C. S.
_nio C. Andrade, M. D.
_y W. Brandt, M. D., F. A. C. S.
_ W. Loeffler, M. D., F. A. C. S.
_de A. McLelland, M. D., F. A. C. S.
_all S. Zane, M. D., F. A. C. S.

Richard Mourglia,
Administrator


Melissa C.




Audrey


Isabel


Marissa


Isaac

DATE: 10/11/99

FACSIMILE COVER SHEET

TO: Dan Whitworth

COMPANY NAME: _____





FAX#: _____

FROM: _____

FAX#: _____


Tracy


Amelia

TOTAL NUMBER OF PAGES: _____
(INCLUDING COVER PAGE)


Adrienne


Sheila

COMMENTS:

Please Respond ASAP
with the Answer for
approval.


Sarah


Rosie

If you do not receive all pages transmitted, please call (512) 854-7000 and
ask for: Rosie Vasquez

EAR, NOSE & THROAT ASSOCIATES
3318 SOUTH ALAMEDA
CORPUS CHRISTI, TEXAS 78411
TELEPHONE: (512) 854-7000
FAX NO.: (512) 854-4245

If the reader of this message is not the intended recipient, or an agent
responsible for delivering this message to the intended recipient(s), you are
hereby notified that you have received this document in error, and that any
use, review, dissemination, distribution, disclosure, or copying of this
document is strictly prohibited by law. The information contained in this
facsimile is legally privileged and confidential communication intended only


Melissa
Cantu


Sharon

EXHIBIT
2

OCT-11-99 04:
P.01

Case 2:00-cv-00021 Document 30 Filed in TXSD on 09/15/2000 Page 37 of 75

## City of Corpus Christi Park & Recreation Department
### LATCHKEY - REQUEST FOR SPECIAL ACCOMMODATIONS

Child's Name: _Christopher E Perez_ Age: _11_ Grade: _5_ Site: _Galvan_

Parent's Name: _Rosie Vasquez_ Home Phone: _8511628_ Work Phone: _8547000_

Specific Accommodations Requested: _para professional to Assist Chris in Latchkey_

Reason for the accommodation: _____

The Latchkey Program is an organized, supervised after school program for children who would otherwise go home to an unsupervised environment. The Latchkey Program is not a preschool, nursery school, or infant care program. The Program is held in elementary school cafeterias, with a ratio of one supervisor to approximately twenty children. Children participate in both active and passive recreation activities and special events.

To qualify to participate in the Latchkey After School Program, the participant must:
- be five years old and have mental and physical abilities of a five year old.
- be able to take responsibility for and handle his/her own personal hygiene.
- be able to administer his/her own medication.
- be able to communicate with site supervisor.
- not place the safety of him/herself or others at risk.
- be willing and able to comply with the Latchkey After School Program rules and regulations.
- be able to take responsibility for and handle interactions with the other participants and staff.

Park and Recreation will allow participants to have a personal assistant or caregiver enter the Latchkey site contingent on the personal caregiver or assistant obtained by the participant's parent or guardian: 1) is qualified to provide such care, 2) is designated by the parent to provide such care, and 3) abides by the rules and regulations.

Reasonable accommodations will be made based on a review of request for accommodation. Requests for reasonable accommodations must be made at the time of registration or within ten (10) days after the need arises. Each time a child enrolls in the Latchkey Program, a new request for reasonable accommodation must be made. Failure to make a timely request for reasonable accommodation may result in delay of the review and implementation of an accommodation or delay the child's entry into the Latchkey Program. An accommodation is not reasonable if it results in a fundamental change in the Latchkey Program.

_Rosie Vasquez_
Parent's Signature

Physician's Signature _Dr. Patel, Girish waives his signature_

| APPROVED: Date: | DISAPPROVED: Date: | |
|---|---|---|
| (Reasonable Accommodation can be made.) | (Reasonable Accommodation cannot be made.) | **FOR OFFICE USE ONLY** |
| Reasonable Accommodation to be made: | Comments: | |

hrlpw-dir/shared Latchkey/accom/ss 11-97

_If application is denied, I am requesting a hearing with your Board members with a Representative with the Children With Disabilities act. Thanks_ _Rosie Vasquez_

# EXHIBIT "2"

CutePDF – www.fastio.com

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CHRISTOPHER E.P., b/n/f      *
ROSE V.,                      *
      Plaintiff,          *
                            *
VS.                           *    NO. C-00-021
                            *
CORPUS CHRISTI INDEPENDENT *
SCHOOL DISTRICT and CITY      *
OF CORPUS CHRISTI, TEXAS,     *
      Defendants.         *

-------------------------------------------------------

ORAL DEPOSITION OF

DANIEL WHITWORTH

August 4, 2000

**COPY**

-------------------------------------------------------

ORAL DEPOSITION OF DANIEL WHITWORTH, produced as

a witness at the instance of the Plaintiff and duly

sworn, was taken in the above styled and numbered cause

on the 4th day of August, 2000, from 9:06 a.m. to 10:39

a.m., before Sandra M. Allen, CSR in and for the State of

Texas, reported by machine shorthand, at 1201 Leopard

Street, Fifth Floor, Corpus Christi, Texas, pursuant to

the Federal Rules of Civil Procedure, and the provisions

stated on the record or attached herein.



