IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

OCT 5 - 2000

MICHAEL N. MILBY, CLERK

| | | |
|---|---|---|
| CHRISTOPHER E.P., b/n/f | § | |
| ROSE V. | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO: C-00-021 |
| | § | |
| CORPUS CHRISTI INDEPENDENT | § | |
| SCHOOL DISTRICT AND CITY OF | § | |
| CORPUS CHRISTI, TEXAS | § | |
| Defendants | § | |

## PLAINTIFF'S RESPONSE WITH AUTHORITIES TO DEFENDANT CITY OF CORPUS CHRISTI'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Christopher E.P., b/n/f Rose V. and respectfully files and submits this Response to the City of Corpus Christi's Motion for Summary Judgment and would show as follows:

## I. BASIS FOR MOTION

1.      Defendant, City of Corpus Christi, is not entitled to judgment as a matter of law and further, genuine and material fact issues exist concerning the reasonable accommodation of Christopher E.P. into the Latchkey "after-school" Program which preclude summary judgment in favor of Defendant.

## II. SUMMARY OF FACTS

2.      Plaintiff is a twelve-year-old boy with multiple disabilities.  More specifically, Plaintiff has Cri-Dy-Chat Syndrome, a form of mental retardation.  Plaintiff is eligible for and receives

33.

special education services from Defendant Corpus Christi Independent School District (hereinafter "CCISD").

Plaintiff was previously enrolled in the 5th grade at Galvan Elementary School within CCISD.  Plaintiff applied to participate in CCISD's after-school care program at that school which is called the Latchkey Program.  Eligible children for this program include those students who attend Galvan Elementary School (Exhibit "1").  The Latchkey Program is jointly provided by the Parks and Recreation Department of the City of Corpus Christi (hereinafter "City") and CCISD.  Pursuant to an agreement between CCISD and the City, CCISD provides buildings, playground facilities, utilities and janitorial services for the Latchkey Program (Exhibit "2").  The Parks and Recreation Department for the City administers the Latchkey Program.  Both Defendants are general recipients of federal funding and are public entities, although the Latchkey Program is funded entirely by parental payment.*

On numerous occasions, Plaintiff has requested through his mother that he be allowed to participate in the Latchkey Program offered on the campus of the school that he attended.  As part of his participation in the program, and as a condition required by the administration because of the Plaintiff's disability, Christopher P. must have additional supervision assigned to him during the time that he is attending the program (see Exhibit "3", Request for Special Accommodation).  Plaintiff already receives the assistance of a paraprofessional when he is attending school during regular hours, but not thereafter.  In spite of Plaintiff's numerous requests, Defendants have refused to allow Plaintiff to participate in the Latchkey Program unless his mother provides an adult assistant at her expense.

---

\* It is the expressed national policy of the United States to develop and expand such programs (see Exhibit "4").

5.     As a result of Defendants' refusal to allow Plaintiff to attend the Latchkey Program,

Plaintiff has brought this cause of action and alleges violations of Individuals with Disabilities in

Education Act, 20 U.S.C. § 1400 et seq., (as to CCISD) the Rehabilitation Act of 1973, 29

U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (as to both

Defendants in their capacity as public entities).

## III. ARGUMENT AND AUTHORITIES

### A.     The Applicable Legal Standard for Summary Judgment

6.     Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment in any

case in which " the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."

### B.     Defendants Have Discriminated Against Plaintiff on the Basis of his Disability and in Violation of the ADA

7.     Applicable law provides that Defendants must make reasonable modifications to the

Latchkey Program to allow Plaintiff to participate in the program.  Title II of the ADA provides

in pertinent part that "no qualified individual with a disability shall, by reason of such disability,

be excluded from participation in or denied the benefits of the services, programs, or activities of

a public entity, or be subject to discrimination by such entity."  42 U.S.C. § 12132.  To establish

a violation of Title II, a claimant must demonstrate that: (1) he is a qualified individual with a

disability within the meaning of the ADA; (2) he was excluded from participation in or denied

the benefits of a public entity's services, programs, or activities, or was otherwise discriminated

against by the entity; and (3) the exclusion, denial of benefits, or other discrimination, was by

reason of his disability. *Layton v. Elder*, 143 F.3d 469 (8th Cir. 1998); *Lightbourn v. County of El Paso, Texas*, 118 F.3d 421 (5th Cir. 1997).

8.     It is undisputed that as a result of Christopher P.'s severe mental retardation that he does not meet the published criteria for participation in the Latchkey Program.  Exhibit "1".  He is a "qualified individual" under the ADA and § 504, and it is his disability which precludes his participation (mental retardation, physical disabilities).  He would otherwise be eligible because of his age and regular attendance at the Latchkey school site.

9.     Title II of the ADA defines public entities subject to the statute to include "any State or local government" as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1).  Because the statutory definition of a public entity is so broad, both the City and CCISD fall within this definition.

10.     Title II of the ADA also defines a "qualified individual with a disability" who is entitled to the benefits of Title II as:

> An individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).  As to whether Plaintiff constitutes a "qualified individual with a disability," Plaintiff is a twelve-year-old boy with multiple disabilities,  (See Affidavit of Rose Vasquez, which is attached hereto as Exhibit "5").  More specifically, Plaintiff has Cri-Dy-Chat Syndrome.  *Id.*  As a result of this condition, Plaintiff suffers from impaired motor skills and control.  *Id.*  Moreover, Plaintiff requires assistance from either his mother or a paraprofessional.  *Id.*  Plaintiff is eligible for and receives special education services from CCISD.  *Id.*  As part of

those special education services, Plaintiff receives the assistance of a paraprofessional when he is attending school during regular hours. *Id.* Because Plaintiff suffers from impaired motor skills and control, he requires constant attention and already receives special education services. He constitutes a qualified individual with a disability under the ADA. Plaintiff, as a student enrolled at a CCISD elementary school site with a Latchkey Program, would otherwise be eligible except for the limitations of his disability.

11.     Plaintiff has been denied the benefits of participation in the Latchkey Program because of his disability in violation of the ADA. Although Plaintiff has made numerous requests to participate in the Latchkey Program, including one as recently as October of 1999 (see Exhibit "3"), the City has denied the requests or enforced restrictions that Plaintiff could not overcome because of his disability (mental and physical abilities of a five-year-old). *Id.* Because Plaintiff has not been allowed to participate in the Latchkey Program, Ms. V. has arranged for private after-school care. *Id.* Ms. V. is a single mother who is employed as an office supervisor with Ear, Nose, and Throat Associates. Her hours are 8:00 a.m. to 5:00 p.m. weekdays. She has worked there for six years.

C.     **Pursuant to the ADA, Defendants must allow Plaintiff to Participate in the Latchkey Program and Provide Additional Assistance or Supervision as a Reasonable Accommodation**

12.     Among the documents provided by CCISD as part of its initial disclosures is one entitled "Interlocal Cooperation Agreement Between the City of Corpus Christi and Corpus Christi Independent School District for the Latchkey Program" (hereinafter "Agreement"). (See Agreement, attached hereto as Exhibit "2"). According to the Agreement, the City jointly sponsors the Latchkey Program with CCISD as an after-school childcare and activities program for those elementary students who meet the program's participant guidelines and who attend

schools with Latchkey sites during the school year. *Id.* Also pursuant to the Agreement, CCISD

provides buildings, playground facilities, utilities, and janitorial services for the program and

conducts site inspections to determine compliance with applicable safety codes. *Id.* Finally, in

providing building and playground facilities for the program, CCISD provides utilities including

water, gas, electricity, and access to telephones for emergency calls, use of tables, chairs, TVs

and VCRs, and access to restrooms and playground facilities. *Id.* The Agreement makes clear

that substantial involvement from both the City and CCISD are necessary for the success of the

Latchkey Program.

13.     With regard to whether Defendants are under a duty to allow Plaintiff to participate with

assistance in the Latchkey Program, the federal agency charged with investigating discrimination

on the basis of disability in violation of Section 504 of the Rehabilitation Act of 1973 and Title II

of the Americans with Disabilities Act has previously concluded that similar defendants are

under such a duty.  More specifically, the United States Department of Education, Office for

Civil Rights (hereinafter "Agency") is the federal agency with responsibility under Section 504

of the Rehabilitation Act to ensure that recipients of federal funds do not discriminate against

program beneficiaries on the basis of disability.  Further, under Title II of the Americans with

Disabilities Act, the Agency has jurisdiction over complaints alleging discrimination on the basis

of disability filed against public elementary and secondary education systems.

14.     The Agency has issued at least two determinations, referred to as Letters of Findings,

regarding after-school childcare programs and the responsibility for such programs to

accommodate students with disabilities.  In *Conejo Valley (CA) Unified School District*, 23

IDELR 448 (OCR 1995), a copy of which is attached hereto as Exhibit "6", the Agency

concluded that a <u>parent funded</u> after-school care program violated the Rehabilitation Act and

Title II of the Americans with Disabilities Act when the program refused to serve a severely

disabled student. *Id.* Citing 28 C.F.R. § 35.164 and 34 C.F.R. § 104.38, which were

promulgated under the ADA and the Rehabilitation Act respectively, the Agency noted that

where a student meets the basic enrollment criteria of the child care program, the student is

entitled to an equal opportunity to participate in the program except: (1) where to do so would

place an undue financial burden upon the program, or (2) where to accommodate the student

would constitute a fundamental alteration in the nature of the program. *Id.* In that instance, the

Agency found that the fact that the student required a part-time aide at $8-$10 an hour did not

constitute an undue financial burden when all resources of the program were considered. *Id.*

Further, with an aide the student would be able to participate in the benefits of the after-school

program by having a safe place to go after school. *Id.* Finally, the Agency concluded that

allowing the disabled student to attend the after-school program would not be a fundamental

alteration in the nature of the program. *Id.*

15.     In *Board of Education of the City of New York*, 16 EHLR 373 (OCR 1989), a copy of

which is attached hereto as Exhibit "7", the Agency cited the school district for violating Section

504 of the Rehabilitation Act by refusing access to Latchkey Programs for students with severe

disabilities. Although this finding was made prior to the passage of the Americans with

Disabilities Act, the Rehabilitation Act was the precursor of the ADA and Rehabilitation Act

cases provide precedent for the ADA. *Darian v. University of Massachusetts, Boston,* 980

F.Supp. 77 (D. Mass. 1997), *see also Layton v. Elder*, 143 F.3d 469 (8th Cir. 1998)(court noting

that the rights, procedures and enforcement remedies under Title II of the ADA are the same as

under Section 504 of the Rehabilitation Act). As to the Agency's finding, the Agency concluded

that students with severe disabilities should be afforded an equal opportunity for meaningful

participation in the Latchkey Program. *Board of Education of the City of New York*, 16 EHLR 373 (OCR 1989). In response to that finding, the district developed and implemented a policy which provided information to parents of students with severe disabilities, offering them opportunities to apply for the Latchkey Programs along with all other eligible students. *Id.*

16.     Both of the Letters of Findings establish that, pursuant to the ADA, public entities have an obligation to provide access to Latchkey Programs for students with severe disabilities. The Agency acknowledged that there are defenses to claims for denial of services for severely disabled students including undue financial burden and fundamental alteration of the program. The Agency concluded, however, that providing a part-time aid would not constitute either an undue financial burden or a fundamental alteration to a Latchkey Program. Similarly, the size of Defendants' Latchkey Program, as it is described in the Agreement between the Defendants, indicates that providing Plaintiff with a paraprofessional so that he can participate in the Latchkey Program would not be an undue financial burden for Defendants or a fundamental alteration to the Latchkey Program.