*Depositions Etc.*

VIDEO SERVICE • PROCESS SERVING • INTERPRETERS • ASCII DISK • CONDENSED • COURIER • STATEWIDE

Office: (361) 883-9990 · Fax: (361) 883-9991 · E-mail: DeposEtc@aol.com
500 N. Water St. · Suite 612 South Tower · Corpus Christi, Texas 78471

1                     A P P E A R A N C E S

2   ATTORNEY FOR PLAINTIFF:

3               LES CASSIDY
                Woolsey & Cassidy, P.C.
4               1020 North Tower
                500 North Water Street
5               Corpus Christi, Texas   78741

6   ATTORNEY FOR DEFENDANT CCISD:

7               LINDA FLORES-RESENDEZ
                801 Leopard Street
8               P.O. Box 110
                Corpus Christi, Texas   78401
9
    ATTORNEY FOR CITY OF CORPUS CHRISTI, TEXAS:
10
                ANDREW L. QUITTNER
11              1201 Leopard Street, Fifth Floor
                P.O. Box 9277
12              Corpus Christi, Texas   78469-9277

13  ALSO PRESENT:  Robin West
                   Rosie Vasquez
14                 Marcia West

15  REPORTED BY:  Sandra M. Allen, CSR No. 7509

16

17                     I N D E X

18  EXAMINATION OF DANIEL WHITWORTH:              PAGE

19      By Mr. Cassidy                           3, 52
        By Mr. Quittner                             49
20      By Ms. Flores-Resendez                      50

21                                              INITIAL
22  EXHIBIT(S)                                  REFERENCE

23      (None.)

24

25

DEPOSITIONS, ETC.  (361)883-9990
500 North Water Street, Suite 612 South Tower, Corpus Christi, TX

1   it is purchasing of the materials for the sites, doing

2   the employee management for those directly assigning

3   people to those sites, those are the kinds of things that

4   they do.

5       Q    Okay.  These 31 latchkey sites, where are they

6   located?

7       A    Throughout the city.

8       Q    At the schools?

9       A    Through CCISD and through Flour Bluff ISD.

10      Q    Is every site located at a school?

11      A    Yes.

12      Q    And are these elementary schools and middle

13  schools?

14      A    Elementary.

15      Q    These are all elementary schools?

16      A    Correct.

17      Q    Who funds the Latchkey Program?

18      A    The people that participate in the program.

19      Q    Any other source of funding?

20      A    No.

21      Q    So that I understand your information exactly,

22  the Latchkey program is entirely funded by participants

23  in the program?

24      A    By the fees that we charge the participants,

25  correct.

1    Q    And no other funds?

2    A    That is correct.

3    Q    Does the Latchkey Program pay your salary?

4    A    No.

5    Q    Does it pay for Linda Hodge?

6    A    No.

7    Q    Does it pay for -- or did it pay for Steve

8    Ramos?

9    A    Yes.

10    Q    So at the level of Steve Ramos is where the

11    funding from the Latchkey Program was used exclusively?

12    A    Correct.

13    Q    Linda Hodge, what was the funding for her pay?

14    A    General fund.

15    Q    I believe I read in the paper within the last

16    three months that the Latchkey Program received a grant,

17    or the after-school program received a grant.  Do you

18    recall any information like that?

19    A    No, I do not.

20    Q    Are any grant funds used in the Latchkey

21    Program?

22    A    No, sir.

23    Q    Any federal assistance of any type?

24    A    No, sir.

25    Q    Why does the City of Corpus Christi participate

1   in a Latchkey Program?

2       A     To offer -- to try to fill a need that was

3   identified in the community.

4       Q     And what was the need?

5       A     For some recreational opportunities for kids who

6   have either dual working parents or single parent

7   families, and would be going home to a house

8   unsupervised.

9       Q     Who identified that need?

10      A     There was a survey that was done several years

11  ago that I think the Chamber of Commerce and the city and

12  the school district, I think -- I don't remember the

13  specifics of the group that put together the coalition

14  that put together the survey that determined the

15  community need.

16      Q     Has the city applied for any grants to fund the

17  Latchkey Program?

18      A     Not to my knowledge, no.

19      Q     How long has the city operated a Latchkey

20  Program?

21      A     I don't remember the exact date we started.   I

22  think it was probably -- I think it's probably been

23  operating for about 10 years, but I would have to go back

24  to my file to get the exact date for when they started

25  the first program.

```
 1      Q     Why does the city operate the program in the
 2   schools?
 3      A     Because it is easier for us to do that.   We
 4   don't have recreation facilities that would be sufficient
 5   to handle the program with our existing recreation
 6   centers.
 7      Q     Does the city lease the buildings from the
 8   school?
 9      A     No.
10      Q     What is the financial relationship between the
11   city and the school for the operation of the Latchkey
12   Program?
13      A     The school district provides us with the
14   facility to operate the program.
15      Q     What else?
16      A     That's what the school district provides.
17      Q     Is the facilities to operate the program?
18      A     Yes.
19      Q     Who was responsible with the city for setting
20   policy for student eligibility to participate in the
21   Latchkey Program?
22      A     I was.
23      Q     Did you work with anyone else?
24      A     I worked with representatives from our Legal
25   Department and from our Human Resources Department.
```

1      Q      Why did you work with someone from the Human

2   Resources Department?

3      A      Because that's where the ADA coordinator for the

4   city for -- Americans with Disabilities Act coordinator

5   for the city was housed.

6      Q      And who was that?

7      A      David Ramos.

8      Q      What about the Legal Department?  Who did you

9   work with in the Legal Department?

10     A      Allison Galloway.  She is no longer employed.

11     Q      When was the policy set for eligibility for

12  participation in the Latchkey Program?

13     A      Again, I can't give you an exact date.  I think

14  we have been operating under our current scenario

15  probably for three to four years, maybe a bit longer.  I

16  don't recall specifically.

17     Q      Is the first requirement for eligibility to be

18  in the Latchkey Program that the student be enrolled in

19  CCISD?

20     A      No.

21     Q      So it is open to students who are not enrolled

22  -- or not students -- it is open to children who are not

23  enrolled within CCISD?

24     A      Our program begins when the child is checked

25  into the program.

1    Q    Who funds the scholarship program?

2    A    The participants in the program.  The fees are

3    structured so that the costs of the program are covered

4    by the participants.

5    Q    What's the total budget for the program, for

6    last year?

7    A    I can give you next year.  That's what I've been

8    working with.  I think it is around 1.7 million.  That's

9    inclusive of both after-school and summer Latchkey.