**D.     The Fact Issue Which Precludes Summary Judgment**

17.     An essential fact issue therefore exists concerning the reasonableness of the Plaintiff's request for the assistance of an aid to supervise Christopher P. in order that he could participate in the Latchkey Program along with other students from his school who are not otherwise disabled (but may be receiving financial assistance in the form of a "scholarship"). At the deposition of Daniel Whitworth, Assistant Director of Programs for the Park and Recreation Department, City of Corpus Christi, he testified that the budget for the Latchkey Program was $1.7 million dollars. His conclusory allegation that providing assistance to Christopher P. would be an undue financial burden is not supported by his deposition testimony. True and correct

copies of deposition excerpts from his deposition conducted August 4, 2000 are attached hereto as Exhibit "8". Mr. Whitworth testified as follows:

> "Q:    . . . why was it determined that the program would not be all inclusive of all children enrolled in CCISD?
>
> A:    I don't have an answer for that question. I don't – we set out the program parameters for the program that we were offering.
>
> Q:    Okay. Well, then it is your understanding, or do you know this, that there are children who have the same needs in terms of an after-school program that aren't eligible for the Latchkey Program?
>
> A:    Yes, I know there are kids out there like that, um-hum.
>
> Q:    Do you know how many children there are out there?
>
> A:    I have no idea.
>
> Q:    Do you know why it was decided that not every child enrolled in CCISD would be eligible to participate in this Latchkey Program?
>
> A:    One of the decisions was that this is a fee-based program. The participants pay for the program. We go by our license guidelines as far as staff to

Page 9

participate ratio, that is laid out in the license, and we try to structure the fee schedule so that we can do that.  And so our guidelines are compatible with those staffing requirements and our abilities with revenues.

Q:    What would it cost you to make the program all-inclusive?

A:    I don't know.  That's not the program that we are offering.  I have never attempted to work out a budget for that.

Q:    What would be the additional cost – or excuse me – is it your testimony that this program cannot be made all-inclusive?

A:    You would have to give me some more information before I could answer that question.   Under the guidelines that we have set and the fee structure that we have set, I would think it could not be.

Q:    What financial information was considered about the increased cost of making this program all-inclusive?

A:    I don't know that we ever tried to make that determination.

Q:      What additional benefit would there be to the
        children who are eligible for the program, as it
        stands now, to be involved with children with
        disabilities that are not eligible?

A:      I don't know how to answer that.

Q:      Was that a consideration?

A:      No."

Whitworth deposition, Exhibit "8", pp. 33-35.

18.      Based upon the foregoing testimony, it is clear that the City cannot meet its burden of

proving that providing a paraprofessional to Christopher P., to allow him to participate with non-

disabled students, would constitute an undue financial hardship on the program, or a fundamental

alteration in its essential purpose.  28 C.F.R. § 35.150 (a)(3).  This is particularly evident by the

City's admission that as many as 40% of all students participate on a scholarship or "no fee"

basis.  Whitworth affidavit, p. 2.  Why couldn't the City grant Christopher P. a "scholarship" in

the form of an aid?  Ms. V., who is willing to pay on the same basis as other parents, should not

have to bear additional costs solely because of her child's disability.

### E.      Sec. 504 is Applicable to the City and CCISD

19.      Plaintiff agrees that IDEA, 20 U.S.C. § 1400 et. seq., does not apply to the City on

this case (but does apply to the school as a related service).  However, sec. 504 of the

Rehabilitation Act is applicable to the City and CCISD because CCISD is a recipient of federal

funding pursuant to 34 C.F.R. § 104.2 (application) and 34 C.F.R. § 104.37 (non-academic

services) "A recipient to which this subpart applies shall provide non-academic and

extracurricular activities in such manner as is necessary to afford handicapped students an equal

CIMPDF - www.fenrir.com

opportunity for participation in such services and activities". Further, 34 C.F.R. § 104.4(b)(1)(v) prohibits a recipient from participating in such discrimination. The use of CCISD facilities is significant assistance in this regard, and creates a substantial relationship with the city as the "Latchkey" administrator. See generally, *Irvine Unified School District*, 19 IDELR 883 (1993) (attached hereto as Exhibit "9"). The description of benefits provided through the program establish its educational, yet non-academic, function.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment and for such other and further relief to which Plaintiff may be entitled.

Respectfully submitted,

Les Cassidy
1020 Bank of America Center North
500 N. Water Street
Corpus Christi, Texas 78471
361/ 887-2965 office
361/ 887-6521 fax
State Bar No. 03979270
Federal I.D. No. 5931
Attorney for Plaintiff

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was forwarded by U.S. Certified Mail, return receipt requested this ___5ᵗʰ___ day of October, 2000, to:

Linda Flores-Resendez
801 Leopard St.
P.O. Box 110
Corpus Christi, Texas  78403-0110

Andrew L. Quittner
Assistant City Attorney
P.O. Box 9277
Corpus Christi, Texas  78469-9277

Les Cassidy

Page 13

1

CVISPDF – www.fastio.com

Case 2:00-cv-00021   Document   Filed in TXSD on 10/05/21   Page 15 of 56

# 1998-1999 SCHOOL YEAR

# LATCHKEY AFTER SCHOOL PROGRAM

**REGISTRATION:**

For more information, call

# 880-3479



▶ **CCISD Elementary School Sites:**
*(REGISTRATION: August 10th, 8:00a.m.–11:30a.m.)*

| | |
|---|---|
| Barnes | Calk |
| Carroll Lane | Casa Linda |
| Central Park | Chula Vista |
| Club Estates | Crocket |
| Dawson | Fannin |
| Galvan | Garcia |
| Houston | Jones |
| Kostoryz | Los Encinos |
| Meadowbrook | Menger |
| Montclair | Moore |
| Oak Park | Sanders |
| Schanen | Smith |
| Wilson | Windsor Park |
| Woodlawn | Yeager |

▶ **FBISD Elementary School Sites:**
*(REGISTRATION: August 6th, 8:00a.m.–4:00p.m.)*
Early Childhood   Primary
Intermediate



City of Corpus Christi

# Park & Recreation
# DEPARTMENT

*REGISTER YOUR CHILD IN THIS OUTSTANDING PROGRAM EARLY SINCE REGISTRATION IS LIMITED!*

**EXHIBIT "1"**

# Latchkey Program

The Latchkey After School Program is the answer for working parents concerned about leaving their children in unsupervised environments. This Program is offered by the Corpus Christi Park & Recreation Department.

## ▶ The program strives to provide:
1. A safe, professionally supervised environment.
2. Basic survival skills necessary in today's society.
3. Quality recreational experiences and enhance the child's leisure skills, including art, drama, games and weekly special events.

## ▶ Licensed Program:
The staff is certified in Standard First Aid, Infant, Child and Adult CPR, and the program is licensed by the Department of Protective and Regulatory Services.

## ▶ Operating Procedures:
GENERAL:
1. Any child may register who is attending a Latchkey elementary school site. The child must attend the site where they are registered.
2. Program operates Monday through Friday, from the end of the school day until 5:45 p.m., observing the same holiday schedule as the school district.
3. Children are encouraged to bring a daily snack from home.

SIGN IN & OUT PROCEDURES:
1. Children go directly to the cafeteria after school and are signed in upon arrival. Children enrolled in such after school activities as tutoring, etc. should sign in following those activities.
2. Parent or guardian must have a picture I.D. as requirement to sign out child. Child must be signed out daily.
3. To remain eligible for the Latchkey Program, children must be signed out by 5:45 p.m.

## ▶ Scholarship Information:
Scholarships will be available the day of registration.
A. Transcript 1722 from the I.R.S. office will be required.
   Hours are from 8:30 a.m. to 4:30 p.m., Monday through Friday
   400 Mann Street, Suite 100, 1-800-829-1040
B. If you do not file a tax return, you must provide a letter certifying you for government assistance. You may obtain this from the office which originally processed your claim. The three Texas Department of Human Services offices are open 8 a.m. to 5 p.m., Monday through Friday with addresses and phone numbers as follows:
   1. 400 Mann Street, Suite 100, (512) 881-9714
   2. 4410 Dillon Lane, Suite 28, (512) 857-8060
   3. 5155 Flynn Parkway, (512) 855-2451
   *If applying for a scholarship, request a scholarship registration form.*

## ▶ Parental Action Notice:
The City of Corpus Christi Park & Recreation Department reserves the right to refuse service to anyone if there are any safety concerns to children or staff. *(Example: Offensive conduct or language, under the influence of alcohol or other intoxicating substance, failure to sign child out, or unauthorized person signing child out, from the Latchkey Program, unresolved custody disputes, etc.)* As a result, parents/guardians must be responsible for their actions and the actions of all authorized persons listed on the registration form who sign your child out of the Latchkey Program.

# Registration Information

## ▶ Registration: Register your child at site where he/she attends.
The Latchkey Program 1998-1999 school year for CCISD and FBISD.

## ▶ Payment:
In order to ensure placement of your child in the Latchkey Program, you must make your payment by the designated deadline. Payment is due at the start of each month before the child can attend. *First payment is due upon registration. Parent has until the fifth working day of the month to pay thereafter!*

## ▶ Monthly Fee:

| August 11-31 | 1st Child: | $58 |
| | Each Additional Child: | $47 |
| September, October, January, February, March, April & May | 1st Child: | $70 |
| | Each Additional Child: | $55 |
| November & December | 1st Child: | $58 |
| | Each Additional Child: | $47 |

## ▶ Late Registration Fee:
Per child (not on scholarship) registering in the Latchkey Program after the 15th of the month involving 10 school days or less. ... $41

## ▶ Supply Fee:
Per Semester Per Child: (twice/school year) ... $20

## ▶ Late Pick-Up Fee:
Per 15 minutes or fraction thereof: (per family) ... $10

## ▶ Monthly Scholarship Fee:
1st Child: ... $25
Each Additional Child: ... $20

# Requirements

CHILD MUST:
- Have the mental and physical abilities of a five-year-old. (minimum)
- Be able to take responsibility for and handle his/her own personal hygiene.
- Be able to administer his/her own medication.
- Be able to communicate with site supervisor.
- Not place the safety of him/herself or other at risk.
- Be willing and able to comply with Latchkey Program rules and regulations.
- Be able to take responsibility for and handle interactions with the other participants and staff.