10   Q    And the 1.7 million is funded directly from the

11   participants?

12   A    From fees.

13   Q    What was the budget last year?  Was it more or

14   less than 1.7 million?

15   A    Less.  I don't remember the number though,

16   without going to the budget book.

17   Q    So the budget has increased?

18   A    Um-hum.

19   Q    Are you anticipating more participation?

20   A    We increased the fees by $5 across the board.

21   Q    Why did you increase the fees by $5?

22   A    To add additional staff to the sites, to deal

23   with the paperwork.

24   Q    You said add additional staff at the sites?

25   A    In order to deal with the paperwork.

1    scholarships and those kinds of things.  They may be --

2    they may be, if we have a shortage of staff that day,

3    someone calls in sick, then they may have to actually

4    provide for direct supervision with the kids.

5        Q    Okay.  All right.  So to summarize what you are

6    saying, you are adding additional staff members at every

7    site, and it is expected that this will result in

8    additional supervision for the children at the site?

9        A    I guess under the scenario that you are

10   describing, yes.  I don't view it exactly what way, but I

11   understand what you are saying.

12       Q    Okay.  And I understand why you don't view it

13   that way.

14                Let me ask you some questions about the

15   determination of student eligibility.

16       A    Okay.

17       Q    You said you made that determination?

18       A    Um-hum.

19       Q    Did you also make the determination as to the

20   number of staff at the latchkey sites?

21       A    It is governed by our license with the

22   Department of Protective and Regulatory Services.

23       Q    And what does that license require?

24       A    I believe it is around a 1 to 20 ratio.

25       Q    Does that present any problems for supervision

1    of the children?

2        A    What do you mean by problems?

3        Q    Problems for students with special needs.

4        A    It prevents us from being able to provide a

5    program that would have a less than 1 to 20 ratio of

6    supervision, i.e., there are some -- in order to

7    participate in the Latchkey Program, we have some

8    guidelines which are required to participate.  The

9    Latchkey Program was never established to be and

10   all-inclusive program.

11       Q    When you say all-inclusive, what do you mean?

12   Nondiscriminatory?

13       A    No.  I mean the kids that participate in the

14   program are required to participate at a certain level

15   that's identified at registration.

16       Q    And the students that aren't eligible are not

17   permitted to participate in the program?

18       A    If they are unable to meet those guidelines.  We

19   do have individuals with special needs that participate

20   in the Latchkey Program successfully.

21       Q    Do they meet the guidelines?

22       A    Yes.

23       Q    So the point is that the guidelines are a

24   threshold requirement for a child to participate in the

25   Latchkey Program?

1   A       In some cases, like with asthma, then they carry

2   their own medications.  In other cases, the medications

3   are held at the desk and the children have to go and drop

4   them off or pick them up from there.

5   Q       Well, what supervision does the staff provide to

6   the children who are administering their own medication?

7   A       I'm not sure that I understand the question.

8   The kids are supposed to be responsible for their own

9   medications.

10  Q       But what does that exactly mean?

11  A       That if they have to take medications at

12  specific times, that they know that, and that they take

13  their medications at those times.

14  Q       And the staff and the Latchkey Program provide

15  no assistance to these children with regard to that?

16  A       No, sir.

17  Q       What exactly do the staff of the Latchkey

18  Program do?

19  A       We offer a recreational program.

20  Q       But what does that mean?  What exactly do you

21  do?

22  A       We do arts and crafts.  We do outside games.  We

23  do videos or movies at times.  We supervise the kids in

24  playing games.

25  Q       And if a child has a special need where he needs

DEPOSITIONS, ETC.  (361)883-9990
500 North Water Street, Suite 612 South Tower, Corpus Christi, TX

1   to take a medication at, say, 3 o'clock, or 3:30, during

2   the hours of the Latchkey Program, the staff don't assist

3   the child in taking the medication?

4        A    No, sir.

5        Q    Do -- does the staff of the Latchkey Program

6   hold the medication?

7        A    In some cases, they may hold the medication

8   after the child brings it in, and then the child will

9   check it back out.

10       Q    And why would they do that?

11       A    Simply for keeping it away from the other kids.

12       Q    And what about dosage?  Does the staff get

13  involved in --

14       A    No, sir.

15       Q    So if a child had been prescribed a potentially

16  dangerous medication, an elementary child, then he would

17  be permitted to administer that medication on his own?

18       A    I couldn't answer that.  To participate in our

19  program, we don't deal with administration of

20  medications.  So, I'm not -- I'm not -- I'm not sure I'm

21  understanding your question.  If a child --

22       Q    I'm trying to understand the program, really.

23       A    It is easy.  It is a recreational program for

24  kids who would be going home otherwise to a house by

25  themselves, where they have structured recreational

1   accommodations?

2       A     It is part of the registration package that was

3   given to everyone that registers for the program.  The

4   parents determine the need to request special

5   accommodations.

6       Q     Okay, but why was she discussing that with you,

7   if you know?

8       A     I think she was trying to -- I think I was

9   talking to her when she was questioning whether a

10  determination had been made on the Request for Special

11  Accommodations form, if I recall correctly.

12      Q     Why did her son need a special accommodation?

13      A     I would have to look at the form.  I don't

14  remember what her request was.  I believe it was for

15  having one-to-one supervision or something.  I would need

16  to look at the form to see.

17      Q     Would you allow a child to participate in the

18  program with an assigned paraprofessional?

19      A     With a caregiver assigned?

20      Q     Right.

21      A     Yes, we would do that at the parent's expense?

22      Q     Does it necessarily have to be the parent's

23  expense?

24      A     It would.  We don't have the ability to provide

25  that within our program.

1    Accommodations form, is what I recall.

2        Q    And submit it to the city?

3        A    Correct.

4        Q    Completed meant appropriately filled in and

5    signed by a physician?