## ▶ Youth Disciplinary Action Notice:
| Time Out* | 5-10 minutes from activities |
| 3 Written Referrals | 1 day suspension |
| 4 Written Referrals | 2 day suspension |
| 5 Written Referrals | 3 day suspension |
| 6 Written Referrals | Permanent suspension from Latchkey Program |

*Depending on severity of infraction, one written referral may warrant permanent suspension from the Latchkey Program.*

2

CVisPDF – www.fpvisi.com

# INTERLOCAL COOPERATION AGREEMENT
## BETWEEN
## THE CITY OF CORPUS CHRISTI
## AND
## CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT
## FOR THE LATCHKEY PROGRAM

This agreement is entered into between the City of Corpus Christi, a Texas municipal corporation (City), acting through its duly authorized agent, David Garcia, City Manager, and Corpus Christi Independent School District (District), acting through its duly authorized agent, Frank Reyes, President, Board of Trustees, for purposes of the Texas Intergovernmental Cooperation Act, Government Code, Chapter 791, to achieve efficiency in meeting intergovernmental responsibilities.

**WHEREAS**, the City is sponsoring an after-school child-care and activities program for those elementary students who meet Latchkey's participant guidelines and who attend schools with Latchkey sites during the District school year which is approximately August __17__, 1998, through May __27__, 1999, using several of the District's school campuses; and

**WHEREAS**, the District agrees to provide building, playground facilities, utilities, and janitorial services for the Latchkey program; and

**WHEREAS**, both parties endeavor to provide a safe after-school environment for CCISD students;

**NOW, THEREFORE**, the City and District, in consideration of the mutual covenants contained herein, agree as follows:

1. **District Responsibilities:**

   a. District agrees to provide building and playground facilities for the Latchkey program operated by the City during Latchkey's full hours of operation sufficient to meet Latchkey program guidelines. This includes building utilities such as water, gas, electricity and access to telephones for emergency calls; use of tables, chairs, TVs, and VCRs; and access to restrooms and playground facilities.

   b. District agrees to conduct site inspections to determine compliance with applicable safety codes. This includes yearly fire and gas line inspections and continual monitoring and repair of alarm systems and safety equipment.

   c. District agrees to provide health care supplies, including lined trashcans, paper towels and toilet paper for each site.

**EXHIBIT "2"**

d. District agrees to provide after-program custodial maintenance, including the emptying of trash containers, the sweeping and mopping of floors and spray waxing of furniture as needed.

2. **City Responsibilities:**

The City of Corpus Christi Park & Recreation Department is self-insured. Administration, program activities, and child supervision are the responsibility of Latchkey staff who are paid employees of the City of Corpus Christi Park & Recreation Department.

a. The Latchkey staff is responsible for administration of the entire program, including:

(1) Setting and collecting fees; providing and monitoring rules and regulations related to student discipline; and replacing items that are damaged during the Latchkey Program;

(2) Other administrative responsibilities such as hiring and training of staff and coordinating assignments; and

(3) Compliance with established program guidelines.

b. City shall coordinate site inspections to determine compliance with health and safety codes. Latchkey staff will cooperate with school site personnel to monitor the site for a determination of and response to health and safety hazards.

c. City shall be responsible for all Latchkey program activities including arts and crafts and structured recreational play. This includes storing such materials at the sites where space allows.

d. Provide custodial maintenance during the program. This includes cleaning the tops of tables and placing trash in trashcans; cleaning chairs and placing chairs under tables; and returning furniture or fixtures to their original arrangements. For safety purposes, Latchkey personnel will be instructed to not place chairs on tops of tables.

3. **Term.** This Agreement begins __Aug. 17__, 1998, and ends __May 27__, 1999.

4. **Consideration.** Expenses incurred through Latchkey program activities are the City's responsibilities. Facility and site expenses are the District's responsibilities. All funds expended by either party to fulfill obligations under this Agreement will be from currently available revenue at the time of each party's expenditure.

5. **Licensing.** City will maintain all licenses as may be required by the State of Texas. Monitors for Latchkey sites may make random visits to determine compliance with state guidelines.

6. **Sites.** The attached *Exhibit A* reflects the currently approved Latchkey sites. Site selection is based on need for services as determined by community survey(s) and by availability of required space and fixtures. Selection is also based on access to restrooms, janitorial service availability, and other criteria as determined by the Park & Recreation Department of the City and the District. Current space requirements are 30 square feet of indoor play space per child. If the City is cited for licensing violations that are due to Facility non-compliance issues, the City reserves the right to cease operating the Latchkey Program at that site based upon the compliance date established in the citation unless District chooses to remedy the non-compliance at its cost or allows City the right to implement non-structural remedies at its cost.

7. **Liability.** Neither party shall be responsible to the other for personal injuries, losses, claims, or demands caused by the acts or omissions, if any, of such party or its agents, employees, contractors, patrons, guests, licensees or invitees related to City conducting the Latchkey program at CCISD sites. Liability if any, of either party shall be that prescribed by the laws of the State of Texas.

8. **Public Hearings.** In compliance with Section 33.902 of the Education Code, the District is required to annually consider, during at least two public hearings, the need for and availability of child care before, after, or both before and after the school day and during school holidays and vacations for the district's school-age students. The public is notified of the hearings through advertisements in the Corpus Christi Caller-Times and press releases distributed to the media.

9. **Control of Facilities and Announcements.** District does not give up ultimate control of the facilities and retains the right to enforce all necessary laws, rules and regulations, as well as the right to make announcements as District may deem necessary in the interest of public safety. City will cooperate and cause its agents and employees to cooperate with delivery of such announcements.

10. **Non-Assignment.** Neither this Agreement, nor any interest therein, is assignable without the prior consent of the District; however, this Agreement is binding upon the parties hereto and their respective heirs, successors, and assigns.

11. **Entire Agreement.** This Agreement contains and incorporates the entire agreement of the parties and supersedes any and all prior oral or written agreements, arrangements or understandings between the parties with respect to the subject of this agreement. This Agreement may be amended or modified only by an agreement in writing signed by both parties.

12. **Programmatic Changes.** If City and District staff determine that programmatic changes are necessary that add additional responsibilities to either **Section 1 or 2**, the City Manager and the District's Agent must agree to the additional responsibilities before the programmatic changes are implemented.

Programmatic changes that do not add additional responsibilities may be implemented by either party upon prior written notice to the other of the proposed change.

13. **Notices.** All notices required hereunder shall be sent to the parties at the following addresses:

Parks & Recreation Department
City of Corpus Christi
P. O. Drawer 9277
Corpus Christi, TX 78463
Attention: Mr. Dan Whitworth

Corpus Christi Independent
School District
P. O. Drawer 110
Corpus Christi, TX 78403
Attention: Mr. James Smith,
Assistant Superintendent

14. This Agreement is dated and effective _____, 1998.

ATTEST:                                         CITY OF CORPUS CHRISTI

_____        _____
Armando Chapa, City Secretary                David Garcia, City Manager

Legal form approved on _____, 19____; James R. Bray, Jr., City Attorney

By: _____
     Alison Gallaway, Assistant City Attorney

CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT

_____
Frank Reyes, President, Board of Trustees

### 1998-1999 LATCHKEY SITES

Ella Barnes
William C. Calk
Carroll Lane
Casa Linda
Central Park
Chula Vista Academy of Fine Arts
Club Estates
David Crockett
Joseph T. Dawson
James W. Fannin
Rafael Galvan
J. A. Garcia
Sam Houston
Luther Jones
Kostoryz
Vicente Lozano Special Emphasis School
Meadowbrook
Moses Menger
Montclair
Blanche Moore
Oak Park Special Emphasis School
Fred R. Sanders
Schanen Estates
Weldon Smith
Robert Wilson
Windsor Park
Woodlawn
C. P. Yeager

3

EAR, NOSE & THROAT ASSOCIATES
of Corpus Christi

CARE and SURGERY of the EAR, NOSE & THROAT AND
FACIAL PLASTIC and RECONSTRUCTIVE SURGERY

Michael L. Mintz, M. D., F.A.C.S.
. Zane, M. D., F.A.C.S.
e M. Fisher, M. D., F.A.C.S.
rt D. Oshman, M. D., F.A.C.S.
s M. Motes, M. D., F.A.C.S.
nio C. Andrade, M. D.
y W. Brandt, M. D., F.A.C.S.
W. Loeffler, M. D., F.A.C.S.
de A. McLelland, M. D., F.A.C.S.
all S. Zane, M. D., F.A.C.S.

Richard Wourgle,
Administrator


Melissa L.




Audrey



Isabel


Marissa

DATE: 10/11/99

## FACSIMILE COVER SHEET

TO: _Dan Whitworth_

COMPANY NAME: _____

FAX#: _____

FROM: _____

FAX#: _____

TOTAL NUMBER OF PAGES: _____
(INCLUDING COVER PAGE)

Isaac

Tracy

Amelia


Adrienne

COMMENTS: _____

_Please Respond ASAP_
_with the Answer for_
_approval._

Sarah

Sheila

If you do not receive all pages transmitted, please call (512) 854-7000 and
ask for:

_Rosie Vasquez_

EAR, NOSE & THROAT ASSOCIATES
3318 SOUTH ALAMEDA
CORPUS CHRISTI, TEXAS 78411
TELEPHONE: (512) 854-7000
FAX NO.: (512) 854-4245

Rosie

If the reader of this message is not the intended recipient, or an agent
responsible for delivering this message to the intended recipient(s), you are
hereby notified that you have received this document in error, and that any
use, review, dissemination, distribution, disclosure, or copying of this
document is strictly prohibited by law. The information contained in this
facsimile is legally privileged and confidential communication intended only

**EXHIBIT "3"**




Sharon

EXHIBIT



Case 2:00-cv-00021  Document 33  Filed in TXSD on 10/05/2000  Page 25 of 56

### City of Corpus Christi Park & Recreation Department
## LATCHKEY - REQUEST FOR SPECIAL ACCOMMODATIONS

Child's Name: _Christopher E Perez_ Age: _11_ Grade: _5_ Site: _GALVAN_

Parent's Name: _Rosie Vasquez_ Home Phone: _8511628_ Work Phone: _8547000_

Specific Accommodations Requested: _Para professional to Assist Chris in Latchke_

Reason for the accommodation:_____

The Latchkey Program is an organized, supervised after school program for children who would otherwise go home to an unsupervised environment. The Latchkey Program is not a preschool, nursery school, or infant care program. The Program is held in elementary school cafeterias, with a ratio of one supervisor to approximately twenty children. Children participate in both active and passive recreation activities and special events.

To qualify to participate in the Latchkey After School Program, the participant must:
* be five years old and have mental and physical abilities of a five year old.
* be able to take responsibility for and handle his/her own personal hygiene.
* be able to administer his/her own medication.
* be able to communicate with site supervisor.
* not place the safety of him/herself or others at risk.
* be willing and able to comply with the Latchkey After School Program rules and regulations.
* be able to take responsibility for and handle interactions with the other participants and staff.

Park and Recreation will allow participants to have a personal assistant or caregiver enter the Latchkey site contingent on the personal caregiver or assistant obtained by the participant's parent or guardian: 1) is qualified to provide such care, 2) is designated by the parent to provide such care, and 3) abides by the rules and regulations.