6        A    Correct.

7        Q    And if a physician would not certify that the

8    child met the eligibility requirements, the child would

9    be ineligible?

10       A    That's correct, unless a request for

11   accommodations, which we could rent, i.e., if the child

12   could participate with a caregiver that the parent

13   provided, well, then we would make those allowances.

14       Q    But those allowances would not include someone

15   assigned one-on-one to supervise the child?

16       A    It would not, that's correct.

17       Q    But you don't know what that would cost?

18       A    No, sir.

19       Q    You just know that it is not consistent with the

20   program?

21       A    That's correct.

22       Q    Regardless of whether the child would benefit by

23   participating in the program?

24       A    That's sort of a parent call.

25       Q    The requirements that I've been provided by the

1        A       That's correct.

2        Q       They are not responsible for complying with any

3   of your health or safety guidelines?

4        A       That's correct.

5        Q       And they are not involved in maintaining any of

6   your state required licenses for the program; is that

7   correct?

8        A       That's correct.

9        Q       And CCISD is not required to provide any type of

10  educational program for the Latchkey?

11       A       That's correct.

12              MS. FLORES-RESENDEZ:  Thank you.  I have no

13  other questions.

14              MR. QUITTNER:  I have a few.

15                      EXAMINATION              10:30 a.m.

16  BY MR. QUITTNER:

17       Q       Going back to the -- I guess I should identify

18  myself just for the record.  This is Andy Quittner, the

19  attorney for the City of Corpus Christi.

20              Going back to the guidelines, or actually

21  rules provided by the Texas Department of Protective and

22  Regulatory Services, do those rules mandate the child to

23  staff ratio?

24       A       They have minimum standards, yes, sir.

25       Q       And do those standards vary with the age of the

1   child that participates?

2      A    Yes, sir.

3      Q    And was the selection of a five-year-old child,

4   then, made in part because of those ratios and the

5   costs --

6      A    Yes, sir.

7      Q    -- associated?  How many days does the Latchkey

8   operate?

9      A    The after-school Latchkey Program operates on

10  all days that the districts that we are involved with are

11  having classes, and then we have a summer Latchkey

12  Program, which is an all-day type of situation from 7 to

13  6:30 during the summertime.

14     Q    So that would be approximately 180 school days

15  plus the summer?

16     A    Correct.

17     Q    And how many hours a day during the school does

18  it operate?

19     A    It operates from 3 to 6 on most campuses, and

20  2 to 6, I think on some.

21     Q    So would the cost then of a one-to-one caretaker

22  be at least that hourly rate for whatever the period of

23  time the child was registered?

24     A    Correct.

25     Q    Does the Texas Department of Protective and

1  Regulatory Services have any rules regarding the

2  qualifications or education level of a staff member that

3  would be giving medications or things like that to a

4  child?

5       A     I don't know.

6       Q     Just a couple more.  Have any other children who

7  needed a one-to-one paraprofessional applied for

8  participation in the Latchkey Program?

9       A     I'm uncertain, but I believe that we have had

10  some cases where that has been requested, and I think in

11  some cases that has been taken advantage of by the

12  parent.

13       Q     And have all of those cases been treated

14  equally?  That is, they would provide their own --

15       A     If there is a cost.

16            MR. QUITTNER:  Nothing further.

17                        EXAMINATION            10:33 am

18  BY MR. CASSIDY:

19       Q     Do you actually know who paid the cost for the

20  paraprofessional?

21       A     I just know that it was not the program.

22       Q     Okay.  Who pays for the utilities in the

23  facilities where the Latchkey Program is held?

24       A     The school district.

25       Q     I do have some more questions.

1           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                 CORPUS CHRISTI DIVISION

3    CHRISTOPHER E.P., b/n/f      *
     ROSE V.,                     *
4            Plaintiff,           *
                                  *
5    VS.                          *   NO. C-00-021
                                  *
6    CORPUS CHRISTI INDEPENDENT  *
     SCHOOL DISTRICT and CITY     *
7    OF CORPUS CHRISTI, TEXAS,    *
            Defendants.           *
8
                  REPORTER'S CERTIFICATION
9              DEPOSITION OF DANIEL WHITWORTH
                    August 4, 2000
10
        I, Sandra M. Allen, Certified Shorthand Reporter in
11   and for the State of Texas, hereby certify to the
     following:
12       That the witness, DANIEL WHITWORTH, was duly sworn
     by the officer and that the transcript of the oral
13   deposition is a true record of the testimony given by the
     witness;
14       That the deposition transcript was submitted on
     _____ to the attorney for DANIEL
15   WHITWORTH for examination, signature, and return to
     Depositions, Etc. by _____;
16       That the amount of time used by each party at the
     deposition is as follows:
17
        LES CASSIDY -             (1:22)
18      LINDA FLORES-RESENDEZ -  (0:02)
        ANDREW QUITTNER -         (0:03)
19
        That pursuant to information given to the deposition
20   officer at the time said testimony was taken, the
     following includes all parties of record:
21
        LES CASSIDY, Attorney for Plaintiff
22      LINDA FLORES-RESENDEZ, Attorney for Defendant CCISD
        ANDREW QUITTNER, Attorney for Defendant City of
23          Corpus Christi, Texas

24

25

1        I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
2   action in which this proceeding was taken, and further
that I am not financially or otherwise interested in the
3   outcome of the action.
        Further certification requirements pursuant to Rule
4   203 of TRCP will be certified to after they have
occurred.