Reasonable accommodations will be made based on a review of request for accommodation. Requests for reasonable accommodations must be made at the time of registration or within ten (10) days after the need arises. Each time a child enrolls in the Latchkey Program, a new request for reasonable accommodation must be made. Failure to make a timely request for reasonable accommodation may result in delay of the review and implementation of an accommodation or delay the child's entry into the Latchkey Program. An accommodation is not reasonable if it results in a fundamental change in the Latchkey Program.

_Rosie Vasquez_
Parent's Signature

Physician's Signature
_Dr. Patel, Girish waives his signature_

APPROVED:                    Date:          DISAPPROVED:                    Date:
(Reasonable Accommodation can be made.)    (Reasonable Accommodation cannot be made.)
Reasonable Accommodation to be made:       Comments:

FOR
OFFICE
USE
ONLY

h:\pr-dir\shared
\latchkey\acc-for
11-97

_If application is denied, I am requesting a_
_hearing with your Board members with a Representativ_
_with the children with Disabilities not in to_

_Rosie Vasquez_

4



### UNITED STATES DEPARTMENT OF EDUCATION
#### WASHINGTON, D.C. 20202-_____

June 1998

Dear Colleague:

American families understand the need for quality after-school opportunities. There are over 28 million children whose parents work outside the home. Many of these parents work because of economic necessity. However, too many of their children do not have access to affordable, supervised, and constructive activities during the hours after school. Indeed, experts estimate that there are at least five million "latchkey" children who come home each day to empty houses.

These children are at a higher risk for drug, alcohol, and tobacco use, delinquent behavior, violent victimization, and injury than their peers who are supervised after school. Statistics show that most juvenile crime is committed between the hours of 2:00 p.m. and 8:00 p.m., with the largest number of offenses committed in the hours immediately following students' release from school.

We can no longer ignore the obvious. Our police chiefs have not. They believe that an investment in after-school programming is the best deterrent against juvenile crime and victimization. Children need safe and engaging opportunities between the last school bell and the end of the work day.

This report, *Safe and Smart: Making After-School Hours Work for Kids*, provides evidence of the impact that safe, enriching, and high-quality after-school opportunities can have on our children and youth. As parents today know, quality after-school programming means much more than babysitting. Children can acquire new skills and broaden their education. They can take part in computer classes and art and music courses; receive homework assistance, mentoring, and tutoring; and perform community service.

Millions of Americans, struggling to be both good parents and good workers, would like to rely on after-school programs during the work week. As part of his balanced budget request, the President called for significant new investments in child care--to build a good supply of after-school programs, help working families pay for child care, improve the safety and quality of care, and promote early learning--because the need is enormous.

We hope this report provides the motivation for others--parent leaders, communities, employers, local governments, schools, and faith communities--to develop or expand their own after-school programs because after-school opportunities make good sense.

Sincerely,

*Janet Reno*
Attorney General

*Richard W. Riley*
Secretary of Education

EXHIBIT "4"

5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHRISTOPHER E.P., b/n/f | § | |
| ROSE V. | § | |
|     Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO: C-00-021 |
| | § | |
| CORPUS CHRISTI INDEPENDENT | § | |
| SCHOOL DISTRICT AND CITY OF | § | |
| CORPUS CHRISTI, TEXAS | § | |
| Defendants | § | |

## AFFIDAVIT OF ROSE VASQUEZ

BEFORE ME, the undersigned authority, personally appeared Rose Vasquez, who after being sworn upon his oath, deposed and said:

"My name is Rose Vasquez. I am over the age of 21, have never been convicted of a felony, am of sound mind and capable of making this affidavit. I have personal knowledge of the statements contained herein, and said statements are all true and correct."

"Christopher P., who is the claimant in the above referenced cause, is my son. Christopher is a twelve year old boy who has multiple disabilities. He has Cri-Dy-Chat Syndrome, a form of mental retardation. As a result of this condition, Christopher suffers from impaired motor skills and control. Moreover, Christopher requires assistance from me or from a paraprofessional while he is at school."

"Christopher is already eligible for and receives special education services from the Corpus Christi Independent School District. As part of those special

**EXHIBIT "5"**

CfsPDF - www.fastio.com

education services, Christopher receives assistance from a paraprofessional when he is attending school during regular hours."

"As to the Latchkey Program, I have made numerous requests to the City of Corpus Christi Parks and Recreation Department so that Christopher would be able to participate in the Latchkey Program, including one as recent as October of 1999. Each time that I have made a request, the City has denied the request as ineligible or enforced restrictions that Christopher cannot meet because of his disability. Finally, because Christopher has not been allowed to participate in the Latchkey Program, I have been forced to pay for private after school care. The city will not allow Christopher to participate without a paraprofessional. The Defendants will not provide an assistant to Christopher as an accommodation to his disability condition. The private cost of an assistant, in my 12 years of experience, is typically $7.00 per hour."

FURTHER, AFFIANT SAYETH NOT.

_Rosie Vasquez_
Rose Vasquez

Sworn to and subscribed to before me, the undersigned Notary Public, on this day _5th_ day of _October_ , 2000, by Rose Vasquez.

_Diana M. Sanchez_
Notary Public, State of Texas

6

CVisPDF – www.fasiso.com

Case 2:00-cv-00021   Document 33   Filed in TXSD on 10/05/2000   Page 32 of 56

Citation             Search Result          Rank 10 of 15          Databa
23 IDELR 448                                                        IDELR
23 Indiv. with Disabilities Educ. Law Rep. 448

### CONEJO VALLEY (CA) UNIFIED SCH. DIST.

Complaint No. 09-94-1149
June 28, 1995

[Summary]

The complainant alleged that her daughter, a student with severe disabilitie
was denied the opportunity to participate in an after school child care progra
in violation of Section 504 and Title II of the ADA.

HELD:  resolved without a finding of violation.

Upon investigation, OCR determined that under the circumstances of the case,
the provision of an aide would not constitute a fundamental alteration of the
program since the child, without the assistance of an aide, could participate
a level of activity and benefit like all other children in having a safe place
to go after school. Moreover, the provision of the aide would not result in an
undue financial or administrative hardship on the district. OCR also raised
concerns regarding the district's compliance with the Title II regulation
procedures for determining whether a student with a disability could be
accommodated in a particular program. Based on its findings, OCR issued notice
to the district of a probable violation of Section 504 and Title II of the ADA
response, the district agreed to voluntarily resolve the matter by providin
written explanations to the parents of children who were denied access to the
child care program based on their disabilities, and allow the student who was
the subject of the complaint to enroll in the child care program. Accordingly,
the matter was closed without a finding of violation.

Dr. Jerry C. Gross
Superintendent
Conejo Valley Unified School District
Administrative Offices
1400 East Janss Road
Thousand Oaks, California 91362

[Text]

This letter is to document the resolution of the above referenced complaint
made to the United States Department of Education (Department), Office for Civ
Rights (OCR) against the Conejo Valley Unified School District (District). The
complaint alleged discrimination on the basis of disability in violation of
Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans wi
Disabilities Act of 1990.
The complaint was filed by [ ], attorney with Protection and Advocacy
incorporated, on behalf of [ ], the daughter of [ ] (hereinafter complainant).

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

EXHIBIT "b"

CVISPDF - www.tws.to.com

23 IDELR 448

The complainant alleged that her daughter, who is severely disabled, was denie
the opportunity to participate in an after school child care program.

OCR has the responsibility under Section 504 and the Department implementing
regulations to ensure that recipients of Federal funds through the Department
not discriminate against program beneficiaries on the basis of disability. OCR
also has jurisdiction as a designated agency under Title II of the Americans
with Disabilities Act of 1990 (ADA) over complaints alleging discrimination on
the basis of disability. This extends to complaints that are filed against
public elementary and secondary education systems. Therefore, OCR has
jurisdiction to investigate complaints of discrimination against the District.

OCR contacted the District on June 13, 1994. The District provided the
information requested by OCR on June 30, 1994. OCR reviewed the information
provided by both the complainant and the District and conducted interviews
during the month of August, 1994 with District staff.

On September 21, 1994, in a conference call with the District, OCR discussed
the issues and analysis of the OCR basis for finding a probable violation of
Section 504 and Title II. The District indicated that it could not enter into
settlement of this individual case because it would set a precedent for the
provision of services to disabled children in the child care program that woul
burden the program. The District requested that OCR furnish a written notice o
its findings to assist the District's counsel in advising the District in this
matter. OCR issued a notice of probable violation letter on September 23, 1994
A written response from the District's counsel was received on November 14,
1994. OCR responded to the District counsel's legal arguments in a letter date
April 19, 1995, and informed counsel that the District did not provide any
information that would change the OCR "Probable violation" determination as
stated in the September 23, 1995 letter.

With regard to jurisdiction, OCR determined that there was probable cause to
find that the after school child care program is a "program" of the District
under Section 504 and Title II. The fact that the program is currently parent-
funded did not by itself change this proposed conclusion. It was undisputed th
the complainant's daughter is disabled.

The OCR letter found a probable basis for concluding that the daughter met t
basic enrollment criteria for the child care program and was enrolled in the
program and that, because of her disability, she is entitled under 34 C.F.R. §
104.37(a) of the Section 504 regulations and 28 C.F.R. § 35.130(a) and
(b)(1)(i), (ii), and (iii) and § 35.150(A) of the Title II regulations, to be
afforded an equal opportunity to participate in the program.

Both 34 C.F.R. § 104.37 in respect to nonacademic services and 34 C.F.R. §
104.38 in respect to day care programs require recipients to provide those
programs in such a manner that the needs of the disabled persons are taken int
account. As a limitation on the duty to provide program accommodation, Title I
as 28 C.F.R. § 35.150 (a) places the burden on the District to demonstrate tha
the provision of a one-on-one aide would be either a fundamental alteration of
the program or would be an undue financial hardship. The probable violation
letter stated that under the circumstances of this case the provision of an ai
would not constitute a fundamental alteration to the program since the child,
with an aide, can participate in a level of activity and benefit like all oth
children in having a safe place to go after school, and that the provision of

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

23 IDELR 448

such accommodations would not pose an undue economic or administrative hardship ↑ the District. The probable determination on this issue was based in part on ↳ne fact that accommodation of the complainant's child would require at most th part-time employment of an $8-$10 an hour aide in program that had raised sufficient funds to repay, in the year in question, $80,000 of an outstanding District loan.

The probable violation letter also raised concerns about the compliance of th District with Title II regulation procedures for determining whether an individual with a disability can be accommodated in a particular program. Titl II at 28 C.F.R. § 35.164 states that the duty of providing compliance with this subpart is on the head of the public entity or his or her designee who only after considering all resources available for use in the funding and operation of the program can determine that a particular accommodation is unduly burdensome or would constitute a fundamental alteration in the nature of the program. The subpart further requires that the reasons for his or her decision be put into writing. The subpart adds that, if an alteration or financial hardship is found, that nevertheless, the District will ensure to the maximum extent possible, that the disabled student receive the benefits or services provided by the District.

The OCR probable violation letter stated the basis for believing that the District did not provide such an analysis of its reasons for excluding the complainant's daughter from the program and did not provide the complainant's daughter with an alternative which would allow her to participate to the maximu extent possible.