5

6        Certified to by me this 8th day of August, 2000.

7        _____
        SANDRA M. ALLEN, CSR
8        Certification No. 7509
        Expiration Date:  12-31-00

9
        DEPOSITIONS, ETC.
10       Suite 612 South Tower
        500 North Water Street
11       Corpus Christi, TX  78471
        (361) 883-9990

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT "3"

CitiPDF – www.fastio.com

**STATE OF TEXAS**                    §
                                      §
**COUNTY OF NUECES**                  §

<u>**AFFIDAVIT OF DANIEL WHITWORTH**</u>

**BEFORE ME**, the undersigned official, on this day appeared Daniel Whitworth, Assistant Director of Programs for the City of Corpus Christi Park and Recreation Department, who is personally known to me, and first being duly sworn according to law upon his oath deposed and said:

1.    My name is Daniel Whitworth. I am over 21 years of age, have never been convicted of a crime of moral turpitude and I am competent to make this affidavit.

2.    I am the assistant director of programs for the City of Corpus Christi Park and Recreation Department. Part of my duties include administrative oversight of the Latchkey Program. In that respect, I am intimately familiar with the Program. I have personal knowledge of all of the facts stated herein.

3.    The Latchkey Program was developed as an after-school recreation program so that eligible elementary school children could participate in structured recreational programs, rather than going home to an empty and unsupervised house. The program is licensed by the Texas Department of Protective and Regulatory Services. Included with this Affidavit as Attachment "A" is a copy of Chapter Five of the 1999 version of the Minimum Standards and Guidelines for Day Care Centers (published by the Texas Department of Protective and Regulatory Services. This Chapter sets the required minimum guidelines for the staff to child ratio (and number of children per room) that can be utilized by a licensed day care center. This Chapter also describes

the maximum number of children allowed in a given room, and the effect that mixing age groups has with the room and staff limitations.

4.      The Latchkey Program was also developed as a program that is financially self-sustained.  The program does not receive any grants or other monies from either federal, state or city funding sources.  The cost of the program is entirely borne by the participants.  In developing the program, the cost of providing reduced fees to needy participants was worked into the fee schedule.  Those children who are eligible for the school lunch program are also eligible for reduced (or no) fees.  Approximately 40% of the children do not pay the monthly fee.  What this means is that the total cost of the program, not covered by scholarship payments, is thus borne by the remaining 60% of the children.   Increases in costs are therefore disproportionately spread and have a greater affect on Program affordability, particularly with respect to children whose financial status is close to the reduced fee guidelines.

5.      In keeping with cost containment, and the perceived needs of the community, the Latchkey program was developed so that a 20:1 child to staff ratio could be utilized. In order to do this, and maintain the TDPRS license, the Program had to set a minimum age of 5 years for every participant.  Furthermore, the licensing regulations limit the number of children per room whenever there are children under the age of 4 years present with older children (See, Attachment "A").  As can be seen, any decrease in the Program's minimum age limit would increase the required staffing,

2

and thus increase the cost of the program.  Since this is a program targeted for elementary school children, this age limit was workable.

6.  In addition to an age limit, the Program also requires that all students be able to handle their own toileting - without assistance.  Again, this requirement is to help maintain the required staffing, without the need of hiring additional staff, solely to aid a few participants. In order to meet minimum standards, if a child needs assistance in the bathroom, then the staff must be (1) sex related, that is both male and female staff must be present at each room site; and, (2) someone else must be present in the room when a staff person takes a child into the bathroom; or, (3) male and female staff must be hired solely to man the bathrooms.  It is also anticipated that such staff would need to have more training than the current staff (particularly if working with disabled children).  Increased training generally equates with increased demand in hourly wage (in order to attract such persons).  This would also increase the cost of the Program.

7.  Presently, the Latchkey Program has 1800-2000 participants located on 31 sites throughout the City.  The five year minimum age limitation allows a staffing ratio of 22-24 children per staff.  Under the current enrollment, which averages approximately 60 students per school, many of the schools can be staffed by three persons. Bathroom assistance would thus require, at a minimum 31 extra staff.  In reality, the number would be greater  Such an increase in cost is not justified for this type of program.  Further, the City had difficulty obtaining its present staffing

3



# 5 Activities At The Facility and Child/Staff Ratios

# 5000 Activities at the Facility & Child/Staff Ratios

## 5100 Discipline and Guidance

**A.** Discipline and guidance of children must be consistent and based on an understanding of individual needs and development.

**B.** Positive methods which encourage self-esteem, self-control, and self-direction must be used.

**C.** There must be no harsh, cruel, or unusual treatment.



1. Corporal punishment (see Glossary) or threats of corporal punishment are prohibited.
2. Children must not be shaken, bitten, hit, or have anything put in or on their mouth as punishment.
3. Children must not be humiliated, yelled at, or rejected.
4. Children must not be subjected to abusive or profane language.
5. Punishment must not be associated with food, naps, or toilet-training.
6. Bed wetters must not be shamed or punished.
7. Staff may use brief, supervised separation from the group if necessary, but staff must not place children in a locked room or in a dark room with the door closed.

## 5200 Activities

**A.** Activities appropriate to each child's developmental needs must be provided.

**B.** A supervised rest period, after the noon meal and lasting not longer than three hours, must be provided.



1. The rest area must be lighted in such a way as to allow visual supervision at all times.
2. After two hours, children who are awake must be allowed to get up and partici-pate in quiet activities.

**C.** All children must have time outdoors each day that weather permits.

**D.** Indoor and outdoor time periods must include:

5-1



1. alternating active and quiet activities; and

2. opportunity for individual and group activities.

## 5300 Child/Staff Ratios and Groupings

A. In a day care center, the number of children per staff member and the group size must not exceed the following, except under the conditions described in subsections (E) through (I) of this section.



| Specified Age Group | Number of Children Supervised by One Staff | Maximum Group Size |
|---|---|---|
| 0–11 months | 4 | 10 |
| 12–17 months* | 6 | 14 |
| 12–17 months** | 5 | 13 |
| 18–23 months | 9 | 18 |
| 2 years | 11–13 | 22–26 |
| 3 years | 15–17 | 30–34 |
| 4 years | 18–20 | 35 |
| 5 years | 22–24 | 35 |
| 6–8 years | 26 | 35 |
| 9-12 years | 26 | 35 |

\* Effective until September 1, 1999

\*\* Effective after September 1, 1999

B. The child/staff ratio as described in subsection (A) of this section is based on the age of more than half of the children in the group. The larger number indicating the child/staff ratio for ages 2 through 5 years are the ratios for groups where more than half of the children are a year or more older than the specified age group.