Following issuance of the probable violation letter and OCR's response to the ˉ˄gal arguments set forth in the District's letter of November 14, 1994, on Ju , 1995 the District and OCR met to discuss the resolution of this complaint. ↗ proposed voluntary commitment was discussed. At this meeting, the District mad: clear its differences with OCR both as to the facts and law pertaining to this matter. The District has at all times denied any violation of law; nonetheless the District expressed its interest in resolving this matter voluntarily. Accordingly, on June 22, 1995, OCR received a voluntary resolution plan from t! District, a copy of which is enclosed. The Plan provides that the District wil in compliance with Title II, provide a written explanation to the parent of a child who is denied access to the child care program based on his or her disability. The plan also specifies that the student who was removed from the child care program in this case, if enrolled in an elementary school within th District, will be entitled to be enrolled in the child care program so long as the parent provides the necessary forms and follows other rules that apply to all participants.

OCR concludes that the agreement when implemented, will satisfactorily resol the allegations raised by the complainant. Accordingly, the investigation is being closed as of the date of this letter.

Under the Freedom of Information Act, it may be necessary to release this document and related documents on request. If OCR receives such a request, it will seek to protect, to the extent possible by law, personal information whic if released, could reasonably be expected to constitute an unwarranted invasio of privacy.

OCR thanks you and your staff for the cooperation and assistance provided to

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

23 IDELR 448

OCR during this investigation. If you have any questions, please contact Mr.
`rman Bossano, Branch Chief at (415) 556-0885.
   John E. Palomino
   Regional Civil Rights Director

                          [Index]

AMERICANS WITH DISABILITIES ACT (ADA); AMERICANS WITH DISABILITIES ACT (ADA);
Refusal to Admit to After-School Day Care Program Raised Probable Violations of
ADA/Section 504

Nonacademic Services; Other Nonacademic Services; Refusal to Admit to After-
School Day Care Program Raised Probable Violations of ADA/Section 504

Rehabilitation Act (Section 504); Athletics/Extracurricular Activities; Refusal
to Admit to After-School Day Care Program Raised Probable Violations of ADA/
Section 504

AMERICANS WITH DISABILITIES ACT (ADA); AMERICANS WITH DISABILITIES ACT (ADA);
District's Admissions Procedures for After-School Child Care Program Were
Suspect

Rehabilitation Act (Section 504); Athletics/Extracurricular Activities;
District's Admissions Procedures for After-School Child Care Program Were
Suspect

 ⌐nacademic Services; Other Nonacademic Services; District's Admissions
Procedures for After-School Child Care Program Were Suspect

23 IDELR 448
END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

7

CM/PDF – www.fastio.com

Case 2:00-cv-00021  Document 33  Filed in TXSD on 10/05/2000  Page 37 of 56

Citation          Search Result          Rank 2 of 2          Databa
16 EHLR 373                                                   IDELR
16 Educ. for the Handicapped Law Rep. 373

## BOARD OF EDUC. OF THE CITY OF NEW YORK (NY)

### Complaint No. 02-88-1079
### December 6, 1989

#### [Summary]

The parent of a severely and multiply handicapped student alleged that the
board of education (Board) and the community school district (District) denied
his son, and other similarly situated students, the opportunity to participate
in the Latch Key After School Program. The student attended a district school,
but because of his multiple handicaps, his educational program was supervised
the Board. When the parent requested information about the District's Latch Ke
Program, the District replied that the program was not available to students w
were under the jurisdiction of the Board. At an impartial hearing, the hearing
officer ruled that he did not have jurisdiction over the issue of the student'
eligibility because the program was primarily recreational in nature.

HELD: for the parent.

OCR determined that neither the Board nor the District had allocated funds f
the provision of services to severely handicapped students in the Latch Key
ogram and that the District had not informed the parents of severely
nandicapped students of the availability of the program. In OCR's opinion, the
Board failed in its obligation to ensure that the District provided severely
handicapped students with an equal opportunity to participate in the program.
OCR held, therefore, that the Board was in violation of Regs. 104.4(a),
104.4(b)(1)(i), (ii), (iii) and (vii) and 104.4(b)(2).

Mr. Bernard Mecklowitz
Chancellor
Board of Education of the City of New York
110 Livingston Street
Brooklyn, NY 10201

#### [Text]

The New York Regional Office for Civil Rights (OCR) has completed its
investigation of the above-referenced complaint filed against the Board of
Education of the City of New York (the Board). Specifically, the complainant
alleges that representatives of the Board, at Public School (P.S.) #3, Distri
#31, Staten Island, New York, denied his son (the student), and other similar]
situated severely handicapped students (the class) an opportunity to particip
in the Latch Key After School Program (the Program). The complaint was
investigated under the authority of Section 504 of the Rehabilitation Act of
1973 (Section 504), as amended, 29 U.S.C. § 794, and its implementing regulati

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

**EXHIBIT "7"**

at 34 C.F.R. Part 104 which prohibit discrimination on the basis of handicap i
any program or activity that receives Federal financial assistance. OCR has
determined that the Board is a recipient of Federal financial assistance from
the United States Department of Education. Therefore, OCR has jurisdiction to
investigate this complaint.

During the course of this investigation, OCR interviewed the complainant and
Board, District #31, and Citywide Programs personnel. In addition, OCR reviewe
relevant data which included the Board's policies and procedures for the
implementation of the Program. Based on an analysis of the information obtaine
during this investigation, OCR has determined that the Board is in violation o
Section 504 for excluding the individual student and the class of qualified
handicapped students from its After School Latch Key Program. A summary of the
factual and legal basis for our determination follows.

The protections of Section 504 extend only to qualified handicapped persons.
The Section 504 regulation at 34 C.F.R. § 104.3(j)(1) defines a handicapped
person as "any person who (i) has a physical or mental impairment which
substantially limits one or more major life activities, (ii) has a record of
such impairment, or (iii) is regarded as having such an impairment." Major lif
activities are defined as functions such as caring for one's self, performing
manual tasks, hearing, learning, and working.  See, 34 C.F.R. § 104. (j)(2). T
information provided during this investigation revealed that the student is
classified as severely multiply handicapped. The Board acknowledged that the
student is a handicapped person.

The Section 504 regulation at 34 C.F.R. § 104.3.(k)(4) defines a qualified
handicapped person, with respect to "other services" offered by a recipient as
e who meets the essential eligibility requirements for the receipt of such
services. The essential eligibility requirements for this Program are that a
student attend a school that is eligible for the Program and his or her parent
both work. Accordingly, those severely handicapped students who meet the
essential requirements of the Program are qualified handicapped persons within
the meaning of Section 504.

The regulation implementing Section 504, at 34 C.F.R. § 104.4 states, in
pertinent part, that no qualified handicapped person shall, on the basis of
handicap, be excluded from participation in any program or activity which
receives or benefits from Federal financial assistance. A recipient, in
providing any aid, benefit or service, may not, on the basis of handicap, deny
qualified handicapped person the opportunity to participate in or benefit from
such aid, benefit or service or afford an opportunity to participate in or
benefit from an aid, benefit or service that is not equal to that afforded
others. Additionally, a recipient may not provide an aid, benefit or service
that is not as effective as that provided to others, or otherwise limit a
qualified handicapped person in the enjoyment of any right, privilege,
advantage, or opportunity enjoyed by others receiving such aids, benefits or
services. .See  34 C.F.R. § 104.4(a) and (b)(1)(i), (ii), (iii), (vii) and
(b)(2). All decisions concerning the provision of aids, benefits or services
must be made in a manner that affords equal opportunity to obtain the same
result and gain the same benefit as is afforded to nonhandicapped persons.

This investigation revealed the following information. During the 1987-88
school year, the complainant inquired of several District personnel about the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

after school Latch Key Program provided at P.S. #3. The complainant contends that District personnel informed him at various times that the student was not ligible to participate in the Program because he was not a part of the community school district, and/or that the services the student required as a severely handicapped person could not be provided as a part of the Program.

OCR's investigation revealed that the student, at the time of the complaint, was a thirteen year old multiply handicapped student. In July 1987, he began attending the summer session at P.S. #37 in Staten Island. P.S. #37 is a "barrier free" school populated solely by handicapped students. The student wa classified as multiply handicapped and placed in a Specialized Instructional Environment I (SIE I) 12 month school program. The SIE I is a special educatic program that is under the jurisdiction of the Central Division of Special Education, Citywide Programs and is designated, by the Board, for students who are severely handicapped. The SIE I site, for Staten Island, during the regula school year was P.S. #3, with a summer program at P.S. #37. P.S. #3 has a scho population that contains both handicapped and nonhandicapped students.

OCR is informed that the student is presently hospitalized, however, during the relevant time period, he used a wheelchair for mobility, although he was able to walk with assistance. He has a tracheotomy tube which requires periodi suctioning. His thermoregulatory mechanism is injured. He is unable to vocaliz but is able to mouth words. His movement throughout the school must be supervised, and he must be assisted with toileting. A registered nurse must be available to assist him on a full time basis. The student requires special transportation to and from school by a vehicle which is equipped with suctioni equipment, oxygen, room for a wheelchair, a lift, and a person to monitor his physical condition, maintain a tracheotomy tube and administer oxygen and CPR, needed.

The student received speech and language services five times a week for thir minutes on a one-to-one basis, occupational therapy five times a week for one hour and physical therapy five times a week for one hour. These various relate services took him out of the classroom for at least two and a half hours each day.

During the 1987-88 school year the student attended school at P.S. #3 in District #31. Sometime in January 1988, the complainant became aware of the after school activities conducted at P.S. #3 and requested information as to eligibility for the Program.

OCR interviewed those persons whom the complainant contacted in regard to th Program. District personnel informed OCR that the complainant contacted them, January or February of the 1987-88 school year, requesting information about t Program and seeking admission for the student. The complainant was advised tha the Program is for students who were under the jurisdiction of District #31. T student, who is in the Citywide SIE I Program, is under the jurisdiction of District #75. District personnel admitted they also informed the complainant that there were no monies allocated in the Program to provide for the related aids and services the student required for his special needs. The complainant did not make a formal application for the Program. When asked if they had provided the complainant with an application, District personnel indicated tha they had not. The investigation disclosed that on March 1, 1988, the complaina requested an Impartial Hearing regarding the District's denial of the Program

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

16 EHLR 373

the student. On April 8, 1988, a decision was rendered by the Impartial Hearing Officer (IHO). A review of the IHO's decision revealed that the IHO ruled that he did not have jurisdiction to hear the issue because the Program in question, primarily recreational in nature, was not part of the student's educational program.

This investigation disclosed that in a memorandum dated June 27, 1985, the Board's Chancellor notified the Presidents of a Community School Boards and Community Superintendents of the initiation of a "Latch-Key After School Program" commencing with the 1985-86 school year. The Chancellor indicated that one district in each of the boroughs of the Bronx, Manhattan, Brooklyn and Staten Island would be selected to receive approximately $600,000 in tax levy funding to operate the Program during the 1985-86 school year. Districts interested in applying for the funding were to develop and submit a narrative proposal for a comprehensive district-wide after school program. The proposals were to include such elements as a guarantee of the participation of seventy percent of the elementary schools in the District; operational hours from 3:00 p.m. to 6:00 p.m. every day the school was in session starting with the first day of classes in September, or as soon as possible thereafter; comprehensive programs which could include educational, tutorial, and recreational components and no fees charged for participation.