C. The maximum group size described in subsection (A) of this section is also the child/staff ratio allowed when two staff are present.



D.  Facilities caring for 35 two-year old children, in one room, may do so when the following conditions are met:

1. The room is divided so that groups are separated; for example, a group of 25 children and another group of 10 children can be cared for in the same room if the placement of shelves, accordion doors, or low movable walls, divides the area so that children in one group do not freely mix with children in another group.

2. Child/staff ratios must be maintained for each group.

3. Teachers must know which children they are responsible for and children must know which is their teacher, so that consistency of care can be maintained.

4. Groups may move from one activity area to another within the classroom during the day, but individual children may not freely mingle. Joint activities in which groups can be mixed as specified in subsection (E) of this section are allowable.

E.  Maximum group size may be exceeded, provided child/staff ratio is maintained for each group, under the following conditions:

1. For children 18 months through four years of age for a maximum of 30 minutes.

2. For children five years old and older for a maximum of one and one-half hours.

3. For field trips, outdoor play, and naptimes for the length of that activity.

F.  During naptime, children 18 months of age and older may be under the supervision of 50% of the child/staff ratio if an additional 25% of the child/staff ratio is maintained in the building and not counted in the child/staff ratio for another group.

G.  Forty-five minutes after opening and 45 minutes before closing, the children may be regrouped at a ratio of one staff member per group of 16 children 18 months of age and older.

H.  When a child in the group is under 18 months of age, the oldest child in the group must not be more than 18 months of age older than the youngest child unless there are fewer than 12 children at the center.



I. If 12 or fewer children are in care at the center, the following child/staff ratios may be used. One adult may care for any combination of children as shown in the following chart.

| Number of Children 0-17 Months | Number of Children 18 months through 4 years | Number of Children 5 Through 13 Years | Maximum Children Allowed |
|---|---|---|---|
| 0 | 8 | 4 | 12 |
|   | 7 | 5 |   |
|   | 6 | 6 |   |
|   | 5 | 7 |   |
|   | 4 | 8 |   |
|   | 3 | 9 |   |
|   | 2 | 10 |   |
|   | 1 | 11 |   |
|   | 0 | 12 |   |
| 1 | 5 | 5 | 11 |
|   | 4 | 6 |   |
|   | 3 | 7 |   |
|   | 2 | 8 |   |
|   | 1 | 9 |   |
|   | 0 | 10 |   |
| 2 | 4 | 4 | 10 |
|   | 3 | 5 |   |
|   | 2 | 6 |   |
|   | 1 | 7 |   |
|   | 0 | 8 |   |
| 3 | 2 | 2 | 7 |
|   | 1 | 3 |   |
|   | 0 | 4 |   |
| 4 | 0 | 0 | 4 |

1. Children under 18 months do not have to be cared for in separate areas.

2. The caregiver can be involved in meal preparation but must be able to supervise the children.

3. Supervision cannot be reduced during naptime.

5-4

## 5400 Night Care

**A.** Naptime child/staff ratios may not be used for night care.

**B.** Staff in a facility providing night care must be awake at all times.

**C.** Activities and routines must meet the unique needs of children in night care.

**D.** There must be visible exits which may be provided by exit lights or by lighted exits.

**E.** Each child in night care must be provided a cot, bed, or mattress that is comfortable and waterproof or washable.



## 5500 Additional Requirements for Children Under 18 Months Old

**A.** Staff must talk to, hold, and play with the children.

**B.** Children in cribs, while awake, may remain in their cribs for up to one hour as long as they stay content and responsive.

**C.** Each child must be allowed to explore outside the crib or playpen each morning and afternoon.

**D.** A child not yet ready for table food must be fed a formula or diet approved in writing, signed and dated by the child's physician or parent, and updated as changes are made.



    1. Bottles must be clearly marked with the child's name.

    2. Bottles must never be propped (See Glossary); the child or an adult must hold the bottle.

    3. Children up to 6 months of age must be held while being bottle-fed.

**E.** Children no longer being held for feeding must be fed in a manner that ensures their safety and comfort.

**F.** A staff member must always be in the room with the children.

# EXHIBIT "4"

CitsPDF - www.fastio.com

# 1999-20 0 SCHOOL YEAR

# LATCHKEY AFTER SCHOOL PROGRAM

**REGISTRATION:**

For more information, call

## 880-3479



▶ **CCISD Elementary School Sites:**
*(REGISTRATION: August 3rd, 8:00a.m.-11:00a.m.)*

| | |
|---|---|
| Barnes | Calk |
| Carroll Lane | Casa Linda |
| Central Park | Chula Vista |
| Club Estates | Crocket |
| Dawson | Fannin |
| Galvan | Garcia |
| Houston | Jones |
| Kostoryz | Los Encinos |
| Meadowbrook | Menger |
| Montclair | Moore |
| Oak Park | Sanders |
| Schanen | Smith |
| Wilson | Windsor Park |
| Woodlawn | Yeager |

▶ **FBISD Elementary School Sites:**
*(REGISTRATION: August 11th, 8:00a.m.-4:00p.m.)*
Early Childhood   Primary
Intermediate

**City of Corpus Christi**

# Park & Recreation
## DEPARTMENT

# *REGISTER YOUR CHILD IN THIS OUTSTANDING PROGRAM EARLY SINCE REGISTRATION IS LIMITED!*

# Latchkey Program

The Latchkey After School Program is the answer for working parents concerned about leaving their children in unsupervised environments. This program is offered by the Corpus Christi Park & Recreation Department.