The Citywide Program personnel informed OCR that the SIE I Program is not a part of District #31, but rather of District #75. During the 1987-88 school year, when the complaint was filed with OCR, the SIE I Program that the student participated in was located in P.S. #3. Because of space problems, it was moved to P.S. #37, a special education school, for the 1988-89 school year.

OCR interviewed the Administrator of the Program. He stated that all students who are physically present in a school that offers the Program, regardless of category, are eligible to apply. The Program applications are to be distributed to all children in a school facility. The Administrator did not know if SIE I students were excluded when the applications were distributed at P.S. #3. OCR interviewed Board personnel regarding the eligibility of SIE I students to participate in the Program. The Board indicated that funding and related services for moderately and mildly handicapped students comes from the Central Budget and goes directly to the Community School District. Funding for severely handicapped students comes from the Board's Central Division of Special Education and goes to the Citywide Programs. The Board also indicated that there are no after school programs specifically funded for severely handicapped students and that the current Latch Key After School Programs in operation were not set up or funded to accommodate these students.

The investigation further disclosed that District #31 was one of the school Districts selected to receive allocations for the implementation of the Program. OCR's review of written policies and procedures for the Program revealed that twenty-seven of the thirty-eight elementary schools in the District participate in the Program since its inception in the 1985-86 school year. P.S. #3 was one of the participating schools. Among the criteria for school participation were school population, number of children eligible for free lunch, number of families receiving aid for dependent children, number of children bussed from school to home at dismissal, socio-economic status of school neighborhood, alternatives available to parents and discussions with parent organizations and

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 2:00-cv-00021   Document 33   Filed in TXSD on 10/05/2000   Page 41 of 56

16 EHLR 373

school administrators. The Program staff consisted of a teacher-in-charge, a
para-professional, a school security guard and a school lunch worker.

OCR's review of the District's policies and procedures also revealed that
announcement of the Program is made at public meetings of the Community School
Board, Principals' Conference and at meetings with the Federation of PTAs. In
addition, circulars serving as announcements and applications are distributed
each elementary school child to take home to parents/guardians. Although
selection is limited to 75 pupils per center and is on a first-come- first-
served basis, no family whose need is real is to be denied an opportunity to
participate. Participants are divided into two groups, grades three to five,
Group 1; Kindergarten to grade two, Group 2. Between 3:00 p.m. and 3:30 p.m.,
snack is served. Between 3:30 p.m. and 6:00 p.m., groups alternate among three
activities, homework, recreation and arts and crafts.

OCR also reviewed the District's "Latch Key After School Program Announcement
Application" dated September 14, 1988. The application indicates that the
Program is designed to assist working parents, and will be held on each day that
school is in session for the full day. Parents/guardians were advised to fill
the information requested and have their child return the form to the classroom
teacher. Information requested included the student's name, school and grade;
the parent's/guardian's name, home and business address and telephone numbers,
and hours worked. There is also an inquiry as to whether the student had any
medical problem requiring medical supervision.

In summary, this investigation disclosed that, while the Program is available
to all eligible students attending participating schools in District #31, the
District does not inform families of severely handicapped children of the
provisions of the Program. Further, the District does not have funds allocated
for the provision of services above its staffing and activity requirements. Both
District and Board personnel are unclear about their responsibilities to
severely handicapped students with regard to participation in the Program. Some
personnel believe that severely handicapped students are not eligible to
participate because they are under the Citywide Programs and other personnel
believe that the students are eligible to participate if funding can be provided
for their special needs.

After reviewing the facts in this matter and the documentation obtained during
this investigation, OCR has determined that the Board failed to develop and
implement a procedure or method to ensure that severely handicapped students are
afforded an equal opportunity for meaningful participation in the Latch Key
After School Program. The Board's failure to develop such a procedure denies
these students the same opportunity to participate in the activities of the
Latch Key Program as is afforded to nonhandicapped students and students who are
mildly and moderately handicapped.

Based on the above, OCR finds that the Board is in violation of Section 504
and its implementing regulation at 34 C.F.R. § 104.4(a) and (b)(1)(i), (ii),
(iii), (vii) and (b)(2).

On February 15, 1989, OCR contacted the Board to discuss the violation and
negotiate a remedy. At the Board's request, OCR met with Board representatives
on March 6, 1989, in a further attempt to secure corrective action on the
violation cited.

OCR would consider the Board's development of a policy or procedure,

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

formulated as set forth below, to be an acceptable remedy. In general, the regulation implementing Section 504 requires that school districts afford qualified handicapped persons an opportunity to participate in or benefit from program equal to that provided to nonhandicapped persons. OCR, as a remedy to correct this violation, requires that the Board (1) develop and implement a policy and procedure to ensure that the individual student and the class are provided an equal opportunity to participate in the Latch Key After School Program; (2) provide notice of the Program to parents/guardians of all student including severely handicapped students, in a school where a Latch Key Program is in operation; (3) disseminate notices to all students attending classes within school facilities, offering information about the Program; (4) advise Board and District personnel, by memorandum, that all students attending a facility that offers a Latch Key After School Program must be offered the opportunity to qualify for participation in the Program; and (5) determine whether the complainant's son is eligible for participation in the program.

This Office is requesting that you provide a plan to remedy this violation within twenty (20) days of the date of this letter.

Our Office is under an obligation to resolve complaints, such as the one fil by the complainant, by March 6, 1990. If, at the end of this period, an agreement has not been reached, I will recommend to the Assistant Secretary fo Civil Rights that enforcement procedures be commenced.

Furthermore, if it is apparent earlier than March 6, 1990, that a negotiated settlement is not possible, it is my obligation to recommend to the Assistant Secretary that enforcement proceedings be commenced immediately.

The Board is reminded that retaliation and harassment against any person who is filed a complaint, participated in, or cooperated with an OCR investigatio is prohibited.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event the OCR receives such a request, we will seek to protect, to the extent provided law, personal information which, if released, could constitute an unwarranted invasion of privacy.

If you have any questions, please contact me at (212) 264-4633.

Paula Kuebler
Regional Director

[Index]

Comparable Facilities/Programs/Services; Programs and Services; Latch Key Program Unavailable to Severely Handicapped

Extended School Day/Year; Relationship to FAPE; Latch Key Program Unavailable Severely Handicapped

Free Appropriate Public Education (FAPE); Comparable School Day/Year; Latch K Program Unavailable to Severely Handicapped

Rehabilitation Act (Section 504); In General; Latch Key Program Unavailable t

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

8

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CHRISTOPHER E.P., b/n/f     *
ROSE V.,     *
        Plaintiff,     *
        *
VS.     *    NO. C-00-021
        *
CORPUS CHRISTI INDEPENDENT *
SCHOOL DISTRICT and CITY *
OF CORPUS CHRISTI, TEXAS, *
        Defendants.     *

-----------------------------------------------

ORAL DEPOSITION OF

DANIEL WHITWORTH

August 4, 2000

**CONDENSED**

-----------------------------------------------

ORAL DEPOSITION OF DANIEL WHITWORTH, produced as

a witness at the instance of the Plaintiff and duly

sworn, was taken in the above styled and numbered cause

on the 4th day of August, 2000, from 9:06 a.m. to 10:39

a.m., before Sandra M. Allen, CSR in and for the State of

Texas, reported by machine shorthand, at 1201 Leopard

Street, Fifth Floor, Corpus Christi, Texas, pursuant to

the Federal Rules of Civil Procedure, and the provisions

stated on the record or attached herein.

**EXHIBIT**

*Depositions Etc.*

VIDEO SERVICE • PROCESS SERVING • INTERPRETERS • ASCII DISK • CONDENSED • COURIER • STATEWIDE

## Page 31

1  regardless of the enrollment?

2      A   Yes.

3      Q   Why do you have a policy for two staff members?

4      A   So that we can control our liability.

5      Q   What do you perceive to be the liability?

6      A   If we have a single staff person out there, and

7  there were allegations of any type of misconduct on the

8  part of the employee, then we would be at a disadvantage.

9  So we have two staff members at every site.  We strive to

10  have a male and a female at each site, but we don't

11  always have enough applicants to do that, but we have two

12  at each site.

13      Q   Why do you strive to have a male and a female at

14  each site?

15      A   For purposes of safety and the kids can be

16  comfortable.

17      Q   How does that have anything to do with safety?

18      A   Because some kids interact with a male or a

19  female better.  For our purposes, it just seems to make

20  good sense to have two staff members out there so that

21  you have two people on site that are watching what's

22  going on.

23      Q   But that doesn't explain the gender preference

24  for a male and a female, as it might relate to safety?

25      A   Maybe it does not relate to safety then.

## Page 32

1      Q   Is the preference to have male and female staff,

2  like you said?

3      A   If we can, um-hum.

4      Q   And is that because the staff may be involved in

5  assisting the children with their hygiene?

6      A   No.  We do not do that.

7      Q   What was the basis for the decision to set the

8  requirement that the child be able to handle his or her

9  own personal hygiene?

10      A   It set the parameters of the program that we

11  were offering.

12      Q   Did you understand, when you set that as a

13  parameter, that some students would be excluded?

14      A   The program was never intended to be a universal

15  type of program.  It was a recreational program, and you

16  had to comply with those guidelines in order to

17  participate in the program.

18      Q   Why was the decision made to have it be a

19  noninclusive program, as you've described it earlier?

20      A   Because that was what we were programming for.

21      Q   I understand that, but why were you programming

22  it --

23      A   Because that was the need that was out there,

24  that we perceived.  It is apparently successful because

25  we've got some 2,000 -- 1,800 kids participating in the

## Page 33

1  program, so we feel like we are meeting a community need.

2      Q   But wouldn't a child with disabilities have that

3  same need?

4      A   Some do.  Some participate in the program.

5      Q   And then my question is, why was it determined

6  that the program would not be all inclusive of all

7  children enrolled in CCISD?

8      A   I don't have an answer for that question.  I

9  don't -- we set out the program parameters for the

10  program that we were offering.

11      Q   Okay.  Well, then it is your understanding, or

12  you know this, that there are children who have the same

13  needs in terms of an after-school program that aren't

14  eligible for the Latchkey Program?

15      A   Yes, I know there are kids out there like that,

16  um-hum.

17      Q   Do you know how many children there are out

18  there?

19      A   I have no idea.

20      Q   Do you know why it was decided that not every

21  child enrolled in CCISD would be eligible to participate

22  in this Latchkey Program?

23      A   One of the decisions was that this is a fee-

24  based program.  The participants pay for the program.  We

25  go by our license guidelines as far as staff to

## Page 34

1  participate ratio, that is laid out in the license, and

2  we try to structure the fee schedule so that we can do

3  that.  And so our guidelines are compatible with those

4  staffing requirements and our abilities with revenues.

5      Q   What would it cost to make the program all-

6  inclusive?