## ▶ The program strives to provide:

1. A safe, professionally supervised environment.
2. Basic survival skills necessary in today's society.
3. Quality recreational experiences and enhance the child's leisure skills, including art, drama, games and weekly special events.

## ▶ Licensed Program:

The staff is certified in Standard First Aid, Infant, Child and Adult CPR, and the program is licensed by the Department of Protective and Regulatory Services.

## ▶ Operating Procedures:

**GENERAL:**

1. Any child may register who is attending a Latchkey elementary school site. The child must attend the site where they are registered.
2. Program operates Monday through Friday, from the end of the school day until 5:45 p.m., observing the same holiday schedule as the school district.
3. Children are encouraged to bring a daily snack from home.

**SIGN IN & OUT PROCEDURES:**

1. Children go directly to the cafeteria after school and are signed in upon arrival. Children enrolled in such after school activities as tutoring, etc. should sign in following those activities.
2. Parent or guardian must have a picture I.D. as requirement to sign out child. Child must be signed out daily.
3. To remain eligible for the Latchkey Program, children must be signed out by 5:45 p.m.

## ▶ Tuition Assistance Information:

- Eligibility will be determined the day of registration.
- Authorization and assessed fee will be determined by the tuition assistance clearing house.
- A $25.00 fee (1st child) and $20.00 fee (each additional child) will be assessed during the waiting/processing period.
- IF APPROVED: A refund/balance will be assessed and will need to be taken care of within the next five days.
- IF DENIED: The balance of the remaining tuition will need to be paid within the next five days.
  *If applying for tuition assistance, request the necessary form.*

## ▶ Parental Action Notice:

The City of Corpus Christi Park & Recreation Department reserves the right to refuse service to anyone if there are any safety concerns to children or staff. *(Example: Offensive conduct or language, under the influence of alcohol or other intoxicating substance, failure to sign child out or unauthorized person signing child out from the Latchkey Program, unresolved custody disputes, etc.)* As a result, parents/guardians must be responsible for their actions and the actions of all authorized persons listed on the registration form who sign your child out of the Latchkey Program.

# Registration Information

## ▶ Registration:
Register your child at site where he/she attends. The Latchkey Program 1999-2000 school year for CCISD and FBISD

## ▶ Payment:
In order to ensure placement of your child in the Latchkey Program, you must make your payment by the designated deadline (no refunds). Payment is due at the start of each month before the child can attend. **First payment is due upon registration. Parent has until the fifth day of the month to pay thereafter!**

## ▶ Monthly Fee:

| August 10-31 | 1st Child: | $58 |
| | Each Additional Child: | $47 |
| September, October, November, January, February, March, April & May | 1st Child: | $70 |
| | Each Additional Child: | $55 |
| December | 1st Child: | $58 |
| | Each Additional Child: | $47 |

## ▶ Late Registration Fee:
Per child (not on CCMS) registering in the Latchkey Program after the 15th of the month involving 10 school days or less. ........ $41

## ▶ Registration Fee:
Per Semester Per Child: (twice/school year) ........ $20

## ▶ Late Pick-Up Fee:
Per 15 minutes or fraction thereof: (per family) ........ $10

## ▶ Monthly Tuition Assistance Fee (pending funding approval):
1st Child: ........ $25
Each Additional Child: ........ $20

# Requirements

**CHILD MUST:**

- Have the mental and physical abilities of a five-year-old. (minimum)
- Be able to take responsibility for and handle his/her own personal hygiene.
- Be able to administer his/her own medication.
- Be able to communicate with site supervisor.
- Not place the safety of him/herself or other at risk.
- Be willing and able to comply with Latchkey Program rules and regulations.
- Be able to take responsibility for and handle interactions with the other participants and staff.

## ▶ Youth Disciplinary Action Notice:

| Time Out* | 5-10 minutes from activities |
| 3 Written Referrals | 1 day suspension |
| 4 Written Referrals | 2 day suspension |
| 5 Written Referrals | 3 day suspension |
| 6 Written Referrals | Permanent suspension from Latchkey Program |

*\* Depending on severity of infraction, one written referral may warrant permanent suspension from the Latchkey Program.*

Please fill out ENTIRE form to speed up the registration process. Fill out one registration form for each child. Bring this with you to the registration site.

## Registration Form

*Fill out one registration form for each child.* ◀◀

# Corpus Christi Park & Recreation Department
## *(MUST FILL OUT COMPLETE FORM or child may be disqualified from the program.)*

Site: _____ _____ Date of Birth: _____ Grade: _____

Name: _____ Age: _____ Sex: _____

Address: _____ City/Zip: _____

Parent/Guardian (P/G): _____ Phone (H): _____ (W): _____

Alternate Emergency Contact: _____ Phone (H): _____ (W): _____

Medical Information: _____

Special Needs: _____

Child's Physician: _____ Address: _____ Phone: _____

<div style="border:1px solid black">

### Check In & Out Authorization:

IMPORTANT: Please list any and all persons and their phone numbers that you authorize to sign your child out of the Latchkey Program (children will only be released to those listed). All authorized persons must present a picture I.D. The City reserves the right to refuse the child to any person listed and/or remove any person listed from the list if circumstances so warrant. You, or authorized person, must sign out your child EACH day.

| Name: | Phone (H): | Phone (W): | Name: | Phone (H): | Phone (W): |
|-------|-----------|-----------|-------|-----------|-----------|
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |

Name of Child: _____

Attends (School): _____ Address: _____ Phone: _____

His/her immunization record is on file at the school and tuberculosis test results are current. I have also been provided with a Parent's Guide to Day Care:

Parent's/Guardian's Signature: _____ Date: _____

</div>

<div style="border:1px solid black">

### Medical Release/Waiver:

I (Parent/Guardian), _____, do hereby authorize the City of Corpus Christi Park & Recreation Department to provide emergency medical treatment to my child, _____, in the event that I am unreachable and in the event of an emergency need for such treatment. I further authorize the treatment to be provided by the licensed medical practitioner or facility determined by the staff to be the best able to serve my child's needs, and further; I understand that I am totally responsible for any expense associated with such treatment. The safety of my child is always the City's number one concern. I understand that every effort will be made to contact me or the person who has been designated by me as soon as practical after such an occurrence. I hereby agree not to sue the **City of Corpus Christi if my child is injured in any manner while participating in said program. I will hold the City of Corpus Christi and staff harmless from all monetary damages, including punitive damages, imposed by any lawsuit filed related to any injury my child may receive while participating in said program. I understand that by signing this I give up all rights to sue the City of Corpus Christi.**

Address: _____ Phone: _____

Parent's/Guardian's Signature: _____ Date: _____

</div>

FOR OFFICE USE ONLY: Name:

Group:

This program does not discriminated against participants because of race, color, national origin, sex, disability, religion or political belief. Reasonable accommodations will be made for all participants.

## Educational Records Release Form:

I (Parent/Guardian), _____, authorize the Corpus Christi Independent School District (CCISD)/ Flour Bluff Independent School District (FBISD) school officials (e.g. teachers, principal, counselor) to release and discuss all pertinent educational records maintained by the school district on my child, _____, DOB _____ who attends _____ Elementary School to a designated representative of the City of Corpus Christi's Legal Department. I release the CCISD/FBISD for all liability related to the release and discussion of the records. The City will only provide information from the educational records to its employees as directed by the City Attorney or designee on a need to know basis and will make every effort to keep all records confidential.

Parent's/Guardian's (P/G's) Signature: _____ Date: _____

## Tardiness/Disciplinary Notice:

I (Parent/Guardian), _____, have been advised that my child needs to be picked up by 5:45 p.m. and no later than 6:00 p.m. in order to remain eligible for the Latchkey Program. No refunds will be granted if a child is suspended. (Tardiness/Disciplinary) $10.00 late fee for every 15 minutes or fraction thereof.

Parent's/Guardian's Signature: _____ Date: _____

## Photographic Release:

I hereby ___ DO, ___ DO NOT, consent and authorize the Corpus Christi Park & Recreation Department to reproduce photographs or video of my child for advertising and publicity purposes of every description.

P/G's Signature: _____

## Request for Special Accommodations:

My signature is proof that I have received a copy of the Request for Special Accommodations Packet.

P/G's Signature: _____

## Names of Other Siblings in the Latchkey Program:

Names of Children:

| First | Last | First | Last |
|-------|------|-------|------|
|       |      |       |      |
| First | Last | First | Last |

## Office Use Only:  Disciplinary Action:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHRISTOPHER E.P., b/n/f | § | |
| ROSE V. | § | |
|     Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO: C-00-021 |
| | § | |
| CORPUS CHRISTI INDEPENDENT | § | |
| SCHOOL DISTRICT AN CITY OF | § | |
| CORPUS CHRISTI, TEXAS | § | |

## ORDER GRANTING CITY OF CORPUS CHRISTI'S
## MOTION FOR SUMMARY JUDGMENT

Before the Court is the Motion for Summary Judgment filed by the City of Corpus Christi and the response to that Motion filed by Plaintiff, Rose V. In consideration of the Motion, the Response, and the evidence before the Court, the Court finds as follows:

Rose V. brought this suit on behalf of her son Christopher E.P. alleging that the City illegally discriminated against her son by not allowing him to participate in the City's Latchkey Program. It is not disputed that Christopher suffers from severe disabilities that would require special accommodation in order to allow him to participate in the Program. In her Amended Complaint, Rose V. alleges violations of the American's with Disabilities Act 42 U.S.C. § 12132, the Rehabilitation Act of 1973, 29 U.S.C. § 7949, and the Individuals with Disabilities Education Act, 20 U.S.C. § 1415.

The evidence provided by the City of Corpus Christi shows that the City receives no federal funds for the operation of the Latchkey Program. It is also not disputed that the Latchkey Program, as currently run, operates solely from the monies obtained from the fees charged to the Program's Participants.

The evidence before the Court also conclusively establishes that the City of Corpus Christi is not an education service provider, as that term is defined by the Individuals with Disabilities Education Act and the Rehabilitation Act of 1973. Similarly, the City of Corpus Christi is not in the business of providing, or servicing the provision, of free public education. The Latchkey Program is self-funding and not "free" to the public.

The evidence also conclusively establishes that Christopher has no problem physically accessing the facilities where the Latchkey Program is held. In that regard, there is no violation of any of the laws cited in Plaintiff's Complaint.

Given the above facts, neither the Individuals with Disabilities Education Act or the Rehabilitation Act of 1973 are applicable to the program run by the City of Corpus Christi. Plaintiff has failed to produce facts to show that a violation of these acts has occurred.

Regulations passed pursuant to the Americans with Disabilities Act provide that an entity does not need to offer an accommodation that would require assistance with eating, toileting or dressing. Rose V. testified that her son needed assistance in these areas. The Latchkey Program does not allow admission to any child who cannot take care of her own toileting needs without assistance. Plaintiff has requested that the Latchkey Program provide a personal assistant so that her son can have assistance with, among other things, toileting. The Americans with Disabilities Act does not require that the City make such an accommodation.

Further, the City offered Rose V. the accommodation of allowing Christopher to participate in the program, if she provided (by whatever means) her own personal assistant. Plaintiff refused to accept this accommodation. Given the facts presented to the Court (concerning the mode of financing the Program) the City's offer of accommodation was reasonable. Nothing in the law cited

2

by Plaintiff requires that an entity give the exact accommodation requested by the Plaintiffs. Plaintiff has not provided any evidence to the contrary.

Considering the above findings, the City of Corpus Christi's Motion for Summary Judgment is hereby

GRANTED, and Judgment will be entered that all causes against the City are to be dismissed.

SIGNED AND ENTERED this ____ day of _____, 2000.

_____
United States District Judge

3