7      A   I don't know.  That's not the program that we

8  are offering.  I have never attempted to work out a

9  budget for that.

10      Q   What would be the additional cost -- or excuse

11  me -- is it your testimony that this program cannot be

12  made all-inclusive?

13      A   You would have to give me some more information

14  before I could answer that question.  Under the

15  guidelines that we have set and the fee structure that we

16  have set, I would think it could not be.

17      Q   What financial information was considered about

18  the increased cost of making this program all-inclusive?

19      A   I don't know that we ever tried to make that

20  determination.

21      Q   What additional benefit would there be to the

22  children who are eligible for the program, as it stands

23  now, to be involved with children with disabilities that

24  are not eligible?

25      A   I don't know how to answer that.

## Page 35

1   Q  Was that a consideration?

2   A  No.

3       MR. CASSIDY: We'll take a break and we

4  may go on. I think we are more than halfway through, if

5  you want to know.

6       THE WITNESS: All right.

7       (Off the record from 10:02 am to 10:08 am.)

8   Q  (By Mr. Cassidy) Mr. Whitworth, what

9  information do you have about Rose Vasquez's son, Chris,

10  and his disability?

11   A  Only what is in the Request for Special

12  Accommodations form.

13   Q  Did you ever have any discussions with Rose

14  Vasquez about her son's disability?

15   A  Other than in terms of getting the Request for

16  Special Accommodations form sent in, no.

17   Q  What is your understanding of what his

18  disability is?

19   A  I do not know.

20   Q  How many conversations have you had with

21  Ms. Vasquez concerning the eligibility of her son

22  participating in the program?

23   A  If I'm recalling correctly, I may have had two

24  telephone conversations.

25   Q  Why did her son need a request for special

## Page 36

1  accommodations?

2   A  It is part of the registration package that was

3  given to everyone that registers for the program. The

4  parents determine the need to request special

5  accommodations.

6   Q  Okay, but why was she discussing that with you,

7  if you know?

8   A  I think she was trying to -- I think I was

9  talking to her when she was questioning whether a

10  determination had been made on the Request for Special

11  Accommodations form, if I recall correctly.

12   Q  Why did her son need a special accommodation?

13   A  I would have to look at the form. I don't

14  remember what her request was. I believe it was for

15  having one-to-one supervision or something. I would need

16  to look at the form to see.

17   Q  Would you allow a child to participate in the

18  program with an assigned paraprofessional?

19   A  With a caregiver assigned?

20·   Q  Right.

21   A  Yes, we would do that at the parent's expense?

22   Q  Does it necessarily have to be the parent's

23  expense?

24   A  It would. We don't have the ability to provide

25  that within our program.

## Page 37

1   Q  In other words, that would be a special

2  accommodation that would not be provided?

3   A  The accommodation would be to allow the

4  caregiver to come on-site in the licensed area during the

5  program time frame.

6   Q  Okay. But the accommodation would not be for

7  the program to provide that supervision?

8   A  No, sir.

9   Q  And why is that?

10   A  Because we do not have the wherewithall to do

11  that.

12   Q  How much would that cost?

13   A  I don't know.

14   Q  And what's the basis of your statement that you

15  do not have the wherewithall to do that?

16   A  Because we have funding to staff approximately a

17  1 to 20 staff ratio.

18   Q  In the budget of $1.7 million, you don't have

19  the ability to provide more direct supervision for

20  individuals with disabilities that otherwise wouldn't

21  meet the requirements?

22   A  That's correct.

23   Q  And how do you know that?

24   A  Because the budget is promulgated along certain

25  staffing levels that reach that amount of money, and so

## Page 38

1  the staffing level that we are working with is the DPRS

2  guidelines. So additional staff obviously costs money,

3  and that money is not budgeted in there.

4   Q  Okay. But as I understood your testimony, no

5  calculation has been made as of today as to what that

6  would cost for this child?

7   A  I have not made that calculation.

8   Q  Does the Latchkey Program operate within budget?

9   A  We try to.

10   Q  What's the answer? Did it operate within budget

11  last year?

12   A  Yes.

13   Q  Has it ever operated over budget?

14   A  Yes.

15   Q  When?

16   A  I would have to go back and look to see.

17   Q  Last year, it was operated within the budget?

18   A  Correct.

19   Q  Was there a surplus?

20   A  I would have to go back and look at my numbers

21  to see for sure.

22   Q  Who would have that information?

23   A  A Budget office or myself. I mean, I can get it

24  from the files, but I don't have it off the top of my

25  head.

9

CitoPDF - www.fastio.com

Case 2:00-cv-00021   Document 33   Filed in TXSD on 10/05/2000   Page 48 of 56

Citation                Found Document             Rank 1 of 1           Database
19 IDELR 883                                                             IDELR
  19 Indiv. with Disabilities Educ. Law Rep. 883

                     IRVINE (CA) UNIFIED SCH. DIST.

                       Complaint No. 09-93-1043
                           April 28, 1993

                             [Summary]

   The parent of a student with insulin-dependent diabetes mellitus alleged that
the district discriminated against her son when the local parent-teacher
association (PTA), a private organization, refused to provide the student with
necessary support services to enable him to participate in the PTA's after-
school program.

   HELD:  for the parent.

   OCR determined that the district provided significant, indirect assistance to
the PTA and its after-school program by not charging the PTA for the use of
school facilities and by allowing the distribution of program literature in its
schools. Moreover, the PTA's refusal to provide the student with the services of
a trained individual to monitor his medical status during the program
effectively denied him participation in the program. OCR concluded, therefore,
that the district violated 34 CFR 104.4(b)(1)(v) and 28 CFR 35.130(b)(1)(v) by
failing to either provide the necessary services to the student or cease
providing the significant assistance to the PTA program.

[Case Name Not Provided]

                              [Text]

   On December 2, 1992, you were advised by the San Francisco Regional Office for
Civil Rights (OCR), U.S. Department of Education (Department), that it would
investigate a complaint filed with OCR on November 19, 1992, against the Irvine
Unified School District (District). You (complainant) alleged that the District
discriminated against your son, Andrew, (A), a student with a disability, by
denying him services to enable him to participate in an after- school program
operated by the Parent Teacher Association (PTA).
   OCR has the responsibility under Section 504 of the Rehabilitation Act of 1973
(Section 504) and its implementing Regulation, 34 C.F.R. Part 104, to ensure
that recipients of Federal financial assistance through the Department do not
discriminate on the basis of disability. The District receives Federal funds
through the Department; OCR, therefore, has jurisdiction to investigate this
complaint under Section 504. OCR also investigated this complaint pursuant to
its jurisdiction as a designated agency, under Title II of the Americans with
Disabilities Act of 1990, (Title II), over complaints alleging discrimination on
the basis of disability which are filed against certain public entities,
including public elementary and secondary education systems. The District is a

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

EXHIBIT 9

Case 2:00-cv-00021   Document 33   Filed in TXSD on 10/05/2000   Page 49 of 56

public entity.

In investigating this complaint, OCR reviewed documents submitted by both the complainant and the District, and interviewed the complainant, the District 504 Coordinator, and PTA staff persons. OCR has completed its investigation and found that the evidence shows that the District is providing significant assistance to an organization that operates a program from which the complainant's son has been excluded based on his disability. Therefore, OCR found the District in violation of Section 104.4(b)(1)(v) of the Section 504 regulation and 28 C.F.R. § 35.130(b)(1)(v) of the Title II regulation. The anticipated findings were communicated to the District on April 15, 1993, and it agreed to take voluntary action to resolve the area of noncompliance. The District submitted a corrective action plan on April 16, 1993, that, when implemented fully, is sufficient to remedy the violation.

This Letter of Findings (LOF) represents a summary of the facts gathered during the investigation, the applicable legal standard(s), and the compliance determinations made regarding the allegation raised in this case, and the corrective action agreed upon.

## Legal Standards

Section 504 and Title II protect any student who has a physical or mental impairment which substantially limits a major life activity, who has a record of such an impairment, or who is regarded as having an impairment.

The regulation implementing Section 504 at 34 C.F.R. § 104.4(a) states that no qualified [disabled] person shall, on the basis of [disability], be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance. 34 C.F.R. § 104.4(b)(1)(i)-(ii) requires that a recipient in providing any aid, benefit, or service, may not deny a qualified [disabled] person the opportunity to participate in or benefit from the aid, benefit, or service or afford an opportunity that is not equal to that afforded others.

Section 104.4(b)(1)(v) prohibits a recipient from aiding or perpetuating discrimination against a qualified [disabled] person by providing significant assistance to any agency, organization, or person that discriminates on the basis of [disability] in providing any aid, benefit, or service to beneficiaries of the recipient's program.

The regulation implementing Title II, at 28 C.F.R. § 35.130(a), and (b)(1)(i)-(ii) and (v) sets forth essentially identical requirements.

## Findings of Fact and Analysis

At several school sites in the District, including the College Park Elementary School, there are programs which offer classes immediately after regular school hours for school children who wish to participate. The College Park program is called the Sunshine Club (Club). It is operated by a non-profit organization, the PTA. The Club program commenced at the school in 1989. It serves children in all elementary grades at the school. Parents pay a fee of $25 to $40 per eight-week session for each class taken. The Club provides "enrichment classes." These

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

CVisPDF - www.foxite.com

Case 2:00-cv-00021   Document 33   Filed in TXSD on 10/05/2000   Page 50 of 56

19 IDELR 883

classes include recreational classes, arts and crafts classes, computer classes, and English as a Second Language classes.

OCR determined that the complainant's son, a person with insulin-dependent diabetes mellitus, is a "[disabled] person" as defined by the regulations implementing Section 504, and further that he is a "qualified [disabled] person" as defined by the regulation implementing Section 504 because he is a student enrolled in the school where the Club is offered and, therefore, meets the basic eligibility requirements. Under the Title II regulations, which use the identical standard but slightly altered language, he is a qualified individual with disabilities.

Because of his medical condition, A. has certain specialized needs including monitoring of his blood-sugar level and the availability of persons trained to administer glucagon and/or insulin on an as-needed basis. The District has developed a health care plan to address A.'s needs during regular school hours, based on information and medical protocols provided by his physician.

The complainant's son was a participant in the Club during the 1991-92 school year. The complainant states that, during that time, a school staff member with the training necessary to respond to A.'s health needs was available on the school grounds during the after-school hours. During the 1992- 93 school year, the District made a decision that the staff person would not continue to be on-campus during after-school hours while the Club was in session. The Club itself did not provide a similarly trained individual. The complainant alleges that the District discriminated against her son when it determined that it would not make available during the Club program, an individual trained to respond to A.'s health needs, resulting in A.'s inability to effectively participate in the Club.

Inasmuch as the Club is not a program of the District, but is operated by a private organization, the PTA, the District does not have a direct obligation to provide the service itself under Section 504 or Title II. The program operator, the PTA of Orange County, therefore is not a recipient of Federal financial assistance and is not a public entity. OCR has no jurisdiction over the PTA. However, the regulations implementing Section 504 and Title II prohibit the District from providing significant assistance to any agency, organization or person that discriminates on the basis of disability. OCR therefore explored whether the District was providing significant assistance to the PTA and if so, whether the failure of the Club to provide the services discriminated against A

## Significant Assistance

Departmental interpretations of 34 C.F.R. § 104.4(b)(1)(v) indicate that the following considerations should be examined to determine whether a recipient is providing "significant assistance" to a private group: (1) direct financial support; (2) indirect financial support; (3) provision of tangible resources such as staff and materials; (4) intangible benefits such as the lending of recognition and approval; (5) the selectivity of the recipient's provision of privileges and resources; and (6) whether the relationship is occasional and temporary or permanent and long-term. OCR examined to what extent these factors were present in the relationship between the District and the PTA Club program.

The District does not fund or subsidize any of the program's staff, and

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

19 IDELR 883

District staff do not appear to play a formal role in the operation of the program. The teachers involved are not paid for their participation in the Club by the District but rather by the organization. OCR found no direct provision of financial or staffing resources.

However, OCR did find evidence of significant indirect assistance. Based on a review of District documents and interviews with PTA and District personnel, OCR found that the Club program is located in permanent school buildings. It is not disputed that the program is housed on a District site on a permanent and long-term basis. A copy of the "Application and Permit for Use of School Facilities" shows that the provider uses "playing fields and classrooms" at the College Park Elementary School site.

The facilities-use form shows that the District has not charged the PTA a fee for the use of the facilities at the School. The PTA acknowledges that it does not pay a facilities-use fee to the District. In addition the District pays the utility and maintenance costs.

Additionally, the PTA advertises its program to parents by furnishing leaflets to students at the school site; the students then distribute them to parents. The College Park Press, a school newsletter advertises the Sunshine Club program. While the District does not operate the Club program, the Club program is closely identified with the District and benefits from that identification.

OCR finds that the District provides significant assistance to the PTA Sunshine Club program at the College Park Elementary School. The District has a substantial relationship with the program. While the District does not provide direct financial support or staff, it provides indirect financial support as well as assistance to the programs in a number of other ways. The facts meet the standards for finding significant assistance.

## Failure to Provide Modification

As explained above, under the Section 504 and Title II regulations the District may not continue to provide significant assistance to the PTA and its program, if A. is being subjected to discrimination in the program. OCR therefore sought to determine whether the failure of the PTA to provide A. with a person trained to respond to his health needs, after the school personnel were no longer available, resulted in discrimination. While the PTA, as a private organization, is not directly subject to Section 504 or Title II, OCR used the standards of the Section 504 and Title II regulations to determine if discrimination has occurred.

Qualified students with disabilities may not be denied equal opportunity to participate. The requirement to provide equal opportunity includes a requirement to make such modifications in a program as are necessary to enable the individual with disabilities to participate effectively. The modifications must be provided unless they would fundamentally alter the nature of the program or create an undue hardship on the program.

As mentioned above, the complainant made a request to the District for the provision of an appropriately trained person as necessary for A. to participate safely and effectively in the Club program during the 1992-93 school year. Specifically, in October 1992, the complainant requested that there be someone at the school site, during the Club hour, who was trained to ensure the accuracy

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 2:00-cv-00021  Document 33  Filed in TXSD on 10/05/2000  Page 52 of 56

of blood-sugar readings and understand how and when to follow the protocols including, if necessary, the administration of glucagon or insulin to A. The District declined to provide the service.

On or about October 27, 1992, the complainant spoke with the school PTA Sunshine Club president. In that conversation the complainant related that she had recently requested of the District the provision of a trained person to be available to administer, as needed, A.'s medical protocol during the Club program time. The response was that the PTA regretted that A. would not be able to participate in the Club. The PTA was thus aware of the complainant's request for provision of a trained person to be available to administer A.'s medical protocol during the Club program, but failed to offer the means to allow him to participate.

OCR examined whether the availability of trained personnel was medically necessary for A. during the one hour after school (2:30-3:30 p.m.) that the Club program is in session. To make this determination, OCR reviewed the medical protocol and the letters sent to the District in calendar years 1992 and 1993 from A.'s endocrinologist who has been his attending physician since 1986, and from a registered nurse who has knowledge of A.'s condition and health needs. OCR also reviewed the health care program developed by the District to address A.'s needs during the regular school day. The program included following the protocol and the provision of a trained person and a back-up person to administer glucagon or insulin to A. on an as-needed basis. OCR noted that neither the protocol nor the letters to the District indicate whether, when written, they were intended to apply to the hour after school, during the PTA Club.

The District in its letter of October 26, 1992 to the complainant proposed that in order to address A.'s needs for the Club program time, a blood-sugar count could be taken at the end of the school day. The letter did not state, but clearly implied that, if the blood-sugar level readings required action at that time, District staff would then follow the procedures in A.'s health-care program. The letter further proposed that, if problems arose during the Club program, paramedics would be called. The District asserted to OCR that this proposal would have been medically adequate to allow A. to participate in the Club program.

OCR asked for a response to the District proposal from A.'s physician. The physician's letter of response, dated April 2, 1993, and the medical logs sent to OCR by the parent clearly illustrate that drastic blood-sugar changes can take place within as little time as one-half hour, which is less than the time period of the Club program. These drastic blood-sugar level changes may result in loss of coordination and of the ability to reason. A. is not capable of administering to his own health needs under those conditions. Because A.'s health status can change dramatically within a very short period of time and the consequences of delay in treatment are severe, the physician's position is that the full protocols for A. are to be in place at all times including throughout the Club program time period. While the District believes that it's proposal is an adequate substitute, it did not provide OCR with a professional medical opinion to support this position.

Based upon the preponderance of the evidence gathered, OCR concluded that the provision of an appropriately trained person as requested by the complainant is

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

19 IDELR 883

medically necessary for A. to participate effectively in the Club after-school program. The PTA Sunshine Club was provided with notice that A. could not participate without this service, but failed to offer to provide it. During the investigation, OCR asked a PTA representative whether a trained person could be provided. The representative stated that she did not know and that the PTA would have to confer further. OCR recognizes that the PTA may not have been aware that it could not continue to receive significant assistance from the District unless it complied with the nondiscriminatory requirements of Section 504 and Title II. Nevertheless, the fact that neither the District nor the PTA offered to provide the necessary modifications had the effect of excluding A. from the Club program based on his disability.

## Conclusions

Based on the evidence summarized above, OCR concluded that the District provides significant assistance to the PTA Club program and that A. was denied the opportunity to effectively participate in the program based on his disability. Under these circumstances, pursuant to 34 C.F.R. Section 104.4(b)(1)(v) and 28 C.F.R. 35.130(b)(1)(v), the District was required either to ensure provision of the necessary services or to cease providing significant assistance to the PTA program. If, prior to taking such action, the District wished to assert the position that the requested modifications were not medically necessary, it had the obligation to obtain professional medical opinion to support that position. Since the District did not take the necessary steps, OCR finds that the District violated the above-cited regulations.

Although the complainant has not alleged to OCR that the District attempted to intimidate her in the matter of her request to the District for services for A., OCR had a concern about certain correspondence from the District to the complainant.

In a letter of October 22, 1992, to the District the complainant asserted that she would take any action necessary to resolve the matter of her request for a modification for her son so that he could participate in the Club program. In its letter of response dated October 26, 1992, the District stated, " . . .we would hope that you'd provide a more supportive attitude to the efforts already made by the staff at College Park to accommodate your son. . . ." and "It is my sincere hope that your action will not jeopardize the availability of the PTA sponsored program that benefits many children both handicapped and nonhandicapped."

OCR believes that the language used by the District in its letter of October 26, 1992 is the type of response that may intimidate a parent requesting services for a child with disabilities and ultimately deter a parent from seeking services to which his or her child may be entitled. Intimidatory action are prohibited by Section 504 and Title II. Although OCR makes no finding as to whether intimidation occurred in this case, it cautions the District against th use of such language. An appropriate response is to set forth the District position and provide notice of the District grievance procedures for complaints of discrimination and/or due process procedures for resolution of free appropriate public education issues.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

19 IDELR 883

## Remedial Action

During discussions on April 15, 1993, OCR informed District representatives of its anticipated findings and discussed voluntary settlement through a corrective action plan. On April 16, 1993, OCR received a remedial plan in which the District agreed to adopt and implement a policy whereby the District will not provide significant assistance to any agency, organization, or individual that discriminates on the basis of disability. The District also agreed to provide notice of this policy to agencies, organizations, and individuals to which it provides significant assistance, and will request that any such agency, organization, or individual (a) provide qualified individuals with disabilities an equal opportunity to participate, and (b) reasonably modify their programs, to include providing supplementary services and aids as necessary for individuals with disabilities to effectively participate without increased cost to the individuals with disabilities.

Additionally, the District will advise the PTA of the PTA's obligation to provide reasonable modification and services that are medically necessary for the complainant's son to participate in the PTA Sunshine Club at College Park Elementary School. If the PTA refuses to provide the services, the District will not continue to provide assistance to the PTA unless the PTA can demonstrate that providing the services would result in a fundamental change in the program or an undue burden on the PTA.

Based upon the District commitments contained in its letter to OCR, and conditional upon full implementation of the commitments, OCR finds the District currently in compliance with Section 504 and Title II concerning the issues discussed in this letter of findings. OCR will monitor the District actions in fulfilling the terms of the corrective action plan. The investigation will be subject to reopening should the District fail to fulfill its obligation as agreed to in the corrective action plan.

This case is being closed with the issuance of this letter. The findings set forth pertain exclusively to the specific issues raised by you. They are not intended, and should not be interpreted, to express opinions as to the District's civil rights compliance with respect to any other individual or any issue not discussed in this letter, and do not preclude OCR from investigating any future allegation of discrimination.

Under the Freedom of Information Act, it may be necessary to release this document and related records on request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personal information which if released, could reasonably be expected to constitute an unwarranted invasion of privacy.

If you have any questions pertaining to this Letter of Findings, please contact Mr. Mack C. Hall, Director, Compliance Division II, at (415) 556-7035.

John E. Palomino
Regional Civil Rights Director

[Index]

AMERICANS WITH DISABILITIES ACT (ADA); AMERICANS WITH DISABILITIES ACT (ADA);

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 2:00-cv-00021   Document 33   Filed in TXSD on 10/05/2000   Page 55 of 56

19 IDELR 883

Significant Assistance to PTA Implicated Section 504/ADA

Nonacademic Services; Other Nonacademic Services; Significant Assistance to PTA Implicated Section 504/ADA

Rehabilitation Act (Section 504); Facilities/Persons Covered by Section 504; Significant Assistance to PTA Implicated Section 504/ADA

19 IDELR 883
END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHRISTOPHER E.P., b/n/f | § | |
| ROSE V. | § | |
|      Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO: C-00-021 |
| | § | |
| CORPUS CHRISTI INDEPENDENT | § | |
| SCHOOL DISTRICT AND CITY OF | § | |
| CORPUS CHRISTI, TEXAS | § | |
|      Defendants | § | |

## **ORDER**

The City of Corpus Christi's Motion for Summary Judgment is DENIED.

Signed this _____ day of _____, 2000.

_____
UNITED STATES DISTRICT JUDGE

Page 14